IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN WRENN, et al., | ) | Case No. 15-CV-162-FJS |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

COME NOW the Plaintiffs, Brian Wrenn, Joshua Akery, Tyler Whidby, and the Second

Amendment Foundation, Inc., by and through undersigned counsel, and submit their

Memorandum of Points and Authorities in Support of their Motion for Preliminary Injunction.

Dated: February 6, 2015                    Respectfully submitted,

                                           Alan Gura (D.C. Bar No. 453449)
                                           Gura & Possessky, PLLC
                                           105 Oronoco Street, Suite 305
                                           Alexandria, VA 22314
                                           703.835.9085/Fax 703.997.7665


                                    By:  /s/ Alan Gura_____
                                           Alan Gura
                                           Attorney for Plaintiffs

## TABLE OF CONTENTS

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.    The Regulatory Scheme. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    2.    The Regulatory Scheme's Application Against Plaintiffs. . . . . . . . . . . . . . . . . . . 6

Summary of Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.    Plaintiffs are Likely to Succeed on the Merits of Their Claims. . . . . . . . . . . . . . 10

        A.    Requiring a "Good" or "Proper" Reason to Exercise a
            Fundamental Right Destroys the Right's Very Nature. . . . . . . . . . . . . . 10

        B.    Defendant Lanier's Generalized Discretion to Deny Carry
            Licenses, and the "Good Reason"/"Other Proper Reason"
            Standard, Both Constitute Unlawful Prior Restraints. . . . . . . . . . . . . . . 17

        C.    Defendants' Licensing Scheme Fails Any Level of
            Means-Ends Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    II.    Defendants' Licensing Scheme Irreparably Harms Plaintiffs. . . . . . . . . . . . . . . 21

    III.    The Balance of Equities Favors Granting Injunctive Relief. . . . . . . . . . . . . . . . 22

    IV.    The Public Interest Warrants Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . 23

    V.    No Bond or Other Security Is Required as a Condition of Injunctive Relief.. . . . 23

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TABLE OFAUTHORITIES

Cases

*Aamer* v. *Obama*,
    742 F.3d 1023 (D.C. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bateman* v. *Perdue*,
    881 F. Supp. 2d 709 (E.D.N.C. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Beal* v. *Stern*,
    184 F.3d 117 (2d Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bsharah* v. *United States*,
    646 A.2d 993 (D.C. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
    486 U.S. 750 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Clark* v. *Jeter*,
    486 U.S. 456 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Davis* v. *District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*District of Columbia* v. *Heller*,
    554 U.S. 574 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15, 19-22

*Doctor's Assocs.* v. *Stuart*,
    85 F.3d 975 (2d Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Drake* v. *Filko*,
    724 F.3d 426 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Ezell* v. *City of Chicago*,
    651 F.3d 684 (7th Cir 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22

*Federal Prescription Serv.* v. *American Pharmaceutical Ass'n*,
    636 F.2d 755 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Fletcher* v. *Haas*,
    851 F. Supp. 2d 287 (D. Mass. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gordon* v. *Holder*,
721 F.3d 638 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Isaacson* v. *Horne*,
716 F.3d 1213 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Kachalsky* v. *Cnty. of Westchester*,
701 F.3d 81 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 19

*Largent* v. *Texas*,
318 U.S. 418 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Moore* v. *Madigan*,
702 F.3d 933 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mosby* v. *Devine*,
851 A.2d 1031 (R.I. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 17

*Palmer v. District of Columbia*, No. 09-CV-1482,
2014 U.S. Dist. LEXIS 101945 (D.D.C. July 24, 2014) . . . . . . . . . . . . . . . . . . . . 1, 10, 13

*Parker* v. *District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People* v. *Zerillo*,
219 Mich. 635, 189 N.W. 927 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 15, 17

*Peruta* v. *Cnty. of San Diego*,
742 F.3d 1144 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-14, 17, 19, 21

*Ross* v. *Meese*,
818 F.2d 1132 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Schubert* v. *De Bard*,
398 N.E.2d 1339 (Ind. App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 17

*Speiser* v. *Randall*,
357 U.S. 513 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*State* v. *Reid*,
    1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Staub* v. *City of Baxley*,
    355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Verdugo-Urquidez*,
    494 U.S. 259 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Woollard* v. *Gallagher*,
    712 F.3d 865 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19


Constitutional Provisions

U.S. Const. amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S. Const. amend. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S. Const. amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S. Const. amend. IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


Statutes, Rules and Regulations

24 D.C.M.R. § 2333.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9

24 D.C.M.R. § 2333.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

24 D.C.M.R. § 2333.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

24 D.C.M.R. § 2334.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

Ariz. H.B. 2036 § 9(B)(1), (2012), available at http://www.azleg.gov/
    legtext/50leg/2r/bills/ hb2036s.pdf, archived at http://perma.cc/
    KA77-TMQ8 (last visited Feb. 6, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D.C. Act 17-690, 56 D.C. Reg. 1162 (Jan. 16, 2009) . . . . . . . . . . . . . . . . . . . . . 2

D.C. Act 20-0564, 62 D.C. Reg. 866 (Jan. 6, 2015) . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Act 20-447, 61 D.C. Reg. 10765 (Oct. 9, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Act 20-462, 61 D.C. Reg. 11814 (Dec. 16, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 22-4504(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 22-4506(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4, 18

D.C. Code § 7-2509.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

D.C. Code § 7-2509.11(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

D.C. Code § 7-2509.11(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Civ. P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Other Authorities

