UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
BRIAN WRENN, *et al.*,                   )
                                        )
                    Plaintiffs,          )
                                        )
        v.                               )        Civil Action No. 15-cv-00162 (FJS)
                                        )
DISTRICT OF COLUMBIA, *et al.*,          )
                                        )
                    Defendants.          )
_____)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

The District of Columbia and Chief Cathy Lanier (in her official capacity), by and

through counsel, pursuant to Fed. R. Civ. P. 65 and LCvR 65.1, hereby submit this Opposition to

Plaintiffs' Motion for Preliminary Injunction.

## INTRODUCTION

Plaintiffs fail to demonstrate that they are entitled to the extraordinary relief they seek: a

mandatory injunction that would require the District to issue concealed-carry licenses to them and

other members of the Second Amendment Foundation, notwithstanding the requirements of the

District's new licensing scheme, in derogation of the status quo.

Three different federal circuits have upheld laws similar to the District's new law, and the

District is likely to prevail here as well. Moreover, while the harms plaintiffs allege are

potentially serious, they concede that these harms are speculative. In contrast, the overbroad

injunction they demand would threaten the safety of the public, a risk that weighs heavily against

granting such relief.

Neither this Court, nor any controlling court, has held that there is an absolute right to carry guns in public for self-defense. And the District's new law does not impose a complete ban on the public carrying of concealed weapons. Rather, it provides a mechanism by which a law-abiding, responsible individual with a legitimate, objectively demonstrable need can obtain a permit to carry a handgun.

The District's law imposes only a minimal burden—that of obtaining a permit—on the carrying of handguns for self-defense in public by individuals with a demonstrable need to do so. The District's "good reason" requirement does not burden any right secured by the Second Amendment and, even if it did, it survives intermediate scrutiny, *i.e.*, the requirement is a reasonable fit to the District's compelling interests in promoting public safety and reducing handgun violence.

The District has a compelling interest in public safety, prevention of crime, and the protection of law-enforcement officers. *See United States v. Salerno*, 481 U.S. 739, 745 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984). Indeed, a government's foremost function is to ensure the safety of all its citizens. *Kelley v. Johnson*, 425 U.S. 238, 247 (1976) (the "promotion of safety of persons and property is unquestionably at the core of the State's police power."). Plaintiffs contest none of these conclusions.

As the Supreme Court specifically noted in *Salerno*, "the government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest[.]" 481 U.S. at 740. Notwithstanding this, plaintiffs argue that there is *no* valid government interest here. *See* Doc. No. 6-2 at 21. Plaintiffs may mock or deride those interests, but they never confront the District's substantial, significant, and unquestionably legitimate interest in ensuring public safety.

Perhaps because they take this all-or-nothing approach, plaintiffs fail to contest—or even mention—any of the legislative history explaining the District's rationale in enacting the challenged law. But the District's compelling interest in keeping the public safe from the inherent risks and dangers of widespread public carrying of handguns cannot be ignored or dismissed. The Council believes the Act will further the District's important interest in reducing potential for armed mayhem, by reducing the risks to members of the public and law-enforcement, and their bases for that belief are amply demonstrated by the record.

Plaintiffs have failed to meet their burden for the extraordinary and drastic relief of a preliminary injunction, and their motion should be denied.

## STATEMENT OF FACTS

On July 26, 2014, this Court issued a Memorandum Decision and Order entering judgment in favor of the plaintiffs in *Palmer v. District of Columbia*, No. 09-01482 (FJS). The Court, relying largely on the Ninth Circuit's decision in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014),[1] held that the District's "total ban on the public carrying of ready-to-use handguns outside the home" is unconstitutional "under any level of scrutiny." *Palmer v. District of Columbia*, ___ F.Supp.3d ____, 2014 WL 3702854, *7 (D.D.C. July 24, 2014).

The Court enjoined the District from enforcing D.C. Official Code § 7-2502.02(a)(4) which prohibited "registration of handguns to be carried in public for self-defense by law-

---

[1]     The continuing viability of *Peruta* remains uncertain. After the panel denied the State of California's motion to intervene, a judge of the Ninth Circuit *sua sponte* called for a vote on whether the case should be reheard *en banc*, and the parties and *amici* have briefed the issue. *See* Order (Dec. 3, 2014), *Peruta v. County of San Diego*, No. 10-56971 (9th Cir.) (docket since oral argument available online at *http://www.ca9.uscourts.gov/content/view.php?pk_id=0000000722*). *Cf.* Darrell A.H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. F. 238, 239–40 (2014) (arguing that *Peruta*'s treatment of historical sources "seems capricious" or "tendentious").

abiding citizens"; from enforcing D.C. Official Code § 22-4504(a), which prohibited carrying a weapon in public without a license; and from enforcing either statute "against individuals based solely on the fact that they are not residents of the District of Columbia."[2] *Id.*

Moving swiftly to comply, on September 23, 2014, the Council of the District of Columbia voted unanimously to pass Bill 20-926, the License to Carry a Pistol Emergency Amendment Act of 2014. *See* http://lims.dccouncil.us/Legislation/B20-0926?FromSearch Results=true (all websites last visited as of Feb. 18, 2015, unless otherwise noted). The bill was signed by the Mayor on October 9, became effective on signing, and remained effective for 90 days as emergency legislation. *See* 61 D.C. REG. 10765 (Oct. 17, 2014); D.C. Official Code § 1-204.12(a) (2014 Supp.).[3]

The Council also introduced permanent legislation, the "License to Carry a Pistol Amendment Act of 2014," Bill 20-930 ("Act"), which was referred to the Committee on the Judiciary and Public Safety. *See* http://lims.dccouncil.us/Legislation/B20-0930?FromSearch Results=true. The Council conducted a public hearing on the permanent legislation on October 16, 2014. *See* 61 D.C. REG. 9791 (Sep. 26, 2014). Committee mark-up occurred on November 25, 2014. *See* "Bill History," *http://lims.dccouncil.us/Legislation/B20-0930?FromSearch*

---

[2]　　The Court also enjoined the District from enforcing the statutes "unless and until such time as the District of Columbia adopts a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms." *Id.* (footnote omitted).

[3]　　The temporary version of the legislation passed by the Council, Act 20-462, was signed by the Mayor on October 31, 2014, transmitted to Congress for review on January 13, 2015, and is projected to become law on March 7, 2015. *See* http://lims.dccouncil.us/ Legislation/B20-0927?FromSearchResults=true. Temporary legislation—if not disapproved by Congress—is valid for no more than 225 days. *See Zukerberg v. District of Columbia Bd. of Elections and Ethics*, 97 A.3d 1064, n.39 (D.C. 2014). The District enacted subsequent emergency legislation on January 6, 2015, Act No. 20-564, which will remain valid until April 6, 2015. *See* 62 D.C. REG. 866 (Jan. 23, 2015).

*Results=true*. The Council, by a vote of 11 to 1, approved the legislation on final reading on December 17, 2014. 62 D.C. REG. 1944 (Feb. 13, 2015). The Mayor signed the legislation, Act No. 20-621, on February 6, 2015, and, on information and belief, it will be transmitted to Congress for review soon.[4]

The Act establishes a regime for granting licenses to carry concealed handguns in the District. It sets forth, *inter alia*, substantive requirements for applicants, including training in firearm safety, usage, and storage. Act at § 2(e) (adding a new Title IX, §§ 901–911, to the Firearms Control Regulations Act of 1975, *codified as amended at* D.C. Official Code §§ 7-2501.01 *et seq.*). Applicants for a license must show "a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life[.]" *Id.* at § 911(1)(A) (*to be codified at* D.C. Official Code § 7-2509.11(1)(A)). Alternatively, applicants may demonstrate "any other proper reason" for carrying a concealed pistol, including "types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person[.]" *Id.* at § 7-2509.11(1)(B). The Act also establishes a process by which non-District residents may obtain a concealed-carry license. *Id.* at § 6; §§ 22-4506(a), (b).