Gary Kleck & Marc Gertz, *Armed Resistance to Crime:*
    *The Prevalence and Nature of Self- Defense with a Gun*,
    86 J. Crim. L. & Criminology 150 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Henry Campbell Black, A Dictionary of Law (1891). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*,
    38 Wm. & Mary L. Rev. 1311 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Mike DeBonis, "Security, not street crime, at risk after gun ruling,
    D.C. Police Chief Cathy Lanier says," *Washington Post*,
    July 30, 2014, available at http://www.washingtonpost.com/
    local/dc-politics/security-not-street-crime-at-risk-after-gun-
    ruling-dc-police-chief-cathy-lanier-says/2014/07/30/
    f8b17e1c-1808-11e4-9e3b-7f2f110c6265_story.html
    (last visited Feb. 6, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Press Release, *Mayor Gray, Chairman Mendelson and*
    *Councilmember Wells Propose Emergency*
    *Firearm Legislation*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PRELIMINARY STATEMENT

If the Second Amendment guarantees individuals a meaningful right to carry handguns for self-defense, as this Court has already determined in the related case of *Palmer v. District of Columbia*, No. 09-CV-1482, 2014 U.S. Dist. LEXIS 101945 (D.D.C. July 24, 2014), the city cannot demand that individuals prove some "special reason" to exercise this fundamental right. Of course, the city remains free to regulate the carriage of guns in the interest of public safety, *e.g.*, by imposing time, place and manner restrictions, or preventing violent felons and the mentally ill from accessing handguns. But the concept of a "fundamental right," as understood in the United States of America, does not allow the police to adopt a rule forbidding its exercise by the "general community," with rare and special exceptions according to the police chief's idea of a "good" or "proper" reason to exercise the *right*.

The *Palmer* plaintiffs have argued that the city's revived discretionary standard for the licensing of handgun carriage does not satisfy this Court's standards, and that the city's continuing enforcement of its prohibition against carrying handguns for self-defense without a license is contemptuous of the Court's injunction in that case. The instant case does not withdraw those arguments. It does, however, resolve city's various objections to this Court reaching the merits of the essential questions now outstanding in *Palmer*: Will this Court's decision in *Palmer* make any practical difference in enabling people to carry handguns for self-defense? Or may the city nullify *Palmer* by pretending that a fundamental right is honored by a rule providing that no one may exercise it unless and until the Police Chief believes it's a good idea?

1

Plaintiffs are committed to providing this Court every platform and every opportunity in which to resolve this issue. The city complained that the *Palmer* plaintiffs did not test the revived licensing law. Plaintiffs here have done so and been denied. The city complained that its appeal deprived this court of power to enforce its earlier order, and to determine whether or not the city's revived licensing regime fails constitutional standards. Here, then, is a fresh complaint.

The arguments will look familiar, as the Constitution has not been recently amended. In this context, considering that Plaintiffs continue to suffer irreparable harm in that their fundamental rights are being infringed, they are entitled to a preliminary injunction.

STATEMENT OF FACTS

*The Regulatory Scheme*

As modified by current emergency legislation, D.C. Act 20-0564, 62 D.C. Reg. 866 (Jan. 6, 2015), D.C. Code § 22-4504(a) provides, "No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon." The first violation of this section by a non-felon, carrying an unlicensed handgun outside the home, is punishable by a fine and imprisonment of up to five years.

From 1932 until 2009, D.C. Code § 22-4506(a) purportedly authorized the District of Columbia's Police Chief to issue licenses to carry handguns. But "[i]t [was] common knowledge . . . that with very rare exceptions licenses to carry pistols have not been issued in the District of Columbia for many years and [were] virtually unobtainable." *Bsharah* v. *United States*, 646 A.2d 993, 996 n.12 (D.C. 1994). The section was repealed, effective May 20, 2009. See D.C. Act 17-690, 56 D.C. Reg. 1162, 1165 (Jan. 16, 2009).

2

As revived by current emergency legislation, D.C. Code § 22-4506(a) provides:

> The Chief of the Metropolitan Police Department ("Chief") may, upon the application of any person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

The current form of D.C. Code § 22-4506(a) is essentially unchanged from its previous iteration. In reviving the provision, the City Council and Mayor intended to reinstate the same licensing standards previously reflected by the provision. See Press Release, *Mayor Gray, Chairman Mendelson and Councilmember Wells Propose Emergency Firearm Legislation*.

Under current emergency legislation, a provision to be codified at D.C. Code § 7-2509.11 provides that the Police Chief "shall issue rules . . . including rules:

> (1) To establish criteria for determining when an applicant has, pursuant to section 6 of the Pistols and Other Dangerous Weapons Act [D.C. Code § 22-4506]:
>
> > "(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life;
> >
> > "(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person;

Permanent legislation containing the same provisions has passed the D.C. City Council and is expected to become law. At all times relevant to the acts and omissions referenced here, substantially similar provisions were in force in the District of Columbia. See D.C. Act 20-447, 61 D.C. Reg. 10765 (Oct. 9, 2014); D.C. Act 20-462, 61 D.C. Reg. 11814 (Dec. 16, 2014).

3

Defendant Lanier has adopted various regulations regarding the licensing of individuals to carry handguns, including:

- "A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life." 24 D.C.M.R. § 2333.1;

- "For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person. The person shall also allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger." 24 D.C.M.R. § 2333.2;

- "The person shall provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not the applicant has made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack." 24 D.C.M.R. § 2333.3;

- "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license." 24 D.C.M.R. § 2333.4; and

- "A person may allege any other proper reason that the Chief may accept for obtaining a concealed carry license which may include: (a) Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or (b) The need for a parent, son, daughter, sibling, or other adult member of the immediate family to provide protection of a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, and the family member who is physically or mentally incapacitated can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333." 24 D.C.M.R. § 2334.1.