The Council's Committee on the Judiciary and Public Safety issued a report on the legislation, explaining in detail the background and need for it. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON PUBLIC SAFETY & THE JUDICIARY, REPORT ON BILL 20-930, "License

---

[4]     Pursuant to the Home Rule Act, District permanent legislation becomes effective after a 30-day period (for most laws) or a 60-day period (for criminal laws) of passive review by Congress, the days being counted only when both Houses of Congress are in session. D.C. Official Code § 1-206.02(c) (2014 Supp.).

to Carry a Pistol Amendment Act of 2014," Nov. 25, 2014 ("Comm.Rep.").[5] The law was enacted specifically in response to the Court's *Palmer* Order. *See* Comm.Rep. at 1, n.2. "The executive and the Council worked closely on the District's legislative response to *Palmer*, in order to ensure that the District's laws and regulations would be in compliance with the decision while also balancing the government's interest in public safety." *Id*. at 2. The Report noted that the law was based on similar licensing schemes from New York, New Jersey, and Maryland, and concluded that the legislation "will enhance public safety in the District, while comporting with the requirements of the Second Amendment of the U.S. Constitution." *Id*.

On October 22, 2014, as required by the Act, the Metropolitan Police Department issued detailed regulations to establish procedures for licensing of persons to carry concealed firearms. 61 D.C. REG. 11,519–11,533 (Oct. 31, 2014). The regulations explain, *inter alia*, how and why they were based on similar laws and regulations from Maryland, New York, and New Jersey. *See id*. at 11,519–11,520. The regulations further define "good reason" or "other proper reason" as

**2333   GOOD REASON TO FEAR INJURY TO PERSON OR PROPERTY**

2333.1 A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life.

2333.2 For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person. The person shall also allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger.

2333.3 The person shall provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not the applicant has made a sworn complaint to the police or the courts of the District of Columbia concerning any threat or attack.

---

[5]      The Committee Report (188 pages long, including attachments) is available online at *http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport1.pdf*.

2333.5 The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license.

**2334    OTHER PROPER REASON FOR CONCEALED CARRY LICENSE**

2334.1 A person may allege any other proper reason that the Chief may accept for obtaining a concealed carry license which may include:

    (a)    Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or

    (b)    The need for a parent, son, daughter, sibling, or other adult member of the immediate family to provide protection of a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, and the family member who is physically or mentally incapacitated can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333.

24 D.C. MUN. REG. §§ 2333, 2334 (as amended, 62 D.C. REG. 1138 (Jan. 23, 2015)).

Plaintiffs filed their instant complaint on February 3, 2015, and served the District with their Motion for Preliminary Injunction [Doc. No. 6-2] on February 6, 2015. Plaintiffs allege that they would like to carry concealed handguns in the District of Columbia for purposes of self-defense, but that Defendant Lanier denied the concealed-carry applications of Plaintiffs Wrenn and Akery (both District residents) because they did not show "good reason" or "other proper reason," as required. Doc. No. 6-2 at 7.[6] Plaintiffs allege that Defendant Lanier denied the

----

[6]    Plaintiff Second Amendment Foundation ("SAF") is a non-profit membership organization "promoting the exercise of the right to keep and bear arms[.]" Complaint ¶ 4. There are *no* specific allegations regarding any purported "harm" to SAF in the pending motion (or in the Complaint) and it thus lacks organizational standing. *See, e.g., Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (organization must show "injury in fact" to itself including "[s]uch concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests.") (quoting *Havens Realty Corp. v.*

application of Plaintiff Whidby (a Florida resident) on the same bases. *Id*. at 9.[7] The individual

Plaintiffs concede that they do not meet the standards set forth in the Act. *Id*. at 7.[8]

## STANDARDS FOR A PRELIMINARY INJUNCTION

A request for a preliminary injunction "is an extraordinary and drastic remedy, one that

should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quoting 11 A.C.

WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (2d ed. 1995).  A

party seeking a preliminary injunction must establish (1) that it will likely succeed on the merits,

(2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the

balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Aamer v.*

---

*Coleman*, 455 U.S. 363, 379 (1982)). "Such a showing requires 'more than allegations of damage to an interest in 'seeing' the law obeyed or a social goal furthered.' Indeed, '[t]he organization must allege that discrete programmatic concerns are being directly and adversely affected' by the challenged action." *Id*. (quoting *American Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). Here, SAF makes no allegations of any kind as to any harm it has suffered. *See* Complaint ¶ 4 (describing purposes of organization); Declaration of Alan Gottleib [Doc. No. 6-11], ¶ 5 ("The issues raised by, and consequences of, Defendants' policies, are of great interest to SAF's constituency."). Consequently, SAF lacks standing to proceed.

Notwithstanding this, SAF *also* lacks standing to ask for an injunction entitling *all* its members to concealed-carry licenses, especially where those "other" members have not even bothered to apply. *Cf*. Complaint ¶ 35 ("Other SAF members . . . refrain from applying to Defendant Lanier for a license to carry a handgun[.]") and *Clapper v. Amnesty Intern*., ⸺ U.S. ⸺, 133 S.Ct. 1138 (2013) (injury for standing purposes "must be *certainly impending*," and "'[a]llegations of *possible* future injury' are not sufficient.") (emphasis in original). *See also* n.22, *infra*. At the appropriate time, the District will move to dismiss SAF as a plaintiff.

[7]     According to the Plaintiffs, Mr. Whidby had sought a license for, *inter alia*, "the defense of his family, including young children, who are not physically able to defend themselves on account of their age." Doc. No. 6-2 at 8.

[8]     The individual plaintiffs filed nearly identical declarations so attesting.

*Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).

Because injunctive relief is such an extraordinary remedy, a plaintiff seeking such relief must prove all four prongs of the standard before relief can be granted. *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008); *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir 2013). Failure to show any irreparable harm is grounds for a court to refuse to issue the requested relief, even if the other factors are in plaintiffs' favor. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Plaintiffs fail to make a strong showing on any of the four factors.

"The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *Cobell v. Norton*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)). Here, however, plaintiffs seek a "mandatory injunction" that would require the District to issue concealed-carry licenses to plaintiffs "and other SAF members," notwithstanding the requirements of the Act, in derogation of the status quo. Consequently, plaintiffs must meet a higher standard than usual, and show "extreme or very serious damage" or that they are "clearly entitled to immediate relief[.]" *In re: Guantanamo Bay Detainee Lit.*, 570 F.Supp.2d 13, 17 n.3 (D.D.C. 2008) (quoting *Veitch v. Danzig*, 135 F.Supp.2d 32, 35 (D.D.C. 2001)). *See also, e.g., United States v. Sum of $70,990,605*, 991 F.Supp.2d 154, 161 (D.D.C. 2013) ("In this Circuit, 'the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.") (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1175 (D.C. Cir. 1969)); *Davis v. Billington*, ___ F.Supp.3d ___, 2014 WL 7204782, *2 (D.D.C. Dec. 19, 2014) (same). Plaintiffs have failed to show the "extreme or very serious damage" required by case law.