Defendants promulgate a "Concealed Carry Pistol License Application" form, required of all individuals seeking to apply for a concealed carry license under D.C. Code § 22-4506(a). See Exhibit D. The third page of that form begins as follows:

4

**Basis for a Request for a Concealed Carry Pistol**

Under District law, an applicant must demonstrate that either they [sic] have good reason to fear injury to himself or herself or property or they [sic] have another proper reason for carrying a concealed pistol.

> *Please check the box below that is the basis of your application and attach the additional documentation as described on the Instructions form.*

**[ ] Good reason to fear injury to person or property**: You fear injury to yourself and can show a special need for self-protection, such as evidence of specific threats or previous attacks which demonstrate a special danger to your life.

**[ ] Other proper reason to carry a concealed pistol**: Your employment requires that you handle large amounts of cash or valuables that you must transport on your person. Or you are the adult member of a family that needs to provide protection for a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself or his or her property.

An attachment to Defendants' "Concealed Carry Pistol License Application" form entitled "Basis for Request for a Concealed Carry Pistol" license instructs: "District of Columbia law requires you to demonstrate that: (1) you have good reason to fear injury to yourself or your property; or (2) you have another proper reason for carrying a concealed pistol." Exh. D, at 4. Accordingly, the "Basis for Request" form requests a personal statement as to the applicant's "Good Reason" or "Other Proper Reason" for seeking a license. With respect to a "Good reason," the form provides:

**Demonstration of Good Reason to Fear Injury to Person or Property**

To demonstrate a good reason to fear injury to yourself, you must:

- Show a special need for self-protection distinguishable from the general community, as supported by evidence of specific threats or previous attacks which demonstrate a special danger to your life.

- Allege serious threats of death or serious bodily harm, any attacks on yourself, or any theft of property from your person.

5

- Allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.

- Provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not you made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.

**Pursuant to District of Columbia law, the fact that you live or work in a high crime area shall not by itself establish a good reason to fear injury to yourself or your property for the issuance of a concealed carry license.**

*Id.* With respect to "Other Proper Reason," the "Basis for Request" form provides:

**Demonstration of Other Proper Reason for a Concealed Carry License**

This may include: (1) employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported on your person; or (2) the need for you to provide protection of a family member who is physically or mentally incapacitated to a point where that family member cannot act in defense of himself or herself, or his or her property. You can include any documents (such as police reports or court documents) and/or personal statements to demonstrate that you have a proper reason to be issued a Concealed Carry License.

*Id.*

Defendants' "Instructions for Submitting an Application for a Concealed Carry Pistol

License" provide:

In the **Basis for Request for a Concealed Carry Pistol** section of the application, you must demonstrate that either you have a good reason to fear injury to yourself or your property, or you have another proper reason for carrying a concealed pistol. You must submit a personal statement and any evidence or documentation that supports the basis for your request. If you include any statements from a third party, the statements must be made under oath and before a notary.

Exh. E, at 2.

*The Regulatory Scheme's Application Against Plaintiffs*

Plaintiffs Brian Wrenn and Joshua Akery each possess validly registered handguns within

the District of Columbia. Wrenn Decl., ¶ 1; Akery Decl., ¶ 1. Akery is licensed by Pennsylvania

6

and Utah to carry a concealed handgun for self-defense. Akery Decl., ¶ 1. Whidby possesses

handguns that are registerable in the District of Columbia for carriage by non-residents, and

holds a Florida license to carry a concealed handgun for self-defense. Whidby Decl., ¶ 1.

Wrenn, Akery, and Whidby, and other members of Plaintiff SAF would each carry a

functional handgun in public in the District of Columbia for self-defense, but refrain from doing

so for fear of arrest, prosecution, fine, and imprisonment on account of their inability to obtain a

concealed handgun carry permit for lack of "Good Reason" or "Other Proper Reason." Wrenn

Decl., ¶ 2; Akery Decl., ¶ 2; Whidby Decl., ¶ 2; Gottlieb Decl., ¶ 6.

Wrenn, Akery, and Whidby each applied to Defendant Lanier for a license to carry a

handgun. Wrenn Decl., ¶ 6; Akery Decl., ¶ 6; Whidby Decl., ¶ 6. Apart from the "Good Reason"

or "Other Proper Reason" requirement, they would each be able to qualify for a Washington,

D.C. license to carry a handgun. Wrenn Decl., ¶ 3; Akery Decl., ¶ 3; Whidby Decl., ¶ 3.

Wrenn, Akery, and Whidby cannot "show a special need for self-protection, such as

evidence of specific threats or previous attacks which demonstrate a special danger to [their]

lives]." They cannot "[a]llege serious threats of death or serious bodily harm, any attacks on

[themselves], or any theft of property from [their] person[s]." They cannot "[a]llege that the

threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution

against the apprehended danger," and have made no police or court reports in Washington, D.C.

relating to such threats. Wrenn Decl., ¶ 4; Akery Decl., ¶ 4; Whidby Decl., ¶ 4.

Wrenn and Akery do not have employment that "requires that [they] handle large

amounts of cash or valuables that [they] must transport on [their] person[s]," and they are not

required to provide protection for any "family member who is physically or mentally

7

incapacitated to a point where that family member cannot act in defense of himself or herself or

his or her property."  Wrenn Decl., ¶ 5; Akery Decl., ¶ 5. Accordingly, neither Wrenn nor Akery

attempted to demonstrate a "Good Reason" or "Other Proper Reason" for obtaining a handgun

carry permit in applying to Defendant Lanier. Wrenn Decl., ¶ 6; Akery Decl., ¶ 6.