## ARGUMENT

### I.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

#### A.  The Court Should Not Apply Strict Scrutiny.

Plaintiffs begin from a false premise, that no means-ends scrutiny is necessary. They argue that "[r]estricting the right to carry handguns only to those with a 'good' or 'proper' reason destroys the Second Amendment right." Doc. No. 6-2 at 11. This is incorrect—as a federal court explained in its decision upholding New York's very similar licensing scheme:

> The statute does not function as an outright ban on concealed carry, but rather calls for individualized, case-by-case determinations regarding whether full-carry permit applicants have an actual and articulable—rather than merely speculative, potential, or even specious—need for self-defense. As crafted, the statute seeks to limit the use of handguns to self-defensive purposes—a use which, although in this context existing outside the home, is nonetheless a hallmark of *Heller*—rather than for some other use that has not been recognized as falling within the protections of the Second Amendment.

*Kachalsky v. Cacace*, 817 F.Supp.2d 235, 271 (S.D.N.Y. 2011), *aff'd*, 701 F.3d 81 (2d Cir. 2012).

Here, too, the Act does not destroy any right, because it does not forbid law-abiding, responsible people from carrying concealed handguns, but rather regulates the right, by saying *when* such people can carry—namely, after they have experienced some incident that gives them some special reason to justify carrying in public, or if they work in an occupation requiring such measures. Indeed, as discussed more fully below, the Second, Third, and Fourth Circuits have all found that "good reason" standards for concealed-carry licenses do not "destroy" any right, because public concealed-carry is not at the core of the Second Amendment. *See Drake v. Filko*, 724 F.3d 426, 436 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2013); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 422 (2013); *Kachalsky v. County of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013). *See also*

*Peterson v. Martinez*, 707 F.3d 1197, 1201 (10th Cir. 2013) ("In light of our nation's extensive practice of restricting citizens' freedom to carry firearms in a concealed manner, we hold that this activity does not fall within the scope of the Second Amendment's protections.").

Alternatively, plaintiffs argue that the Act must be judged according to strict scrutiny. Doc. No. 6-2 at 20. This, too, is incorrect; the Supreme Court in *Heller* did not hold that strict scrutiny should be applied to review the complete prohibition on the core Second Amendment right to possess a handgun in the home, so there is no basis to apply it here, where no such core right is implicated.[9]

*Heller* held that the Second Amendment secures an individual right to carry a handgun for self-defense within one's home. *See* 554 U.S. 570, 635 (2008).[10] But even assuming that this right extends outside the home, nothing in *Heller* suggests that there is a right to carry a loaded handgun in public without a demonstrable need to do so for self-defense. *See id.* at 626 (Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose").

Indeed, "[b]urdens on any right to carry a gun outside the home should be subject to less exacting scrutiny than burdens on the right to use a gun for self-defense in the home."

---

[9]     Indeed, *Heller* made it clear that it did not intend to undercut legislative action aimed at confronting gun violence where the legislation did not impermissibly impact the right to keep arms in one's home for self-defense. 554 U.S. at 626–27.

[10]     The Supreme Court's holdings in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), struck down laws imposing complete bans on possession of handguns in the home for the purpose of self-defense. The District's "good reason" requirement is clearly different from those laws. The "good reason" requirement does not apply at all to handgun possession in the home, and, as to possession outside the home, the requirement regulates but does not prohibit concealed carrying of handguns. Moreover, the Supreme Court's opinion in *Heller* expressly endorses bans on concealed carrying of firearms outside the home as among a group of presumptively lawful restrictions on firearms that have deep roots in American history. *See also infra* at 13–15.

*Piszczatoski v. Filko*, 840 F.Supp.2d 813, 834 (D.N.J. 2012), *affirmed sub nom.*, *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013). *Cf. Drake*, 724 F.3d at n.5 ("Firearms have always been more heavily regulated in the public sphere so, undoubtedly, if the right articulated in *Heller* does "extend beyond the home," it most certainly operates in a different manner."). Historically, there has long been a constitutional difference between rights afforded in the home and those afforded in public. For instance, American law (just like its English predecessor) has long recognized no "duty to retreat" in the home, where one is privileged to use deadly force in self-defense. *See, e.g., Piszczatoski*, 840 F.Supp.2d at 829; *Gillis v. United States*, 400 A.2d 311, n.4 (D.C. 1979) ("It is well settled that one who through no fault of his own is attacked in his home is under no duty to retreat therefrom.") (quoting *United States v. Peterson*, 483 F.2d 1222, 1236 (D.C. Cir. 1973)). *Cf. Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."); *Illinois v. Lidster*, 540 U.S. 419, 424 (2004) ("The Fourth Amendment does not treat a motorist's car as his castle."); *United States v. Dunn*, 480 U.S. 294, 300–303 (1987) (holding that core Fourth Amendment protection does not extend beyond curtilage of home); *Terry v. Ohio*, 392 U.S. 1, 6–7, 22–27 (1968) (allowing warrantless search of person on public street with reasonable suspicion).

Similarly, the Supreme Court in *Stanley v. Georgia*, 394 U.S. 557 (1969), held that private possession of obscene materials in the home could not be prosecuted, even while assuming that the *public* possession of such materials was unprotected by the First Amendment. *Id*. at 568. Although "the States retain broad power to regulate obscenity[,] that power simply does not extend to mere possession by the individual in the privacy of his own home." *Id*. Likewise, in *Lawrence v. Texas*, 539 U.S. 558, 562 (2003), "the Court emphasized that the state's

efforts to regulate private sexual conduct between consulting adults is especially suspect when it intrudes into the home[.]" *Kachalsky*, 701 F.3d at 94.

Consequently, plaintiffs' glib assertion of "fundamental" rights should be subject to a more nuanced approach. As discussed herein, the D.C. Circuit has already indicated that intermediate scrutiny is appropriate in cases such as this one. *Heller v. District of Columbia*, 670 F.3d 1244, 1256–58 (D.C. Cir. 2011) ("*Heller II*"). And the Act plainly survives such scrutiny. It is a regulatory measure designed to combat the risks and dangers associated with the misuse and accidental use of handguns. Outside of the home, those risks and dangers are borne not only by the person seeking the permit, but by everyone he encounters. The Act provides a means to determine whether the increase in risk to the public is justified by the applicant's demonstrable need to carry a concealed handgun for self-defense.

> **B.      No Scrutiny of the Act is Required Because Regulation of Public Carrying of Guns is "Longstanding."**

If a particular firearm regulation is "longstanding," it is "presumptively valid," *i.e.*, it is "presumed not to burden conduct within the scope of the Second Amendment." *Heller II*, 670 F.3d at 1258 (quoting *Heller*, 554 U.S. at 626–27 & n.26). Indeed, the Supreme Court in *Heller* considered certain laws to be "longstanding," including the prohibition of possession of firearms by convicted felons or the mentally ill, hence entitled to a presumption of constitutionality, even though those laws were not enacted until the early 20th century. *See Heller II*, 670 F.3d at 1253 (discussing *Heller*). *See also id.* at 1253–54 (early 20th century State handgun-registration laws are presumptively lawful). In addition, *Heller*, in discussing these longstanding, "presumptively lawful regulatory measures," specifically noted that "the majority of the 19th-century courts to

consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626.