On January 27, 2015, Defendant Lanier denied Wrenn's application for a license to carry

a handgun on grounds that Wrenn did not

> Demonstrate a good reason to fear injury to person or property, or other proper reason for
> a concealed carry license. Specifically, the applicant did not meet the minimum
> requirement of showing: "a special need for self-protection distinguishable from the
> general community as supported by evidence of specific threats or previous attacks that
> demonstrate a special danger to the applicant's life," (D.C. Official Code § 7-
> 2509.11(1)(A)) and therefore did not receive further consideration.

Wrenn Decl., ¶ 7; Exh. A.

On January 27, 2015, Defendant Lanier denied Akery's application for a license to carry a

handgun on grounds that Akery did not

> Demonstrate a good reason to fear injury to person or property, or other proper reason for
> a concealed carry license. Specifically, the applicant did not meet the minimum
> requirement of showing: "a special need for self-protection distinguishable from the
> general community as supported by evidence of specific threats or previous attacks that
> demonstrate a special danger to the applicant's life," (D.C. Official Code § 7-
> 2509.11(1)(A)) and therefore did not receive further consideration.

Akery Decl., ¶ 7; Exh. B.

Whidby is a federal firearms licensee, doing business in Virginia. Whidby Decl., ¶ 1.

Whidby applied to Defendant Lanier for a license to carry a handgun because he wishes to

lawfully carry a handgun in the District of Columbia for self-defense and the defense of his

family, including young children, who are not physically able to defend themselves on account of

their age. At the time Whidby applied, 24 D.C.M.R. § 2334.1 did not require that the family

8

member to be protected demonstrate a special need under § 2333.1. Whidby also lawfully

transports firearms through the District of Columbia in connection with his business. Whidby

included those reasons as the "Good Reason" and "Other Proper Reason" for seeking a handgun

carry license. Whidby Decl., ¶¶ 5, 6.

On January 23, 2015, Defendant Lanier denied Whidby's application for a license to carry

a handgun on grounds that Whidby did not

> Demonstrate a good reason to fear injury to person or property, or other proper reason for
> a concealed carry license. Specifically, the applicant did not meet the minimum
> requirement of showing: "Employment of a type that requires the handling of large
> amounts of cash or other highly valuable objects that must be transported upon the
> applicant's person." (D.C. Official Code § 7-2509.11(1)(A). The applicant also wrote
> that he has two family members that are physically or mentally incapacitated, the
> applicant did not demonstrate that the referenced family member(s) had a "special need
> for self-protection distinguishable from the general community as supported by evidence
> of specific threats or previous attacks that demonstrate a special danger to the applicant's
> life (D.C. Official Code § 7-2509.11(1)(A))  and therefore did not receive further
> consideration.

Whidby Decl., ¶ 7; Exh. C.

Other SAF members lacking a "Good Reason" or "Other Proper Reason" as described on

Defendants' application forms refrain from applying to Defendant Lanier for a license to carry a

handgun because doing so would be futile. Gottlieb Decl., ¶ 6.

### SUMMARY OF ARGUMENT

As this Court has already found, in rejecting Defendants' motion for a stay in *Palmer*,

Plaintiffs are likely to prevail on appeal on the question of whether the Second Amendment

secures an individual right to carry handguns outside one's home for self-defense. Likewise,

Plaintiffs here are likely to succeed on the merits of their claim that the District's demand that

they submit a "good" or "proper" reason to exercise a fundamental right is unconstitutional.

9

Because plaintiffs are being deprived of a constitutional right, they are suffering irreparable harm. The balance of equities tips in their favor, as Defendants would not suffer any harm were an injunction issued. And enforcing the Constitution's requirements against recalcitrant officials is the very definition of the public interest.

ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer* v. *Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quotations omitted).

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

"[C]arrying a handgun outside the home for self-defense comes within the meaning of 'bear[ing] Arms'" under the Second Amendment . . . ." *Palmer*, 2014 U.S. Dist. LEXIS 101945 at *23. Defendants' handgun carrying licensing regime violate this Second Amendment right—as a virtual destruction of the right, as a prior restraint, and under means-ends scrutiny.

A.    Requiring a "Good" or "Proper" Reason to Exercise a Fundamental Right
       Destroys the Right's Very Nature.

This case can be resolved by recalling first principles. The concept of a "right" is simply not compatible with Defendants' licensing requirements for the act of carrying a handgun for self-defense. Traditionally, a "right" in the relevant sense was understood— and remains understood—as follows:

> As a *noun*, and taken in the *concrete* sense, a right signifies a power, privilege, faculty or demand, inherent in one person and incident upon another. "Rights" are defined generally as "powers of free action." And the primal rights pertaining to men are undoubtedly

10

enjoyed by human beings purely as such, being grounded in personality, and existing
anecdotally to their recognition by positive law.

Henry Campbell Black, A Dictionary of Law 1044 (1891). A "right" to do something only when

the police determine one has a "good" or "proper" reason to do it, is not much of a right. People

would scoff at "rights" to due process, or against unreasonable searches and seizures, only when

the police chief agrees that someone has an unusually "good" or "proper" reason to enjoy those

rights. It is incredibly simple to construct public safety arguments against these (and any other)

rights. Perhaps in a future constitutional convention, the people of the United States might

determine that Fourth and Fifth Amendments' costs outweigh their benefits. But for now, the

police chief's personal opinion about someone's "good" or "proper" reason to demand a warrant

is not a factor in determining the applicability of Fourth Amendment rights, and the prosecutor's

strong belief in the desirability of a conviction does not determine what process is "due."