The District of Columbia has been regulating guns for over two centuries. In 1801, the then-Town of Georgetown prohibited firing guns in its "inhabited parts." Town of Georgetown Ordinance of Oct. 24, 1801. In 1809, the City of Washington similarly made it unlawful to fire guns "within four hundred yards of any house . . . or on the Sabbath." Act of the Corporation of the City of Washington of Dec. 9, 1809 (copy attached)

In 1857, the District of Columbia authorized civil complaints to be filed by "any person having reasonable cause to fear an injury or breach of the peace" against any person who "shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, *without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property*[.] Revised Code of the District of Columbia, ch. 141, § 16 (1857) (emphasis added) (copy attached). Also that year, the city made it unlawful to carry "deadly or dangerous weapons, such as . . . pistol[s]." Act of the Corporation of the City of Washington of Nov. 4, 1857 (copy attached); *see also* Act of Nov. 18, 1858. *Id.*

In 1892, Congress itself similarly barred persons throughout the District from having such weapons "concealed about their person" outside of the person's "place of business, dwelling house, or premises." Act of July 13, 1892, ch. 159, 27 Stat. 116. In 1932, Congress required licenses for carrying pistols and other concealable weapons outside of one's home or place of business. Act of July 8, 1932, ch. 465, Pub. L. No. 72-275, 47 Stat. 651. Thus, leaving aside the recent legislation, the District's regulation of firearms generally—and concealed weapons in particular—is manifestly "longstanding" and therefore does not burden conduct within the scope of the Second Amendment. Indeed,   the Circuit decisions discussed herein have found laws of

similar vintage to be "longstanding" and therefore beyond the scope of the Second Amendment *See Drake*, 724 F.3d at 431–34 (New Jersey law, enacted in 1924, requiring "justifiable need" to obtain license to carry handgun, qualified as "longstanding" and thus did not burden conduct within the scope of the Second Amendment); *Kachalsky*, 701 F.3d at n.11 ("New York's proper cause requirement is similarly 'longstanding'—it has been the law in New York since 1913."); *id*. at 90–91 (citing 19th century State statutes that prohibited the public carrying of handguns); *cf. United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (*en banc*) ("The first federal statute disqualifying felons from possessing firearms was not enacted until 1938[.]"). Not only do these decisions support a conclusion that the District's restrictions on carrying are longstanding, they establish other longstanding regulations demonstrating that the Act does not implicate Second Amendment rights. *See Drake*, 724 F.3d at 434 ("We discern no hint in the Second Amendment jurisprudence of either the Supreme Court or this Court that the analysis of a particular regulation in a particular jurisdiction should turn entirely on the historical experience of that jurisdiction alone.").

"The historical prevalence of the regulation of firearms in public demonstrates that while the Second Amendment's core concerns are strongest inside hearth and home, states have long recognized a countervailing and competing set of concerns with regard to handgun ownership and use in public." *Kachalsky*, 701 F.3d at 96. *Cf. id.* ("We believe state regulation of the use of firearms in public was 'enshrined with[in] the scope' of the Second Amendment when it was adopted.") (quoting *Heller*, 554 U.S. at 634).

## C.   Even If Constitutional Scrutiny Is Warranted, The Appropriate Standard Is Intermediate Scrutiny, Which The Act Survives.

In their consideration of laws similar to the Act, the Second, Third, and Fourth Circuits all found that the laws were subject only to intermediate scrutiny, because they do not completely

prohibit the exercise of the core Second Amendment right.[11] *Drake*, 724 F.3d at 430; *Kachalsky*, 701 F.3d at 93 & n.17; *Woollard*, 712 F.3d at 876. In *Heller II*, the D.C. Circuit explained that "intermediate scrutiny" was applicable to the District's registration regulations because the gun-registration laws at issue there did "not affect the core right protected by the Second Amendment[,]" 670 F.3d at 1266, *i.e.*, "the right of law abiding, responsible citizens to use arms in defense of hearth and home." *Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013). The Act should likewise be subject to intermediate scrutiny, because it does not affect the core right of law-abiding, responsible persons to use firearms in defense of hearth and home. *Cf. United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("Since historical meaning enjoys a privileged interpretative role in the Second Amendment context, this longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable.") (citations omitted).

Laws pass intermediate scrutiny if the government can show that the laws are "substantially related to an important government objective." *Heller II*, 670 F.3d at 1258 (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). *See also National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012) (intermediate scrutiny requires government to show a "reasonable fit" between the disputed regulation and an "important" government objective) (citations omitted). The Circuit in *Heller II* reiterated that intermediate scrutiny tolerates overbroad regulation, if "not broader" than the government "reasonably could have determined to be necessary." *Id*.

As discussed below, the District's law easily survives intermediate scrutiny.

---

[11]     Third Circuit determined that it need not move to the second step of the analysis, the determination of the appropriate level of scrutiny. *Drake*, 724 F.3d at 430. Nonetheless, that court did so "because of the important constitutional issues presented," and determined that the law should be examined under intermediate scrutiny. *Id*. These circuits all applied intermediate scrutiny. *Id*.

### 1.      The "good reason" provision is constitutional.

The Act requires applicants to demonstrate a "good reason" for the issuance of a concealed-carry license. *See* Act, § 911(1)(A). Plaintiffs complain that this provision violates the Second Amendment because it will not allow people "to carry functional, loaded handguns in public areas for the purpose of self-defense." Complaint ¶ 37.

The Second, Third, and Fourth Circuits have *all* rejected identical arguments in upholding similar licensure standards. The Second Circuit found that New York's "proper cause" requirement met intermediate scrutiny: "Restricting handgun possession in public to those who have a reason to possess the weapon for a lawful purpose is substantially related to New York's interests in public safety and crime prevention." *Kachalsky*, 701 F.3d at 98. "The decision to regulate handgun possession was premised on the belief that it would have an appreciable impact on public safety and crime prevention." *Id. See also id.* at 99 ("[S]tudies and data demonstrat[e] that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces."). *See also United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) ("Implicit in the statutory proscription of carrying a pistol without a license outside the possessor's 'dwelling house or place of business' is a congressional recognition of the inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor.").

Similarly, the Fourth Circuit upheld Maryland's comparable scheme because "there is a reasonable fit between the good-and-substantial-reason requirement and Maryland's objectives of protecting public safety and preventing crime." *Woollard*, 712 F.3d at 880. The Fourth Circuit found that Maryland's statutory criterion "strikes an appropriate balance between granting

handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of Maryland." *Id*. at 881. *See also id.* at 879 (handgun-licensing scheme "advances the objectives of protecting public safety and preventing crime because it reduces the number of handguns carried in public.").

Likewise, the Third Circuit upheld New Jersey's determination that "it can best determine when the individual benefit outweighs the increased risk to the community through careful case-by-case scrutiny of each application[.]" *Drake*, 724 F.3d at 439. *See also id*. at 437–38 (licensing scheme "combat[s] handgun violence" and improves public safety by "combating the dangers and risks associated with the misuse and accidental use of handguns" and "reduc[ing] the use of handguns in crimes."); *id*. at 438 ("private possession of a handgun is rarely an effective means of self-protection" and "the ready accessibility of guns contributes significantly to the number of unpremeditated homicides and to the seriousness of many assaults.") (citation omitted).

Here, the legislative record is sufficient to withstand plaintiffs' attack, even at this stage of the proceedings, under intermediate scrutiny. The District need only present "some meaningful evidence" that its concealed-carry requirements "can reasonably be expected to promote" an important governmental interest. *Heller II*, 670 F.3d at 1259.[12] The existing record contains more than enough such evidence.

As the Council heard, research, data, and experience show that possession and carrying of handguns outside the home pose different dangers than inside the home. The same factors that

---

[12]     *See also See Heller v. District of Columbia*, ___ F. Supp. 2d ___, 2014 WL 1978073, *9 (D.D.C. May 15, 2014) (appeal pending) ("The proper standard, the Supreme Court has suggested, is that the government may rely on "whatever evidence . . . is reasonably believed to be relevant to the problem that [the government is] address[ing].") (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51–52 (1986)).

make handguns the weapon of choice for defense of the home also make them the weapon of choice for criminal acts outside of the home. The District has an important interest in reducing the number of concealed weapons in public in order to reduce the risks to other members of the public. It also has an important interest in reducing the number of concealed handguns in public due to their disproportionate use in violent crime in public places. The District's "good reason" requirement relates reasonably to these interests.