   The right to bear arms is no different. So long as there is no reason to bar someone from

carrying a handgun, the police chief's opinion about the wisdom of this right is unimportant.

Restricting the right to carry handguns only to those with a "good" or "proper" reason destroys

the Second Amendment right. Defendants' licensing regime presumes that people are not entitled

to carry guns, and burdens applicants with the task of proving the social value of their right. But

"a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory

presumption any more than it can be violated by direct enactment. The power to create

presumptions is not a means of escape from constitutional restrictions." *Speiser* v. *Randall*, 357

U.S. 513, 526 (1958) (citation omitted).

Moreover, constitutional rights are enjoyed by "the people." See U.S. Const. amend. II ("right of the people); U.S. Const. amend. I (same); U.S. Const. amend. IV (same); U.S. Const. amend. IX ("rights . . . retained by the people"). "[T]he term ['the people'] unambiguously refers to all members of the political community, not an unspecified subset." *District of Columbia* v. *Heller*, 554 U.S. 574, 580 (2008).

> "[T]he people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* (quoting *United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Thus, a right cannot be something enjoyed only by people with a "special need . . . distinguishable from the general community." D.C. Code § 7-2509.11(1)(A). If bearing arms is "a right of the people," it cannot possibly be denied to the "general community" absent "special need." Nor is the right purchased with the carriage of cash or valuables. The interest in self-defense is, after all, primarily an interest in defending human life, not material wealth.

Three courts have struck down this level of licensing discretion as being incompatible with a right to bear arms. *Peruta* v. *Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014); *Schubert* v. *De Bard*, 398 N.E.2d 1339 (Ind. App. 1980); *People* v. *Zerillo*, 219 Mich. 635, 189 N.W. 927 (1922). A fourth court indicated, albeit in dicta, that such a licensing scheme would be unconstitutional. *Mosby* v. *Devine*, 851 A.2d 1031 (R.I. 2004).[1] Of these, *Peruta* is most

---

[1] Although three courts have upheld "may issue" licensing schemes, one of these agreed with Plaintiffs' essential point that such a scheme is incompatible with the right's existence. *Compare Drake* v. *Filko*, 724 F.3d 426 (3d Cir. 2013) (may issue scheme is evidence that right was unknown) and *Woollard* v. *Gallagher*, 712 F.3d 865 (4th Cir. 2013) (right to carry assumed); *Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) (same).

instructive. This Court has followed *Peruta*'s reasoning before. It should do so again.

*Peruta* addressed San Diego County's "good cause" policy for the issuance of handgun carry permits. *Palmer*, 2014 U.S. Dist. LEXIS 101945, at *14 n.2. The *Peruta* appellants "place[d] one argument at center stage . . . that by defining 'good cause' in San Diego County's permitting scheme to exclude a general desire to carry for self-defense, the County impermissibly burdens their Second Amendment right to bear arms." *Peruta*, 742 F.3d at 1149. Specifically, San Diego County defined "good cause" as

> "[A] set of circumstances that distinguish the applicant from the mainstream and causes him or her to be placed in harm's way." Good cause is "evaluated on an individual basis" and may arise in "situations related to personal protection as well as those related to individual businesses or occupations." But—important here—concern for "one's personal safety alone is not considered good cause." . . . If the applicant cannot demonstrate "circumstances that distinguish [him] from the mainstream," then he will not qualify for a concealed-carry permit.

*Peruta*, 742 F.3d at 1148. "Given this requirement, the 'typical' responsible, law-abiding citizen in San Diego County cannot bear arms in public for self-defense; a *typical* citizen fearing for his 'personal safety'—by definition—cannot '*distinguish [himself] from the mainstream*.'" *Id.* at 1169.

This Court held that *Peruta* "addressed statutes very similar" to the District's previous illusory handgun carry licensing scheme, *Palmer*, 2014 U.S. Dist. LEXIS 101945, at *13, and indeed, there is no now practical daylight between San Diego County's "good cause" policies and Defendants' "good" or "proper" reason requirements. Moreover, in *Peruta*, as here, a license to carry a concealed handgun was the exclusive legal mode of bearing arms. The legal regime, as a whole, did "not cover the scope of the right, which includes the right to carry *in case of public confrontation* . . . ." *Peruta*, 742 F.3d at 1169. The Second Amendment "is, in effect, destroyed

13

when exercise of the right [to bear arms] is limited to a few people, in a few places, at a few times." *Id*. at 1170.

"A statute which, under the pretence of regulating, amounts to a destruction of the right . . . would be clearly unconstitutional." *Id.* (quoting *Heller*, 554 U.S. at 629); *State* v. *Reid*, 1 Ala. 612, 616-17 (1840). "*Heller* teaches that a near-total prohibition on keeping arms (*Heller*) is hardly better than a near-total prohibition on bearing them (this case), and vice versa. Both go too far." *Peruta*, 742 F.3d at 1170.

In *Schubert*, the Indiana Court of Appeals rejected a licensing official's claim that a statutory "proper reason" requirement allowed him to reject handgun carry license applications for an applicant's insufficient self-defense interest. The court rejected the notion that the licensing official had "the power and duty to subjectively evaluate an assignment of 'self-defense' as a reason for desiring a license and the ability to grant or deny the license upon the basis of whether the applicant 'needed' to defend himself." *Schubert*, 398 N.E.2d at 1341.