The Report from the Council's Committee on the Judiciary and Public Safety emphasized in detail the uniqueness of the District and its public-safety and security needs, a point invoked repeatedly by defendant Lanier, the United States Secret Service, and others. Comm.Rep. at 4–7. The Report found that "[t]he circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place." *Id*. at 7. The Report also discusses the rationale behind the law's "good reason" requirement, and how it compares to the standards used in other jurisdictions, and describes the reasoning behind the law's specific requirements in detail. *Id*. at 8–17.

The Committee also examined the available empirical evidence on concealed-carry laws, noting that the best, most recent evidence on more lax "right-to-carry," a.k.a "shall issue" laws "'are associated with substantially higher rates' of aggravated assault, rape, robbery and murder." *Id*. at 17 (quoting Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, STANFORD REPORT, Nov. 14, 2014) (available online at *http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html*).[13]   The  Report

---

[13]     The research cited is an updated version of a comprehensive study first conducted in 2011. *See* Abhay Aneja, John J. Donohue, and Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and*

cited a study that examined the District's 1976 prohibition on handguns (overturned in *Heller*) and found that that "[r]estrictive licensing of handguns was associated with a prompt decline in homicides and suicides in the District of Columbia. [N]o [such] decline was seen in adjacent metropolitan areas where restrictive licensing did not apply." *Id*. at 18 (quoting Colin Loftin, David McDowell, Brian Wiersema, and Talbert J. Cotley, *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, 325 THE NEW ENGLAND J. OF MED. 1615 (1991)).[14]

The Committee heard evidence that allowing law enforcement the ability to ascertain an applicant's "good reason," to carry a concealed handgun, as in the cases of New York, New Jersey, and Maryland, is important

> because of the significant risks associated with a dangerous person carrying a concealed handgun in public. Numerous studies have shown that the unfettered carrying of firearms in public places augments the risks associated with gun violence. Studies analyzing the connection between increased gun prevalence and crime indicate that most states that broadly allow concealed firearms in public—that is states that don't provide law enforcement with discretion—appear to "experience increases in violent crime, murder, and robbery when [those] laws are adopted." Importantly, "guns did not seem to protect [even] those who possessed them from being shot in an assault."

Hrg.Rec. at 14 (statement of Brian Malte, Senior National Policy Director, Brady Campaign to Prevent Gun Violence) (quoting John Donohue, *The Impact of Concealed-Carry Laws, Evaluating Gun Policy: Effects on Crime and Violence*, 289, 320 (Jens Ludwig & Phillip Cook eds. 2003) and Charles C. Branas, *et al*., *Investigating the Link Between Gun Possession and Gun Assault*, 99 AM. J. PUB. HEALTH 2034 (2009)).

---

*Policy* (Sep. 4, 2014), Stanford Law and Economics Olin Working Paper No. 461, *available online at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2443681.

[14]    The study is attached to the Committee Report, at 112, and also available elsewhere online at *http://www.nejm.org/doi/full/10.1056/NEJM199112053252305*. "Our data suggest that restrictions on access to guns in the District of Columbia prevented an average of 47 deaths each year after the law was implemented." *Id*.

Even in cases alleging infringement of the First Amendment, the Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)). The District has more than met that burden here. As the Report concludes, "[w]hen considering concealed carry in a densely populated city, it is clear that the balancing equation must include the District's substantial governmental interest in public safety and crime prevention."[15] *Id.*

The Act's "good reason" requirement advances the District's compelling and undisputed governmental interests in public safety and crime prevention, by limiting the concealed-carry of handguns in public to suitable persons who have a demonstrated need to carry weapons for protection, after careful, case-by-case scrutiny of each application. The District's "good reason" requirement "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of" the District. *Woollard*, 712 F.3d at 881. The District's scheme "takes into account the individual's right to protect himself from violence as well as the community at large's interest in self-protection." *Drake*, 724 F.3d at 439.

Plaintiffs barely acknowledge this compelling government interest; they imply that the Court need not credit it because the exercise of a "fundamental" constitutional right, by

---

[15]     The Report summarizes the testimony and written statements received in response to the legislation. *See* Comm.Rep. at 21–26. The witnesses' testimony and written statements are also online, as is a video of the public hearing of October 16, 2014, on the legislation. *See* http://lims.dccouncil.us/Download/32576/B20-0930-HearingRecord1.pdf ("Hrg.Rec.").

definition, cannot implicate any legitimate government interest. Doc. No. 6-2 at 21.[16] Plaintiffs would have the Court simply skip constitutional review in favor of a test that only asks whether a constitutional right is implicated by a statute. This is wrong as a matter of law, even for First Amendment rights. *See, e.g.*, Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 696 (2007) ("[S]trict scrutiny is quite rarely applied to laws burdening the textually guaranteed rights found in the Bill of Rights."). The D.C. Circuit in *Heller II* employed the "intermediate scrutiny" test because the laws at issue there, as here, "do not affect the core right protected by the Second Amendment[,]" 670 F.3d at 1266, *i.e.*, "the right of law abiding, responsible citizens to use arms in defense of hearth and home." *Schrader*, 704 F.3d at 989.[17]

The result plaintiffs seek—the invalidation of the "good reason" requirement, resulting in automatic issuance of concealed-carry licenses to all applicants meeting minimal threshold requirements—would dramatically change public space in the District. Unlike possession in the home, the possession of a handgun in public places subjects all others present to the dangers— intentional and accidental—presented by the handgun. By its nature, such carrying subjects vast numbers of people to safety risks against their will, thus concealed-carry is an appropriate subject for regulation through the collective judgment of the citizens' elected representatives.

Aside from *Peruta*, the only authority plaintiffs cite striking down a "good reason" licensing standard are a case from an Indiana intermediate appellate court from 1980, and a

---

[16]     Plaintiffs ignore completely the legislative findings of the Council, and thus disregard the only evidence in the record about the importance of the "good reason" requirement, in favor of their standardless, categorical pronouncement.

[17]     Even if the public carrying of weapons were at the "core" of the Second Amendment right, the government *still* would be able to regulate it, so long as it had a "strong justification[.]" *Heller II*, 670 F.3d at 1257.

Michigan Supreme Court case from 1922. *See* Doc. No. 6-2 at 12.[18] These cases simply lack the persuasive force of *Kachalsky*, *Drake*, and *Woollard*—all of which are recent, on point, and issued by federal appellate courts.

Incredibly, plaintiffs argue that "there seems little legitimate scholarly reason to doubt that defensive gun use is very common in the U.S., and that it probably is substantially more common than criminal gun use." *Id.* at 22 (quoting Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 180 (1995)). On the contrary, the empirical foundation of the "more guns, less crime" hypothesis—and specifically the work of Dr. Kleck—has been thoroughly discredited. *See, e.g.*, Anthony A. Braga *et al.*, *Interpreting the Empirical Evidence on Illegal Gun Market Dynamics*, 89 J. URBAN HEALTH: BULL. OF THE NEW YORK ACAD. OF MED. 779 (2012);[19] Ian Ayres & John J. Donohue III, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977–2006*, 6 ECON J. WATCH 218 (May 2009); Ian Ayres & John J. Donohue III, *Yet Another Refutation of the More Guns, Less Crime Hypothesis—With Some Help From Moody and Marvell*, 6 ECON J. WATCH 35 (2009); Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 STANFORD L. REV. 1193 (2003); David Hemenway, *Policy and Perspective: Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. CRIM. L. & CRIMINOLOGY 1430 (1997).