> Such an approach contravenes the essential nature of the constitutional guarantee. It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved.

*Id.* (footnote omitted).

In *Zerillo*, Michigan's Supreme Court struck down a statute prohibiting aliens from possessing revolvers without their Sheriff's consent. There, too, the licensing discretion was viewed as a destruction of a constitutional right to bear arms. "The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff. The part of the act under which the prosecution was planted is not one of regulation but is one of prohibition and

confiscation." *Zerillo*, 219 Mich. at 639, 189 N.W. at 928. "The [provision] making it a crime for

an unnaturalized, foreign-born resident to possess a revolver, unless so permitted by the sheriff,

contravenes the guaranty of such right in the Constitution of the State and is void." *Id.* at 642,

189 N.W.2d at 928.

> Albeit in dicta, Rhode Island's Supreme Court was in accord:

> [T]his Court will not countenance any system of permitting . . . that would be committed
> to the unfettered discretion of an executive agency. . . One does not need to be an expert
> in American history to understand the fault inherent in a gun-permitting system that
> would allow a licensing body carte blanche authority to decide who is worthy of carrying
> a concealed weapon. The constitutional right to bear arms would be illusory, of course, if
> it could be abrogated entirely on the basis of an unreviewable unrestricted licensing
> scheme.

*Mosby*, 851 A.2d at 1050.

The Third Circuit's opinion upholding such a licensing regime is also instructive. *Drake*

reasoned that 1913 and 1924 state laws mirroring Defendants' practice are "longstanding" and

thus evidence that the carrying of handguns itself falls outside the Second Amendment's scope.

*Drake*, 724 F.3d at 433-34. Of course, *Drake* cannot be right on this point. "Constitutional rights

are enshrined with the scope they were understood to have when the people adopted them,

whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*,

554 U.S. at 634-35. But *Drake* is essentially correct in acknowledging that a "justifiable need"

licensing standard is not compatible with the concept of a right.

The notion that a right is destroyed, and thus violated, by schemes that allow authorities

the discretion to determine whether an individual is entitled to exercise the right, is hardly limited

to the right to bear arms. Recently, for example, Arizona barred abortion at 20 weeks of gestation

absent a doctor's certificate of "medical emergency," invoking "documented risks to women's

15

health and the strong medical evidence that unborn children feel pain during an abortion at that gestational age." Ariz. H.B. 2036 § 9(B)(1), (2012), available at http://www.azleg.gov/legtext /50leg/2r/bills/hb2036s.pdf, archived at http://perma.cc/KA77-TMQ8 (last visited Feb. 6, 2015). The Ninth Circuit did not defer to the legislature's oversight of the medical profession, or the expert medical judgment of each doctor under the circumstances of each case.

> Allowing a *physician* to decide if abortion is medically necessary is not the same as allowing a *woman* to decide whether to carry her own pregnancy to term. Moreover, regulations involve limitations as to the mode and manner of abortion, not preclusion of the choice to terminate a pregnancy altogether.

*Isaacson* v. *Horne*, 716 F.3d 1213, 1217 (9th Cir. 2013).

> Adapted to present circumstances, the holding would read:

> Allowing *Defendant Lanier* to decide if carrying a handgun is necessary for self-defense is not the same as allowing *Brian Wrenn* to decide whether to carry his handgun. Moreover, regulations involve limitations as to the mode and manner of carrying handguns, not preclusion of the choice to carry a handgun altogether.

The Ninth Circuit continued, explaining that "[t]he presence of a medical exception does not make an otherwise impermissible prohibition constitutional. The adequacy of the medical exception has no bearing on whether the prohibition is permissible in the first place." *Id.* at 1227. Likewise, here, the presence of a "good reason" exception does not make constitutional the prohibition on bearing arms for the core purpose of self-defense. In *Isaacson*, a woman may not have had grounds for a medical exception, but she had Supreme Court precedent securing post-20 week abortions. Plaintiffs here plainly lack a "good" or "proper" reason, but they have a right to carry handguns for self-defense. Of course, the D.C. City Council would never prohibit abortions in this manner (or create databases to better ostracize and harass women who have had abortions), but that is only because councilmembers personally favor that right.

B.     Defendant Lanier's Generalized Discretion to Deny Carry Licenses, and the
       "Good Reason"/"Other Proper Reason" Standard, Both Constitute Unlawful Prior
       Restraints.

Although *Peruta*, *Zerillo*, *Schubert*, *Mosby* and *Isaacson* did not expressly say as much,

the common-sense proposition that a right becomes something else, of lesser stature, if it exists

only at the government's pleasure, has an established legal definition:

> It is settled by a long line of recent decisions of this Court that an ordinance which . . .
> makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent
> upon the uncontrolled will of an official—as by requiring a permit or license which may
> be granted or withheld in the discretion of such official—is an unconstitutional
> censorship or prior restraint upon the enjoyment of those freedoms.

*Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted). Indeed, long before *Heller*,

Prof. Powe reasoned that "[p]ossibly the Second Amendment can best be understood to

incorporate a common law rule against prior restraints." L.A. Powe, Jr., *Guns, Words, and*

*Constitutional Interpretation*, 38 Wm. & Mary L. Rev. 1311, 1384 (1997); see also *id.* at 1402

("the rule against prior restraints offers a sound meaning [for the Second Amendment]").