---

[18]     Plaintiffs also cite *dicta* from another case, *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004), but that case does not help them. *See id.* at 1044 ("Even in jurisdictions that have declared the right to keep and bear arms to be a fundamental constitutional right, a strict scrutiny analysis has been rejected in favor of a reasonableness test[.]").

[19]     *Available online at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3462834/.

All the evidence supports the Council's reasonable conclusions here. Plaintiffs have presented no evidence supporting their dogmatic assertions of the necessity of concealed-carrying for self-defense, regardless of the public-safety implications. And even if plaintiffs *had* presented some contrary evidence, the Court should still defer to the Council's conclusions. *See, e.g., Gonzalez v. Carhart*, 550 U.S. 124, 163 (2007) ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." (citing cases); *Baze v. Rees*, 553 U.S. 35, 90 (2008) (Scalia, J., concurring) ("It is simply not our place to choose one set of responsible empirical studies over another in interpreting the Constitution. Nor is it our place to demand that state legislatures support their criminal sanctions with foolproof empirical studies, rather than commonsense predictions about human behavior."). *See also, e.g. Woollard*, 712 F.3d at 881 ("[i]t is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments.") (quoting *Kachalsky*, 701 F.3d at 89).

Notwithstanding this, should the Court determine that the present record is insufficient to uphold the Act, it should deny plaintiffs' motion and permit the District a full and fair opportunity to make an evidentiary record in support of the Act. The D.C. Circuit's 2011 decision in the *Heller II* litigation compels that result, as the District argued in *Palmer*.

In response to the Supreme Court's invalidation in 2008 of the District's ban on possessing firearms, the District amended its laws to permit the possession of most firearms in the home so long as they are properly registered with the District's law-enforcement authorities. When that registration scheme was challenged, the D.C. Circuit concluded that intermediate scrutiny applied. *Heller II*, 670 F.3d at 1256–58. It then remanded the case for further factual development because "the record [wa]s inadequate for us confidently to hold the registration

requirements are narrowly tailored." *Id.* at 1258. On remand, the parties offered extensive, additional evidence, including expert evidence, on why the new law appropriately balances the right of self-defense and the protection of public safety in the specific context of the District of Columbia. *See Heller*, 2014 WL 1978073, at *3–*5, *17–*22. Based on that evidence, the district court rejected Heller's challenge. *Id.*

Consistent with *Heller II*, the evidence that the District could offer in this case might include, for example, expert testimony explaining why, given the special circumstances in the District of Columbia, the new law appropriately balances the right of self-defense and the protection of public safety.

### 2.      The prior-restraint doctrine is inapplicable.

Plaintiffs argue that the District's new licensing scheme is an impermissible "prior restraint," allowing Chief Lanier "unbridled discretion" to grant or deny license. Doc. No. 6-2 at 18. Plaintiffs are incorrect. No court has applied that doctrine in a Second Amendment challenge, nor would such application serve any rational purpose here.

The prior restraint doctrine is limited to the First Amendment context, referring to restraints on *expressive* conduct. *See, e.g., City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988). Thus, to be a prior restraint, the challenged law "must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship." *Id*. Prior restraint doctrine typically rejects licensing schemes for parades and other acts of public expression that confer on government officials unfettered discretion to deny the license.

The doctrine works in that context because harmful speech generally does not result in bodily injury or death, so the risks of preventing potentially harmful speech in advance are

greater than the risks of allowing it. Under the Second Amendment, however, the risks are reversed—harmful exercise of a right to carry a gun may result in injury or death, so the risks from allowing potentially harmful exercise of the right are greater than the risks of preventing it. Prior restraint doctrine under the First Amendment is rooted in concerns about government censorship of public expression, and therefore has no place, and would make little sense, in the Second Amendment context.

While some courts have drawn analogies between the First and Second Amendments in crafting an appropriate standard of review, no court has accepted plaintiffs' novel prior-restraint theory. *See Ghantous v. Illinois Concealed Carry Licensing Review Bd.*, 2014 WL 4914802, *3 (N.D. Ill. Sep. 30, 2014) ("[N]either the Supreme Court nor the Seventh Circuit (nor any other jurisdiction that the Court is aware of) has extended prior restraint analysis into the Second Amendment context."). "The concerns regarding prior restraints are historically unique to the First Amendment." *Id.* Indeed, the Supreme Court in *Heller* implicitly rejected the application of prior restraint in holding that many restraints on the right to bear arms are presumptively lawful, approving the blanket denial of the right, in advance, to entire categories of people. *Heller*, 554 U.S. at 626–27 & n.26. And it is not clear how the doctrine would translate in this context, where there is no prohibition based on expressive content. Activity under the First Amendment is difficult to regulate without—even accidentally—materially infringing on its core rights, and those core rights are not typically expressed through conduct that presents an inherent risk of grievous danger to the general public. In contrast, Second Amendment activities can be regulated to further public safety without materially infringing on the core right to self-defense in one's home.

Moreover, the Second, Third, and Fourth Circuits have all explicitly rejected plaintiffs' prior-restraint arguments. *See Kachalsky*, 701 F.3d at 91 ("We are hesitant to import *substantive* First Amendment principles wholesale into Second Amendment jurisprudence. Indeed, no court has done so.") (emphasis in original). *Kachalsky* explained the risks of conflating the two rights:

> We recognize that analogies between the First and Second Amendment were made often in *Heller*, 554 U.S. at 582, 595, 606, 635. Similar analogies have been made since the Founding. Notably, these analogies often used the states' power to regulate firearms, which was taken as unassailably obvious, to support arguments in favor of upholding limitations on First Amendment rights. But it would be as imprudent to assume that the principles and doctrines developed in connection with the First Amendment apply equally to the Second, as to assume that rules developed in the Second Amendment context could be transferred without modification to the First. Endorsing that approach would be an incautious equation of the two amendments and could well result in the erosion of hard-won First Amendment rights. As discussed throughout, there are salient differences between the state's ability to regulate each of these rights.

*Id.* at 92 (citations omitted). The court added: "Plaintiffs' complaint is not that the proper cause requirement is *standardless*; rather, they simply do like the *standard*—that licenses are limited to those with a special need for self-protection. This is not an argument that licensing officials have unbridled discretion in granting full-carry permits." *Id.* (emphasis in original).

*Woollard* and *Drake* likewise rejected the plaintiffs' argument that analogous licensing schemes authorized the government unfettered power to deny permits. As *Drake* explained:

> Even if we were to apply the prior restraint doctrine, it would not compel the result sought by Appellants because New Jersey's Handgun Permit Law does not vest licensing officials with "unbridled discretion." Appellants incorrectly characterize the "justifiable need" standard as a highly discretionary, seat-of-the-pants determination. On the contrary, the standards to be applied by licensing officials are clear and specific, as they are codified in New Jersey's administrative code and have been explained and applied in numerous New Jersey court opinions. Moreover, they are accompanied by specific procedures that provide "safeguards against arbitrary official action."

*Drake*, 724 F.3d at 435 (footnote and citation omitted). *See also Woollard*, 712 F.3d at n.11 (rejecting plaintiffs' prior-restraint theory because "it is premised on an uncorroborated assertion

that the good-and-substantial-reason requirement vests the State 'with virtually unbridled and absolute power to deny permits.'") (citations omitted). The same holds true here—the District's new scheme has clear and specific standards, defined in the law and further elaborated in the implementing regulations, that provide safeguards against arbitrary action. *See* Act, § 911; 24 D.C. Mun. Reg. §§ 2333–2335. The "good reason" standard is not an exercise of unfettered discretion or whimsy but instead a carefully constructed regulatory scheme bounded by reasonable, identified standards and grounded in due process.