Some authorities have erroneously asserted that prior restraint is exclusively a First

Amendment doctrine, and on that ground hesitated to extend it to the Second Amendment

context. See, *e.g.*, *Kachalsky*, 701 F.3d at 91-92. But courts "have already begun to adapt First

Amendment doctrine to the Second Amendment context." *Ezell* v. *City of Chicago*, 651 F.3d

684, 706-07 (7th Cir 2011) (citations omitted); see also *Parker* v. *District of Columbia*, 478 F.3d

370, 399 (D.C. Cir. 2007). And as the right to bear arms stands among "the freedoms which the

Constitution guarantees," *Staub*, 355 U.S. at 322, Defendants' licensing regime constitutes an

unlawful prior restraint in two respects.

17

First, Defendants' handgun carry licensing regime allows Defendant Lanier wholly unbridled discretion to grant or deny applications, even when they fully satisfy all the licensing criteria. The police chief "*may* . . . issue" a license to qualified applicants. D.C. Code § 22-4506(a) (emphasis added). Nothing actually requires her to do so, and no rule purports to limit this ultimate level of discretion. The City Council understands the difference between "may" and "shall." While Lanier "may" issue licenses, she "shall" adopt a restrictive definition of "good reason" and "other proper reason." D.C. Code § 7-2509.11.

Lanier may counter that she would, in fact, issue licenses to all fully qualified applicants, but "[t]his presumes the [Chief] will act in good faith and adhere to standards absent from the ordinance's face . . . the very presumption that the doctrine forbidding unbridled discretion disallows." *City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750, 770 (1988) (citations omitted). Even were there limits to Section 22-4506(a)'s absolute "may . . . issue" discretion, they are not "made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Id.* (citations omitted). And "we have never held that a federal litigant must await a state-court construction or the development of an established practice before bringing the federal suit." *Id.* at 770 n.11 (citation omitted).

Second, nothing bars Lanier from exercising the type of unbridled discretion sanctioned by Section 22-4506(a)'s absolute "may issue" language by simply claiming that an applicant failed to establish a "good" or "other proper reason" for the license. This requirement is among the impermissible "illusory 'constraints'" on licensing discretion amounting to "little more than a high-sounding ideal." *City of Lakewood*, 486 U.S. at 769-70; see, *e.g. Largent* v. *Texas*, 318 U.S. 418, 422 (1943) (striking down ordinance allowing speech permit where mayor "deems it proper

or advisable"). It is not that Plaintiffs merely dislike the "standard." Plaintiffs dislike the

"standard" because it is meaningless, and effectively supplants their *entitlement* to exercise a

fundamental right for the purpose of self-defense with an administrative privilege dispensed at

the Chief's boundless discretion.

> The existence of standards does not in itself preclude a finding of unbridled discretion,
> for the existence of discretion may turn on the looseness of the standards or the existence
> of a condition that effectively renders the standards meaningless as to some or all persons
> subject to the prior restraint.

*Beal* v. *Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999).

> C.      Defendants' Licensing Scheme Fails Any Level of Means-Ends Scrutiny.

Assuming the revived licensing regime were subjected to the familiar "two-step" process,

the Court could not balance interests to determine whether there *should* be a right to bear arms.

Certainly the Court could not hold that a right inherently contradicts the public interest, the odd

implication of decisions such as *Kachalsky* and *Woollard*. While crediting the government's

public safety interest, the Court could not credit an interest in suppressing the right, as that would

essentially have the Court engage in the sort of interest-balancing *Heller* precluded. See *Peruta*,

742 F.3d at 1176-77. And if courts are to defer to the Government's discretion to ration a

"dangerous" right, then nothing prevents the Government from determining that no reason

suffices to exercise the right.

Nor is the "good reason/special need/proper reason" regime adequately tailored to a

public safety rationale under any level of scrutiny. This "standard" is not directed at dangerous

people, nor does it regulate the manner of carrying handguns, or impose any place restrictions. It

amounts to nothing more than a rationing system. See *Peruta*, 742 F.3d at 1177-78.

19

Courts have had little trouble striking down safety-based firearms laws that do not focus on dangerousness. For example, the District of Massachusetts struck down a state law barring lawful resident aliens from possessing guns "regardless of whether intermediate scrutiny or strict scrutiny applies." *Fletcher* v. *Haas*, 851 F. Supp. 2d 287, 303 (D. Mass. 2012).

> [T]he statute here fails to distinguish between dangerous non-citizens and those non-citizens who would pose no particular threat if allowed to possess handguns. Nor does it distinguish between temporary non-immigrant residents and permanent residents. Any classification based on the assumption that lawful permanent residents are categorically dangerous and that all American citizens by contrast are trustworthy lacks even a reasonable basis.

*Id.* And applying strict scrutiny, the Eastern District of North Carolina struck down, inter alia, laws barring handgun carrying during so-called "states of emergency," finding the laws

> do not target dangerous individuals or dangerous conduct. Nor do they seek to impose reasonable time, place and manner restrictions by, for example, imposing a curfew to allow the exercise of Second Amendment rights during circumscribed times. Rather, the statutes here excessively intrude upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest . . . .

*Bateman* v. *Perdue*, 881 F. Supp. 2d 709, 716 (E.D.N.C. 2012).