## II.     PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY.

A plaintiff seeking emergency injunctive relief must make a threshold showing of irreparable injury. *CityFed Fin. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) ("we require the moving party to demonstrate at least 'some injury'") (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986)). A court may deny a preliminary injunction for failure to make a successful showing of irreparable injury, even where the other three factors all point in the movant's favor. *Chaplaincy*, 454 F.3d at 297. "This Circuit has 'set a high standard for irreparable injury.'" *Holmes v. FEC*, ___ F.Supp.3d ____, 2014 WL 5316216, *7 (D.D.C. Oct. 20, 2014) (quoting *Chaplaincy*, 454 F.3d at 297). The alleged injury "must be both certain and great; it must be actual and not theoretical." *Sweis v. United States Foreign Claims Settlement Comm'n*, 950 F. Supp. 2d 44, 47 (D.D.C. 2013) (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*)). And, where, as here, the relief requested would change rather than preserve the *status quo*, that standard is even higher: plaintiffs must show "extreme or very serious damage" or that they are "clearly entitled to immediate relief[.]" *Guantanamo Bay Detainee Lit.*, 570 F.Supp.2d at 17 n.3.

Plaintiffs allege that "the denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." Doc. 6-2 at 21 (quoting *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987)). The proposition is true as far as it goes, but plaintiffs bury the lead—"if denial is established."

Here, plaintiffs have not yet established that they have an absolute right to carry a handgun in public for self-defense without being subject to reasonable government regulation. *See American Freedom Defense Initiative v. WMATA*, 898 F.Supp.2d 73, 84 (D.D.C. 2012) (to obtain emergency injunctive relief, plaintiffs must show that their "First Amendment interests [were] either threatened or in fact being impaired at the time relief [was] sought.") (quoting *Nat'l Treas. Emps. Union v. United States*, 927 F.2d 1253, 1254–55 (D.C. Cir. 1991)).[20] *See also Nat'l Ass'n of Manufacturers v. Taylor*, 549 F.Supp.2d 68, 76 (D.D.C. 2008) (case law "require[s] movants to do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong[.]") (quoting *Chaplaincy*, 545 F.3d at 301).

Indeed, the proposition (and the language from *Elrod*) "is directed toward circumstances concerning freedom of expression." *Chaplaincy*, 454 at 300. *See also id.* ("The timeliness of political speech is particularly important.") (quoting *Elrod*, 427 U.S. at 374 n.29). The District is not aware of any controlling case extending this proposition to the rights protected under the Second Amendment. And while the District does not doubt the sincerity and depth of plaintiffs'

---

[20]     This argument—that the infringement of constitutional rights can constitute irreparable injury—derives from the plurality opinion in *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976), which stated that "the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." But as the D.C. Circuit has noted, *Elrod* "is not binding precedent" in this or any federal circuit. *Chaplaincy*, 454 F.3d at 300 n.7; *id.* at 301 (holding that "in this court, as in several others, there is no *per se* rule that a violation of [a constitutional right] *automatically* constitutes irreparable harm.") (emphasis in original). *See also Sweis*, 950 F. Supp. 2d at 48 ("[O]ur Court of Appeals has indicated that merely raising a constitutional claim is insufficient to warrant a presumption of irreparable injury.").

views, there are no such concerns here regarding expressive behavior or timeliness of speech. *Cf.* *Holmes*, 2014 WL 5316216 at *7 (denying motion for preliminary injunction to prevent feared infringement of First Amendment rights). Plaintiffs' theory of the case—that they cannot obtain a license under the Act because they do *not* have any particularized reason to fear harm, but just the general fear that they could find themselves in a situation in which a firearm would be helpful—makes it all but impossible for them to establish irreparable harm if forced to wait for a license while their challenge is pending in this Court. In essence, they have conceded the speculative nature of their theory of injury, when they are entitled to injunctive relief only if they can show their injury is "both certain and great," "actual and not theoretical." *Chaplaincy*, 454 F.3d at 297. "The moving party must show [t]he injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citations and internal quotation marks omitted). Indeed, if plaintiffs could demonstrate irreparable harm, their applications for licenses would have been granted.

Plaintiffs otherwise overreach, stating categorically (without support in case law or even common sense) that "[n]o constitutional right is so directly linked to one's immediate physical well-being as is the right to keep and bear arms." Doc. No. 6-2 at 21–22. Notwithstanding that plaintiffs have not presented any evidence at all of any imminent threat to their health or safety, the District respectfully suggests that the right to bodily integrity lies closer to "one's immediate physical well-being." *See, e.g., Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 270 (1990) ("Every human being of adult years and sound mind has a right to determine what shall be done with his own body[.]") (quoting *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129–130 (1914) (Cardozo, J.)). *Cf. Aamer*, 742 F.3d at 1039 (affirming denial of preliminary injunction despite Guantanamo prisoners' allegations "that force-feeding may cause

physical pain, invade bodily integrity, or even implicate petitioners' fundamental individual rights.").

Here, because plaintiffs have made an insufficient showing on all four factors, their motion should be denied.[21]

## III.   THE BALANCE OF EQUITIES TIPS HEAVILY IN FAVOR OF THE DEFENDANTS

By their motion, plaintiffs seek to enjoin the implementation of a law of substantial local importance.[22] Indeed, when considering the harm to the parties in determining the balance of equities, the Court must not only consider the parties to the case, but also the general public. *See Majhor v. Kempthorne*, 518 F. Supp. 2d 221, 255 (D.D.C. 2007) (court must consider "the extent to which a preliminary injunction would 'substantially injure other parties.'") (quoting *CityFed*, 58 F.3d at 746). Enjoining the Act would clearly have a negative impact on thousands of District residents and visitors, in light of the (at best) uncertain public impact of allowing untold numbers of concealed handguns to be carried on the streets of the city.

---

[21]     Plaintiffs devote all of three sentences to the "balance of the equities" prong and a single sentence to addressing the "public interest" portion of the test. *See* Doc. No. 6-2 at 22–23.

[22]     Actually, plaintiffs seek to enjoin application of the "good reason" requirement as to them "and other SAF members." Doc. No. 6-12 at 2. Plaintiffs, of course, only have standing to assert their *own* rights. *See, e.g., Rumber v. District of Columbia*, 595 F.3d 1298, 1301 (D.C. Cir. 2010) ("A plaintiff must ordinarily 'assert his own legal interests, rather than those of third parties.'") (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 (1979)). Consequently, even if the Court were inclined to agree with plaintiffs on the merits, the injunction sought is far too broad. *See, e.g., Nebraska Dep't of Health & Human Servs. v. United States Dep't of Health & Human Servs.*, 435 F.3d 326, (D.C. Cir. 2006) ("An injunction must be narrowly tailored to remedy the specific harm shown.") (quoting *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976)). Even if the "good reason" requirement were unconstitutional, there remains the complete administrative process; the unnamed SAF members could not possibly all be beneficiaries of an injunction requiring the issuance of concealed-carry licenses, since they have not even applied for them, much less completed the required steps of the administrative process. Surely the District has the right to check for itself to determine whether self-declared "otherwise eligible" applicants are responsible and law-abiding.

Contrary to plaintiffs' arguments, the Court should not simply ignore the interests of the District because plaintiffs have invoked the Constitution. *See, e.g., American Freedom Defense Initiative*, 898 F.Supp.2d at 84 ("The Court must balance Plaintiffs' First Amendment right with [defendant's] concern for a possible threat to public safety.").