To be sure, strict scrutiny governs analysis of Defendants' licensing scheme. "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark* v. *Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Absent any reason for reducing the level of scrutiny, strict scrutiny should apply to protection of this fundamental right. Moreover, the type of discretionary licensing at issue here is not "longstanding," in that it has no remotely analogous antecedents in the Framing Era. "Longstanding" laws can inform the "scope" of the right that the Framers ratified, *Heller*, 554 U.S. at 626-27, because the fact that the right's ratification did not

20

disturb certain practices may be evidence that the Framers or those who followed soon after did

not view such practices as inconsistent with the right. But "1791, the year the Second

Amendment was ratified—[is] the critical year for determining the amendment's historical

meaning." *Moore* v. *Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (citation omitted). The Supreme

Court has "made clear that the scope of the Second Amendment right depends not on

post-twentieth century developments, but instead on the understanding of the right that

predominated from the time of ratification through the nineteenth century." *Peruta*, 744 F.3d at

1175 n.21. *Heller* was careful to confirm that "future legislatures" could not override "the scope

[rights] were understood to have when the people adopted them." *Heller*, 554 U.S. at 634.

In any event, considering the lack of a valid governmental interest in suppressing the

exercise of a fundamental right, and the fact that the discretionary regime here is aimed not at

dangerous people or dangerous behavior, but law-abiding people exercising a fundamental right,

the standard of scrutiny is unimportant. The licensing scheme fails any level of scrutiny.

Plaintiffs have no objection to standards that are actually aimed at ferreting out dangerous and

irresponsible people, and which do not trample on rights in the process of so doing. But rationing

the right only to those whom the Chief believes are especially deserving violates individual rights

without advancing any legitimate government interest.

II.    DEFENDANTS' LICENSING SCHEME IRREPARABLY HARMS PLAINTIFFS.

"[T]he denial of a constitutional right, if denial is established, constitutes irreparable

harm for purposes of equitable jurisdiction." *Ross* v. *Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987)

(citation omitted); *Davis* v. *District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). No

constitutional right is so directly linked to one's immediate physical well-being as is the right to

keep and bear arms. The interest in self-defense is the "*central component* of the [Second

Amendment] right itself," *Heller*, 554 U.S. at 599 (emphasis original). Though Defendants refuse

to acknowledge any positive social value to carrying guns, "there seems little legitimate scholarly

reason to doubt that defensive gun use is very common in the U.S., and that it probably is

substantially more common than criminal gun use." Gary Kleck & Marc Gertz, *Armed Resistance*

*to Crime: The Prevalence and Nature of Self- Defense with a Gun*, 86 J. CRIM. L. &

CRIMINOLOGY 150, 180 (1995). Plainly, the inability to access constitutionally-protected arms

impacts one's sense of security—to say nothing of the irreparable harm resulting from a

successful criminal attack that might have been averted with access to defensive arms.

> As the Seventh Circuit explained,

> The loss of a First Amendment right is frequently presumed to cause irreparable harm
> based on "the intangible nature of the benefits flowing from the exercise of those rights;
> and the fear that, if those rights are not jealously safeguarded, persons will be deterred,
> even if imperceptibly, from exercising those rights in the future." The Second
> Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the
> Amendment's central component is the right to possess firearms for protection.
> Infringements of this right cannot be compensated by damages.

*Ezell*, 651 F.3d at 699 (citations and footnote omitted).

Second Amendment violations inflict severe and irreparable harm that is not compensable

with money damages. The profound loss of security, and its possible consequences, when

individuals are denied adequate means of self-defense, cannot be quantified or remedied.

III.    THE BALANCE OF EQUITIES FAVORS GRANTING INJUNCTIVE RELIEF.

While Plaintiffs suffer irreparable harm when their fundamental rights are violated,

Defendants would not be harmed at all by the Court's injunction—a point virtually conceded by

Defendant Lanier. Commenting on this Court's decision striking down the total carry ban, Lanier

offered, "Law-abiding citizens that register firearms, that follow the rules, are not our worry."[2]

Nothing requested here impacts the city's handgun registration requirements, which are generally

stricter than state licensing requirements (if any) for the carrying of handguns, nor would the

injunction impact any city carry restrictions as to time, place, and manner.

IV.    THE PUBLIC INTEREST WARRANTS INJUNCTIVE RELIEF.

It is "obvious" that "enforcement of an unconstitutional law is always contrary to the

public interest." *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (citations omitted).

V.    NO BOND OR OTHER SECURITY IS REQUIRED AS A CONDITION OF INJUNCTIVE RELIEF.

Although Fed. R. Civ. P. 65(c) requires that a bond or other security be provided as a

condition of issuing preliminary injunctions, this requirement may be dispensed with when there

is no risk of financial harm. *Federal Prescription Serv.* v. *American Pharmaceutical Ass'n*, 636

F.2d 755, 759 (D.C. Cir. 1980); *Doctor's Assocs.* v. *Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

Even courts that view Rule 65(c) as mandatory are open to the idea of the bond being set at zero.

See *Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).

Given the nature of this case, the Court should dispense with the bond requirement.

---

[2]Mike DeBonis, "Security, not street crime, at risk after gun ruling, D.C. Police Chief Cathy Lanier says," *Washington Post*, July 30, 2014, available at http://www.washingtonpost. com/local/dc-politics/security-not-street-crime-at-risk-after-gun-ruling-dc-police-chief-cathy-lanier-says/2014/07/30/f8b17e1c-1808-11e4-9e3b-7f2f110c6265_story.html (last visited Feb. 6, 2015).

CONCLUSION

The Court should enter a preliminary injunction.

Dated: February 6, 2015                    Respectfully submitted,

                                           Alan Gura (D.C. Bar No. 453449)
                                           Gura & Possessky, PLLC
                                           105 Oronoco Street, Suite 305
                                           Alexandria, VA 22314
                                           703.835.9085/Fax 703.997.7665

                                    By:  /s/ Alan Gura_____
                                         Alan Gura
                                         Attorney for Plaintiffs

24