An injunction now would harm the District of Columbia and its citizens, by injecting massive uncertainty into an important public-safety measure. "[A]ny time a State [or local government] is enjoined by a court from effectuating statutes enacted by the representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). *See also Maryland v. King*, ___ U.S. ___, 133 S. Ct. 1, 3 (July 30, 2012) (Roberts, C.J., in chambers) (same). Granting this preliminary injunctive relief would irrevocably change public spaces in the District.

In this case, the balance of equities tips decidedly in favor of the District. The Defendants aver that the risk of a gun-related tragedy—accidental or deliberate—outweighs plaintiffs' speculative fears about any imminent need to defend themselves from public attack. But even if a license to carry would afford some incremental measure of self-protection for a particular applicant, it would also increase the risk of that applicant being involved in "the known and serious dangers of misuse and accidental use." *Siccardi v. State*, 59 N.J. 545, 558 (N.J. 1971). And, of particular importance here, when a handgun is carried in public, the risks and dangers of misuse and accidents are borne by everyone, not just the holder. As the Supreme Court of New Jersey recognized long ago: "Surely such widespread handgun possession in the streets, somewhat reminiscent of frontier days, would not be at all in the public interest." *Id*.

It should come as little surprise that the bulk of the "may issue" jurisdictions are located in the more densely populated Northeast. And the District is a city, not a State—it has *no* rural,

less populated areas. Our city is a densely populated urban area that "shares the problem of gun violence with other dense, urban jurisdictions." *Heller II*, 670 F.3d at 1263. Jurisdictions with different conditions should have different gun laws; urban areas should not be governed by standards appropriate for rural areas. The exercise of the right alleged by plaintiffs affects other people much more strongly in an urban environment. As Justice Stevens explained, in his dissent in *McDonald*:

> Across the Nation, States and localities vary significantly in the patterns and problems of gun violence they face, as well as in the traditions and cultures of lawful gun use they claim. Cf. *post*, at 3128–3129. The city of Chicago, for example, faces a pressing challenge in combating criminal street gangs. Most rural areas do not. The city of Chicago has a high population density, which increases the potential for a gunman to inflict mass terror and casualties. Most rural areas do not. The city of Chicago offers little in the way of hunting opportunities. Residents of rural communities are, one presumes, much more likely to stock the dinner table with game they have personally felled.

561 U.S. at 902 (2010) (Stevens, J., dissenting) (citing *Heller*, 554 U.S., at 696–97 (Breyer, J., dissenting) (detailing evidence showing that a "disproportionate amount of violent and property crimes occur in urban areas, and urban criminals are more likely than other offenders to use a firearm during the commission of a violent crime")). *Cf.* Lee T. Dresang, MD, *Gun Deaths in Rural and Urban Settings: Recommendations for Prevention*, 14 J. AM. BD. FAM. MED. 107, at 108 (Mar. 2001) (*available online at* http://www.jabfm.org/content/14/2/107.full.pdf+html) (accessed Nov. 4, 2013) (App. at 215) (noting that "homicide gun deaths in the United States are more of an urban than a rural problem"); Matthew Miller, Deborah Azrael, & David Hemenway, *Firearms and Violent Death in the United States, in* REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 4 (Daniel W. Webster & Jon S. Vernick eds., 2013), *available at* http://jhupress.files.wordpress.com/2013/01/1421411113_updf.pdf ("The U.S. homicide rate is much higher in urban than rural areas, as are rates of all violent crimes.").

To be sure, the Constitution is just as important in cities as in rural areas, but the *application* of the Constitution through means-ends scrutiny should take into account the real world. *See Skoien*, 614 F.3d at 640 ("[T]he legislative role did not end in 1791. That *some* categorical limits are proper is part of the original meaning [of the Second Amendment], leaving to the people's elected representatives the filling in of the details.") (emphasis in original).

Plaintiffs allege that they have an absolute right to carry concealed weapons in public for self-defense of themselves and their families, and that irreparable harm will result "from a successful [public] criminal attack that might have been averted with access to defensive arms." Doc. No. 6-2 at 22. "Those are important interests, but there is no record evidence of imminent or upcoming threats, and 'speculative injuries do not justify th[e] extraordinary remedy' of a preliminary injunction." *Bolton v. Bryant*, ___ F.Supp.3d ____, 2014 WL 5350465,*10 (N.D. Ill. Oct. 21, 2014) (quoting *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005)). Identically here, plaintiffs have "not provided any information on these potential threats that would tip the balance of harms in [their] favor." *Id.* These speculative harms, while not insubstantial, are simply not enough to overcome the potential harm to public safety that would arise should a preliminary injunction be erroneously granted.

> Whereas on the balance of the hardships the court examined only hardship to Plaintiffs, because constitutional rights are at issue, any infringement on the Second Amendment naturally harms the public. Likewise, because gun violence threatens the public at large, the court balances the public's interest in preserving its constitutional rights against the public's interest in preventing gun violence.

*Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267, 1283 (N.D. Cal. 2014).[23]

---

[23]     The court in *Fyock* denied plaintiffs' motion for preliminary injunction against the enforcement of a city ordinance prohibiting possession of high-capacity magazines, despite

The District's concealed-carry regime enables it to ensure that individuals who genuinely need to carry handguns outside of their home or business are able to do so, while lessening the public safety concerns associated with allowing individuals to carry handguns outside of the home without a genuine need to do so.

## IV.    ALLOWING BROAD CARRYING OF CONCEALED WEAPONS IS NOT IN THE PUBLIC INTEREST.

Finally, it is the interests of plaintiffs and SAF's members, not the interests of the public, which drives this lawsuit. Their asserted desire for self-defense by carrying concealed weapons in public must be balanced against the rights of the public.

While for "several hundred years" courts sitting in equity have had the discretion to weigh the public interest in granting or denying injunctive relief, such courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496 (2001) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944), and *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). *See also Taylor*, 549 F.Supp.2d at 77 ("The public interest is a uniquely important consideration in evaluating a request for [emergency relief].") (quoting *National Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 616 (D.C. Cir. 1980)). "The aim is to minimize the costs of a wrong decision." *Bolton*, 2014 WL 5350465 at *9 (quoting *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013)).

Moreover, "when an injunction would 'adversely affect a public interest . . . even temporarily . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Goings v.*

finding that the ordinance "comes relatively near the core of the Second Amendment right." *id*. at 1278, and that the balance-of-the-hardships factor was "neutral."

*Court Servs. & Offender Supervision Agency for the District of Columbia*, 786 F.Supp.48, 60–61 (D.D.C. 2011) (quoting *Yakus v. United States*, 321 U.S. 414, 440–41 (1944)). "The Court may thus deny injunctive relief, even when private rights are implicated, because courts in equity 'may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" *Id.* at 61 (quoting *Yakus*, 321 U.S. at 441). *See also Marine Transport Lines, Inc. v. Lehman*, 623 F. Supp. 330, 334–35 (D.D.C. 1985) ("The award of such relief is not a matter of right, even though the petitioner claims and may incur irreparable injury.").

In this case, the public consequences of granting an injunction would be significant; potentially thousands of additional concealed weapons on the street will increase the risk of mishaps, at the gain of some incremental amount of self-identified personal "safety." Even from a sheer numeric standpoint, the number of additional handguns would increase the risk of accidental discharges, road-rage incidents, or other public escalations turning fatal.

The public interest lies in the denial of plaintiffs' motion.

## CONCLUSION

For the above-stated reasons, the Court should deny the Plaintiffs' Motion for Preliminary Injunction.

DATE: February 20, 2015          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELLEN A. EFROS
Deputy Attorney General
Public Interest Division

_____/s/ Andrew J. Saindon_____
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
Equity Section I
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov