IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN WRENN, et al., | ) | Case No. 15-CV-162-FJS |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

COME NOW the Plaintiffs, Brian Wrenn, Joshua Akery, Tyler Whidby, and the Second

Amendment Foundation, Inc., by and through undersigned counsel, and submit their

memorandum of points and authorities in reply to Defendants' opposition to Plaintiffs' motion

for a preliminary injunction.

Dated: February 27, 2015          Respectfully submitted,

                                  Alan Gura (D.C. Bar No. 453449)
                                  Gura & Possessky, PLLC
                                  105 Oronoco Street, Suite 305
                                  Alexandria, VA 22314
                                  703.835.9085/Fax 703.997.7665


                            By:  /s/ Alan Gura_____
                                  Alan Gura
                                  Attorney for Plaintiffs

Table of Contents

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      The Second Amendment Foundation Has Standing. . . . . . . . . . . . . . . . . . . . . 1

II.     The Second Amendment Secures a Fundamental Right
        to Carry a Handgun. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    The "Proper Reason" Requirement Is Not Presumptively Lawful.. . . . . . . . . . . . 7

IV.     The "Proper Reason" Requirement Is Unconstitutional. . . . . . . . . . . . . . . . . . 12

V.      Plaintiffs Are Irreparably Harmed, as There Is No Speculation
        That Defendants Have Denied Them the Ability to Exercise a
        Fundamental Constitutional Right. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.     The Balance of Equities, and the Public Interest, Favor Plaintiffs
        and Other Law-Abiding, Responsible Americans. . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

Table of Authorities

Cases

*Am. Trucking Ass'ns* v. *Fed. Motor Carrier Safety Admin.*,
   724 F.3d 243 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-4

*Cases* v. *United States*,
   131 F.2d 916 (1st Cir. 1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cooke* v. *United States*,
   275 F.2d 887 (D.C. Cir. 1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Dearth* v. *Holder*,
   641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4

*Denius* v. *Dunlap*,
   330 F.3d 919 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dickens* v. *Ryan*,
   688 F.3d 1054 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*District of Columbia* v. *Heller*,
   554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*DKT Memorial Fund, Ltd.* v. *Agency for International Dev.*,
   810 F.2d 1236 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Drake* v. *Filko*,
   724 F.3d 426 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20

*Ezell* v. *City of Chicago*,
   651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 21

*Heller* v. *District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Hunt* v. *Washington State Apple Advertising Comm'n*,
   432 U.S. 333 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Ill. Ass'n of Firearms Retailers* v. *City of Chicago*,
   961 F. Supp. 2d 928 (N.D. Ill. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Int'l Bhd. of Teamsters* v. *United States DOT*,
 724 F.3d 206 (D.C. Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kachalsky* v. *Cnty. of Westchester*,
 701 F.3d 81 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

*Kwong* v. *Bloomberg*,
 723 F.3d 160 (2d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Kwong* v. *Bloomberg*,
 876 F. Supp. 2d 246 (S.D.N.Y. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Mance* v. *Holder*, No. 14-539-O,
 2015 U.S. Dist. LEXIS 16679 (N.D. Tex. Feb. 11, 2015). . . . . . . . . . . . . . . . . . . . . . . 4, 8

*McDonald* v. *City of Chicago*,
 561 U.S. 742 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8

*Moore* v. *Madigan*,
 702 F.3d 933 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

*Moore* v. *Madigan*,
 842 F. Supp. 2d 1092 (C.D. Ill. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol,*
 *Tobacco, Firearms & Explosives,*
 700 F.3d 185 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 8

*Nunn* v. *State*,
 1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Palmer* v. *District of Columbia*, No. 09-1482,
 2015 U.S. Dist. LEXIS 101945 (D.D.C. July 26, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . 5

*People* v. *Zerillo*,
 219 Mich. 635, 189 N.W. 927 (1922). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Peoples Rights Org.* v. *City of Columbus*,
 152 F.3d 522 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Peruta* v. *Cnty. of San Diego*,
 742 F.3d 1144 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

iii

*Schubert* v. *De Bard*,
        398 N.E.2d 1339 (Ind. App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Silvester* v. *Harris*, No. 11-2137,
        2014 U.S. Dist. LEXIS 118284 (E.D. Cal. Aug. 22, 2014). . . . . . . . . . . . . . . . . . . . . . . . 3

*South Coast Air Quality Mgmt. Dist.* v. *EPA*,
        472 F.3d 882 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Staub* v. *City of Baxley*,
        355 U.S. 313 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Cruikshank*,
        92 U.S. 542 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States* v. *Pritchett*,
        470 F.2d 455 (D.C. Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States* v. *Tot*,
        131 F.2d 261 (3d Cir. 1942).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Vill. of Arlington Heights* v. *Metropolitan Housing Dev. Corp.*,
        429 U.S. 252 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*West Virginia Ass'n of Community Health Centers, Inc.* v. *Heckler*,
        734 F.2d 1570 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Wildearth Guardians* v. *Jewell*,
        738 F.3d 298 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3


Statutes

D.C. Code § 22-4506(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


Other Authorities

*Current Valid Tennessee Handgun Permits by County*, available at
        http://www.tn.gov/safety/stats/DL_Handgun/Handgun/
        Current_HG_PermitHolders.pdf (last visited Feb. 27, 2015). . . . . . . . . . . . . . . . . . . . . . 18

FBI, *Uniform Crime Reports: Crime in the United States 2013*, Table 4,
    available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/
    crime-in-the-u.s.-2013/tables/4tabledatadecoverviewpdf/table_4_
    crime_in_the_united_states_by_region_geographic_division_and_
    state_2012-2013.xls (last visited Feb. 27, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Florida Department of Agriculture and Consumer Services
    Division of Licensing, *Concealed Weapon or Firearm*
    *License Summary Report October 1, 1987 - June 30, 2015*,
    available at http://www.freshfromflorida.com/content/download/
    7499/118851/cw_monthly.pdf (last visited Feb. 27, 2015) . . . . . . . . . . . . . . . . . . . . . . . 19

Michigan State Police Criminal Justice Information Center,
    *Concealed Pistol License Annual Report, July 1, 2012*
    *to June 30, 2013*, available at http://www.michigan.gov/
    documents/msp/CPLAnnual_Report2013_463317_7.pdf
    (last visited Feb. 27, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Peter Whoriskey, "The U.S. government is poised to withdraw
    longstanding warnings about cholesterol," *The Washington Post*,
    Feb. 10, 2015, available at http://www.washingtonpost.com/blogs/
    wonkblog/wp/2015/02/10/feds-poised-to-withdraw-longstanding-
    warnings-about-dietary-cholesterol/ (last visited Feb. 27, 2015) . . . . . . . . . . . . . . . . . . . 15

Rothstein Catalog on Disaster Recovery and The Disaster Center,
    available at http://www.disastercenter.com/crime/dccrime.htm
    (last visited Feb. 27, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Tennessee Dep't of Safety & Homeland Security, *Handgun Carry*
    *Permit Statistics Calendar Year 2013*, available at
    http://www.tn.gov/safety/stats/DL_Handgun/Handgun/
    HandgunReport2013Full.pdf (last visited Feb. 27, 2015) . . . . . . . . . . . . . . . . . . . . . . . 18

Texas Dep't of Public Safety, *Conviction Rates for Concealed Handgun*
    *License Holders, Reporting Period 1/1/2012-12/31/2012*, available at
    http://www.txdps.state.tx.us/RSD/CHL/Reports/ConvictionRates
    Report2012.pdf (last visited Feb. 27, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. Bureau of the Census, Statistical Abstracts of the United States . . . . . . . . . . . . . . . . . . . . . 16

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PRELIMINARY STATEMENT

Both sides of this case are, in some measure, continuing to litigate *Palmer* v. *District of Columbia*, No. 09-CV-1482-FJS. Plaintiffs are picking up from where *Palmer* ended (so far), seeking the injunctive relief that has not yet been adjudicated in the prior case. But Defendants are re-litigating the core issue *Palmer* already resolved. This is not entirely surprising, as Defendants are appealing *Palmer* and may wish to preserve their common claims here. However, that approach makes this Court's task in resolving the instant motion relatively simple. What's done is done; there is, in fact, a fundamental right to carry handguns for self-defense. Defendants will never agree, but their arguments along these lines, now preserved, should be directed at a higher court.

Because there is a fundamental right to carry a gun, it follows that the right cannot be totally prohibited to the entire community, with vanishingly rare exceptions for when the police chief agrees that a good reason may exist for its exercise. What kind of nonsense "right" is available only in the rarest of cases when the police agree it's a good idea?

Defendants' opposition is, in the end, largely non-responsive to the motion. It merely denies that the right exists, throwing in the now-familiar mix of hyperbole, bad history, policy arguments, and random standing theories that are simply detached from the language of the complaint and binding precedent.

The motion should be granted.

ARGUMENT

I.     THE SECOND AMENDMENT FOUNDATION HAS STANDING.

As Defendants do not question the individual plaintiffs' standing, which is obvious,[1] there

is no need to reach the question of the Second Amendment Foundation's ("SAF") standing. See

*Dearth* v. *Holder*, 641 F.3d 499, 503 n.*** (D.C. Cir. 2011). But because Defendants promise a

forthcoming motion on the subject, and because their argument is so emblematic of the

opposition's loose approach to the facts and the law, it merits addressing at this juncture.

In a lengthy footnote, Defendants launch a strong argument against SAF's organizational

standing. Opp. 7-8 n.6. There is only one problem with this argument. SAF does not claim

organizational standing—the standing to sue based on an injury suffered by an organization.

Rather, SAF claims *associational* standing, which is very different—the standing to sue based on

the injuries suffered by an organization's *members*. See Complaint, ¶ 4 ("SAF brings this action

on behalf of its members"); Gottlieb Decl., ¶ 7.

The law of associational standing, definitively established in *Hunt* v. *Washington State*

*Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977), has not changed. As the D.C. Circuit

recently described it:

> An association has standing to sue under Article III of the Constitution of the United
> States only if (1) at least one of its members would have standing to sue in his own right;
> (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim
> asserted nor the relief requested requires the member to participate in the lawsuit.

*Am. Trucking Ass'ns* v. *Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013)

(quotation omitted). Defendants' generalized citation to the third party standing doctrine, Opp. 31

---

[1]Wrenn, Akery and Whidby plainly have pre-enforcement standing owing to their coerced
compliance with the law, and to Defendant Lanier's denial of their license applications.

2

n.22, cannot be serious. Associational standing has been a commonly-recognized feature of American law for many decades.

SAF identifies Wrenn, Akery, and Whidby as among its members, Gottlieb Decl., ¶ 6, thus satisfying the first associational standing element. The D.C. Circuit routinely accepts that the second two prongs of associational standing are satisfied. See, *e.g.*, *Am. Trucking*, 724 F.3d at 247 ("the national association has an obvious interest"); *Wildearth Guardians* v. *Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) ("We have little difficulty concluding that the latter two elements of associational standing are met"); *South Coast Air Quality Mgmt. Dist.* v. *EPA*, 472 F.3d 882, 895 (D.C. Cir. 2006) ("Only the first element of standing can seriously be challenged here."); *Int'l Bhd. of Teamsters* v. *United States DOT*, 724 F.3d 206, 212 (D.C. Cir. 2013). And there is no reason to dwell on the second two prongs here. SAF's interest in advancing its members' Second Amendment rights cannot be disputed. Nor is there any requirement for any SAF member to participate in the case, which this Court will decide, one way or another, as a matter of law.

Indeed, courts routinely find that SAF has associational standing upon finding that at least one of its members (typically, as here, another plaintiff in the case) has standing. "The Second Amendment Foundation and the Illinois Rifle Association have many members who reside in Chicago and easily meet the requirements for associational standing." *Ezell* v. *City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011); see also *Silvester* v. *Harris*, No. 11-2137, 2014 U.S. Dist. LEXIS 118284, at *22-*23 (E.D. Cal. Aug. 22, 2014); *Moore* v. *Madigan*, 842 F. Supp. 2d 1092, 1098 (C.D. Ill.), *rev'd on other grounds*, 702 F.3d 933 (7th Cir. 2012). The same holds true for other gun rights membership organizations. See, *e.g.*, *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 191 & n.5 (5th Cir. 2012) ("*NRA*");

3

*Peoples Rights Org.* v. *City of Columbus*, 152 F.3d 522, 531 (6th Cir. 1998); *Mance* v. *Holder*, No. 14-539-O, 2015 U.S. Dist. LEXIS 16679, at *11-*12 (N.D. Tex. Feb. 11, 2015).[2]

None of this is to say that SAF could not also assert an organizational injury. It could. But there is no serious question that SAF has associational standing, which Defendants fail to address.

Apart from decrying SAF's alleged lack of organizational injury, Defendants raise other frivolous attacks on SAF's standing and the scope of the requested injunction. Because other SAF members have refrained from applying, Defendants claim that their injuries are speculative and not imminent. That is not how standing works. Individuals need not formally apply and be denied a license to have standing. Erecting a scheme with which would-be applicants cannot comply confers standing. See *Dearth*, 641 F.3d at 502. "The Supreme Court has recognized that otherwise qualified non-applicants may have standing to challenge a disqualifying statute or regulation." *DKT Memorial Fund, Ltd.* v. *Agency for International Dev.*, 810 F.2d 1236, 1238 (D.C. Cir. 1987) (citing *Vill. of Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1976)).

Nor does it matter, as Defendants protest, that *some* SAF members may prove to be unqualified for other reasons. SAF need not prove that each of its over 650,000 members are otherwise qualified for a permit. The law quite clearly requires organizations seeking associational standing to identify only *one* member who has standing in his or her own right. *Am. Trucking*, 724 F.3d at 247. SAF has identified three such members. That ends the inquiry. And

---

[2]The only apparent exception occurred under the Second Circuit's unique (erroneous) view that representational standing is unavailable in actions under 42 U.S.C. § 1983. See *Kwong* v. *Bloomberg*, 876 F. Supp. 2d 246, 252 (S.D.N.Y. 2012), *aff'd*, 723 F.3d 160 (2d Cir. 2013).

even if it did not, where non-applicant standing is concerned, "[c]ertainty of success" in applying, but for the challenged factor, "[is] not required." *West Virginia Ass'n of Community Health Centers, Inc.* v. *Heckler*, 734 F.2d 1570, 1575 (D.C. Cir. 1984) (footnote omitted).

II.   THE SECOND AMENDMENT SECURES A FUNDAMENTAL RIGHT TO CARRY A HANDGUN.

This Court's opinion in *Palmer* speaks for itself on this simple point: law-abiding, responsible Americans have a fundamental right to carry a handgun for self-defense. Virtually every argument Defendants advance, in arguing that they are not violating this right, is incompatible with this right. But at times, Defendants make plain that they do not truly accept *Palmer*'s basic premise.

For example, Defendants assert that no court "has held that there is *an absolute* right to carry guns in public for self-defense." Opp. 2 (emphasis added). It seems that whenever the government wishes to violate someone's rights, it trots out the shibboleth that there are no "absolute" rights. If by that, Defendants mean that there are no rights exempt from at least some form of regulation, and that in the abstract sense, they can regulate the right to bear arms, that much is not disputed. *Palmer* explicitly allowed Defendants to enact a licensing regime for the exercise of this right, *Palmer* v. *District of Columbia*, No. 09-1482, 2015 U.S. Dist. LEXIS 101945, at *25 (D.D.C. July 26, 2014), albeit one that comports with constitutional standards. But of course it is no answer to a claim that rights are being violated, to merely assert that there are no "absolute" rights. The question is not whether the right is absolute. The question is whether the right, which must have *some* actual scope, is being violated.

Plaintiffs are not the ones seeking an "all-or-nothing approach." Opp. 3. Just as it is fair to question whether Defendants have truly comprehended the scope of *Palmer*, it is fair to ask

them to disagree, if they must, with Plaintiffs' legal claims, but to at least describe those claims

accurately. The second sentence of Plaintiffs' brief reads:

> Of course, the city remains free to regulate the carriage of guns in the interest of public
> safety, *e.g.,* by imposing time, place and manner restrictions, or preventing violent felons
> and the mentally ill from accessing handguns.

Pl. Br., 1. So much for an "absolute" "all-or-nothing" approach.

"All-or-nothing" better describes the Defendants' views. They present a binary universe

in which there is either an "absolute" right to carry guns, without regulation whatsoever; or no

right at all, because the police chief, and not the Constitution, determines whether someone has a

"good reason" to carry a gun for self-defense. Having presented this false choice, Defendants

clearly choose the lack of a right altogether, deriding "plaintiffs' glib assertion of 'fundamental'

rights." Opp. 13.

Plaintiffs' assertion? "*Glib*?" Scare quotes around the term, fundamental? No. It is the

Supreme Court that has declared the Second Amendment to secure a fundamental right, and there

is nothing "glib" about its opinion. See *McDonald* v. *City of Chicago*, 561 U.S. 742, 767 (2010);

*id.* at 805 (Thomas, J., concurring in part and in the judgment). Without any apparent sense of

irony, having essentially thumbed their nose at controlling Supreme Court precedent, Defendants

assert (without citation) that Plaintiffs "mock or deride" the government's interest in public

safety. Opp. 2. Of course Plaintiffs have done no such thing. Plaintiffs deny, in responsible

language, only that there is a governmental interest in extinguishing fundamental rights. The only

mockery and derision here is the casual approach Defendants take toward the not-glib, Supreme

Court-confirmed fundamental right to bear arms for self-defense.

III.   THE "PROPER REASON" REQUIREMENT IS NOT PRESUMPTIVELY LAWFUL.

The Supreme Court advised that "longstanding" laws can inform the "scope" of the right

that the Framers ratified, *District of Columbia* v. *Heller*, 554 U.S. 570, 626-27 (2008), because

the fact that the right's ratification did not disturb certain practices may be evidence that the

Framers or those who followed soon after did not view such practices as inconsistent with the

right.

While "*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it

cannot boast a precise founding-era analogue," *NRA*, 700 F.3d at 196, "1791, the year the Second

Amendment was ratified—[is] the critical year for determining the amendment's historical

meaning." *Moore* v. *Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (citation omitted). "[T]he

relevant time period for the first-step historical analysis is 1791." *Ill. Ass'n of Firearms Retailers*

v. *City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014). *Heller* and *McDonald* "made clear

that the scope of the Second Amendment right depends not on post-twentieth century

developments, but instead on the understanding of the right that predominated from the time of

ratification through the nineteenth century." *Peruta* v. *Cnty. of San Diego*, 742 F.3d 1144, 1175

n.21 (9th Cir. 2014).

The concept of "longstanding" regulation consistent with the right must be tied in some

meaningful way to the Framing Era, for if a *modern* enactment is viewed as thereby limiting a

constitutional right's scope, the right is effectively erased. Everything and anything that a

legislature enacts is thereby automatically self-constitutionalizing. But *Heller* was careful to

confirm that "future legislatures" could not override "the scope [rights] were understood to have

when the people adopted them," *Heller*, 554 U.S. at 634. Thus, as the Fifth Circuit put it, "we

7

look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *NRA*, 700 F.3d at 194.

Even if a "good reason" requirement could co-exist with a *right*, there is no competent evidence that this type of law is "longstanding." Defendants' citation to New Jersey and New York's handgun carry licensing schemes is unavailing. It cannot be said that state enactments in 1924 and 1913 reflected compliance with the Second Amendment's requirements, because those legislatures were on notice that they were not bound to respect Second Amendment rights at all. *See United States* v. *Cruikshank*, 92 U.S. 542 (1876) (holding the Fourteenth Amendment does not apply the Second Amendment as against the States), *overruled*, *McDonald* v. *City of Chicago*, supra. And without any evidence that these regulations relate back to earlier ones, they are by themselves too novel. See, e.g., *Mance*, 2015 U.S. Dist. LEXIS 16679, at *18 ("While two-hundred years from now, restrictions from 1909 may seem longstanding, looking back only to 1909, today, omits more than half of America's history and belies the purpose of the inquiry."). Moreover, New Jersey's law—unlike the District's—did not entirely regulate handgun carrying, as no license was required to carry handguns openly until 1966. *Drake* v. *Filko*, 724 F.3d 426, 448 (3d Cir. 2013) (Hardiman, J., dissenting).

Nor do the District's antiquated laws support the contention that Defendants' "good reason" requirement for carrying handguns is longstanding. The city's 1809 ordinance forbidding the shooting of guns "within four hundred yards of any house . . . or on the sabbath in any part of the city," Dkt. 9-1, says nothing about the carrying of guns for self-defense. Rather, it is a normal time and place regulation governing the *shooting* of firearms.

The District advanced the same argument in *Heller*, citing early public discharge laws for the proposition that there was no right to keep a gun for self-defense. The Supreme Court rejected that argument. "Those laws provide no support for the severe restriction in the present case." *Heller*, 554 U.S. at 632. "It is inconceivable that this law would have been enforced against a person exercising his right to self-defense . . . ." *Id.* "[I]t is unlikely that this law (which in any event amounted to at most a licensing regime) would have been enforced against a person who used firearms for self-defense." *Id.* "It is again implausible that this would have been enforced against a citizen acting in self-defense . . . ." *Id.* The Supreme Court then observed that public discharge laws did not carry significant penalties, in contrast to the severe criminal penalties that the District imposed for handgun possession. "[W]e do not think that a law imposing a 5-shilling fine and forfeiture of the gun would have prevented a person in the founding era from using a gun to protect himself or his family from violence, or that if he did so the law would be enforced against him." *Id*. at 633-34.

The same holds true in this case. There is no reason to believe such laws have ever been enforced to bar the carriage of guns, else regulations on such carriage would not have been separately enacted. Indeed, the fact that the discharge of firearms has long been regulated does not even place that activity, let alone the mere carriage of guns, outside the scope of Second Amendment protection. *Ezell*, 651 F.3d at 705-06.

Defendants next cite an 1857 law that references a good-reason type requirement, but in a manner that, far from advancing their claims, substantially undermines their position. This law provided that an individual going armed "without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property . . . find sureties for keeping the

9

peace for a term not exceeding six months," upon "complaint of any person having reasonable cause to fear an injury or breach of the peace." Dkt. 9-2. In other words, a complainant would have to establish "reasonable cause" that the gun-carrier would injure him or breach the peace. Doing so would result not in any criminal sanction or even prohibition on the carrying of arms, but only the temporary posting of sureties. That is a far cry from requiring the individual gun-carrier to prove a good reason for so doing.

Defendants do not provide, and Plaintiffs have not identified, the precise date on which this provision was enacted. That is unfortunate, because the provision is inconsistent with the next one they cite, a November 4, 1857 prohibition on the carrying of "any deadly or dangerous weapons," including a "pistol." Dkt. 9-3. But this provision was almost immediately replaced with a nearly-identically worded law that prohibited only the *concealed* carrying of arms. *Id*. It could not be said to "ha[ve] long been accepted by the public." *Heller* v. *District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("*Heller II*"), especially when the only apparent similar, prior enactment had been struck down decades earlier for violating the Second Amendment, see *Nunn* v. *State*, 1 Ga. 243 (1846).

In 1892, Congress enacted a statute (codified as Section 1855 of the 1901 code) that was effective until 1932, proscribing the open carrying of handguns if carried "with intent to unlawfully use the same." *United States* v. *Pritchett*, 470 F.2d 455, 457 & n.4 (D.C. Cir. 1972) (summarizing the statutory history of the weapons laws of the District of Columbia). Concealed carrying was prohibited without a license. A replacement law in 1932 continued the prohibition on the unlicensed concealed carrying of handguns, but omitted any reference to the open carrying of handguns, which thus continued to be legal without license, and without any *mens rea*

qualification. It was only "[i]n 1943 [that] the statute was amended to prohibit the carrying of an unlicensed pistol openly as well as concealed. 57 Stat. 586." *Cooke* v. *United States*, 275 F.2d 887, 889 n.3 (D.C. Cir. 1960).

Thus, the requirement that one must have a "good reason" to carry a handgun for self-defense in the District of Columbia dates only to 1943—hardly a "longstanding" requirement. And if in 1943, Congress had looked to the federal courts for constitutional guidance in enacting this provision, it would have only been misled by the then-emerging, erroneous "collective rights" doctrine. See *United States* v. *Tot*, 131 F.2d 261, 266 (3d Cir. 1942), *rev'd on other grounds*, 319 U.S. 463 (1943); *Cases* v. *United States*, 131 F.2d 916, 921 (1st Cir. 1942).

In any event, the "longstanding" inquiry is irrelevant, because "[a] plaintiff may rebut this presumption [of longstanding lawfulness] by showing the regulation does have more than a de minimis effect upon his right." *Heller II*, 670 F.3d at 1253. Obviously, the "good reason" requirement here has far more than a "de minimis" effect on Plaintiffs' rights—it completely bars the right from being exercised, at all times and places and in any manner, without exception. Defendants assert that the permit requirement imposes only "a minimal burden" on those they deem to have "a demonstrable need" to exercise their rights. Opp. 2. Viewed that way, filling out some paperwork at the police station may itself be a minor inconvenience. But the inquiry is not whether a select few people whose rights are not violated have to fill out a form, it is whether *the Plaintiffs* are burdened by a law that totally prevents them from exercising their *fundamental right*. They are. Consequently, under *Heller II*, it does not matter how old this law or its antecedents (if any) might be. The Court must examine it for constitutional compliance.

11

IV.   THE "PROPER REASON" REQUIREMENT IS UNCONSTITUTIONAL.

Defendants argue that

the Act does not destroy any right, because it does not forbid law-abiding, responsible people from carrying concealed handguns, but rather regulates the right, by saying *when* such people can carry—namely, after they have experienced some incident that gives them some special reason to justify carrying in public, or if they work in an occupation requiring such measures.

Opp. 10.

The argument is specious. People do not need a "special reason" to exercise a fundamental right, nor are fundamental rights enjoyed in occupations "requiring such measures." Imagine if the government, despairing of all the religiously-inspired violence afflicting the world today, forbade religious exercise unless people had a "special reason" or special occupation that "required such measures."

Nor is the District's law, in any way, a time regulation. The "when" here is not limited to some particular hour of the day, like an ordinance regulating loud speech at night. The time here is "never" for virtually everyone. And while restricting loud speech at night is eminently reasonable, preventing people from defending themselves until *after* they have suffered a threat or attack is not even rational. Crime is often random, and many people, once victimized, have no further need of guns. While some courts have upheld such laws, others have not. Pl. Br. 12-16. Cases such as *Peruta* still have the better argument.

Ironically, Defendants argue that strict scrutiny should not be applied here because the Supreme Court did not apply it in *Heller*, and here, allegedly, "no such core right is implicated." Opp. 11. Again, that a core right—the right to have arms for self-defense—is implicated, was already established in *Palmer*. And the Supreme Court did not apply strict scrutiny in *Heller*

because it did not need to do so—the District of Columbia destroyed Second Amendment rights in that case, just as it did in *Palmer*, and just as it does today. At some point, perhaps, the District will stop trying to destroy Second Amendment rights, at which time strict scrutiny would present the first mode of analysis for the city's laws.

Defendants argue that rights have greater salience inside one's home than outside, and that much is true. But the argument does not sanction every First or Fourth Amendment violation that occurs outside one's home, nor does it practically erase the Second Amendment outside the home, a topic already litigated in *Palmer*.[3] And while Defendants persist in arguing that self-defense requires no retreat inside the home, they fail to acknowledge that in the District of Columbia, retreat to the wall is not required *outside* the home, either. The District of Columbia Court of Appeals follows a "middle ground" approach whereby the law "does not impose a duty to retreat but does allow a failure to retreat, together with all the other circumstances, to be considered by the jury in determining if there was a case of true self-defense." *Gillis* v. *United States*, 400 A.2d 311, 313 (D.C.1979); *In re Robertson*, 19 A.3d 751, 763 (D.C. 2011). And this right of self-defense is enjoyed by *everyone* in the District of Columbia, not just those with a police-approved good reason. If everyone has the right of self-defense, why should nearly everyone be forbidden the means of exercising that right?

---

[3]The argument also has some practical limits. Defendants parrot the Second Circuit's observation that "the state's efforts to regulate private sexual conduct between consulting adults is especially suspect when it intrudes into the home," Opp. 12-13 (quoting *Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81, 94 (2d Cir. 2012)). To this, the Seventh Circuit aptly replied, "Well of course—the interest in having sex inside one's home is much greater than the interest in having sex on the sidewalk in front of one's home. But the interest in self-protection is as great outside as inside the home. " *Moore*, 702 F.3d at 941.

Defendants' arguments under intermediate scrutiny fare no better. To begin, Defendants substantially misrepresent their burden under this test. It is emphatically not the case that "[t]he District need only present 'some meaningful evidence' that its concealed-carry requirements 'can reasonably be expected to promote' an important governmental interest." Opp. 18 (quoting *Heller II*, 670 F.3d at 1259). Plaintiffs, and this Court, also have access to the *Heller II* opinion, which spells out a very different version of intermediate scrutiny—one which requires actual "scrutiny."

> [T]he District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective . . . the means chosen [may] not [be] substantially broader than necessary to achieve that interest.

*Heller II*, 670 F.3d at 1258 (quotations omitted).

In other words, Defendants completely ignore the concept of "fit." Not surprisingly, they fail to demonstrate how the challenged law comports with the right (which they grudgingly refuse to acknowledge). But it is not as though they supply any evidence, apart from arguments that the right (that they refuse to acknowledge) is socially harmful. The logic is as follows: (1) carrying guns is dangerous; (2) rationing the ability to carry guns thus minimizes harm; (3) the law is constitutional. Q.E.D.

Under this logic, every constitutional right may be abolished. Defendants can present evidence that due process, or limits on search and seizure, or the right to counsel in criminal trials, all have negative consequences for "public safety." These arguments would not be difficult to sustain. "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that

14

impose restrictions on law enforcement and on the prosecution of crimes fall into

the same category." *McDonald*, 561 U.S. at 783. And laws barring religion, or blasphemy, will

not become less unconstitutional if the D.C. City Council determines they are necessary to reduce

religious strife. Indeed, the Government routinely changes its mind about what is good for

society. Until recently, it warned about the danger of eggs, but has now reconsidered.[4] If there is

a right to eat eggs, *cf.* U.S. Const. amend. IX, an egg-eating ban that would have been

constitutional last week is not suddenly unlawful because the Government has issued a report.

Considering Defendants' invocation of "science" to support their law, they should have

more carefully read Plaintiffs' arguments before attempting to rebut them. Plaintiffs cited a

scholarly work for the proposition that "there seems little legitimate scholarly reason to doubt

that defensive gun use is very common in the U.S., and that it probably is substantially more

common than criminal gun use." Pl. Br. 22. Defendants responded by attacking "the empirical

foundation of the 'more guns, less crime' hypothesis." Opp. 23. Leaving aside their attack on

Prof. Kleck (whose seminal book on the subject won an award from the American Society of

Criminology), Defendants' response is a non-sequitor. Plaintiffs do not invoke the "more guns,

less crime" hypothesis, which asserts that increased civilian gun use deters crime. They have

merely asserted that defensive gun use is more common than criminal gun use, and that this point

is not particularly controversial.[5]

---

[4] See Peter Whoriskey, "The U.S. government is poised to withdraw longstanding warnings about cholesterol," *The Washington Post*, Feb. 10, 2015, available at http://www.washingtonpost.com/blogs/wonkblog/wp/2015/02/10/feds-poised-to-withdraw-longst anding-warnings-about-dietary-cholesterol/ (last visited Feb. 27, 2015).

[5] Plaintiffs happen to believe that the science behind "more guns, less crime" is sound, but that is immaterial for purposes of this case, as is the fact that lawful defensive gun use is more

Defendants' failure to even grasp the arguments advanced here should give any court pause before deferring abjectly to the City Council's "scientific" views—especially as a reason for erasing a fundamental constitutional right. The fact is, the science is far from settled, at least on Defendants' terms. What follows on the point has been submitted before in *Palmer*, but it merits consideration (and preservation on the record) here. Some of Defendants' evidence can only be charitably described as junk-science. Defendants again recite the familiar 1991 paper by Loftin, et al., purporting to show how well the District's handgun ban "worked" by correlating *raw* numbers of murders and suicides to the gun ban. This study was the primary evidence on the city's summary judgment motion in *Heller*, where neither the D.C. Circuit nor Supreme Court believed it relevant to examine whether keeping handguns was a good or bad idea. The result would be no different when the question is bearing handguns.

In any event, the study is deeply flawed. Putting aside that correlation does not equal causation, even the correlative relationship is dubious. The study measures death with raw numbers rather than rates, thus ignoring the city's dramatic depopulation through the studied period. Between the two ten-year periods examined in the study, Washington's annual population declined 15%. U.S. Bureau of the Census, Statistical Abstracts of the United States.  When one examines homicide *rates*, the supposed benefits disappear. The suicide prevention benefits are likewise overstated. Moreover, the study ends in 1988, a year in which the murder rate doubled pre-ban levels—hardly an improvement—and one year before a severe crime increase. In 1991, the peak year, the homicide rate tripled pre-ban levels. *See* FBI UCR Data compiled by Rothstein

---

frequent than unlawful gun use. The right to carry handguns for self-defense is a part of our constitutional fabric regardless of whether the Framers erred in placing it there.

Catalog on Disaster Recovery and The Disaster Center, available at

http://www.disastercenter.com/crime/dccrime.htm (last visited Feb. 27, 2015).

There are, of course, other measures that might indicate whether handgun carrying

benefits or harms society. Again, while correlation is not causation, one might expect higher

violent crime rates in jurisdictions respecting the right to bear arms if such laws create crime.

Alas, the data indicates the opposite. According to the latest FBI crime rate figures, for 2013,[6] the

United States as a whole experienced 367.9 violent crimes per 100,000 people.[7] But the average

violent crime rates of those jurisdictions where the carrying of handguns was tightly restricted on

a "may issue" basis or completely forbidden was 456.46.[8]

Perhaps the best evidence on the question of whether licensing people to carry defensive

handguns creates crime lies in the outcomes of people so licensed. Do they behave responsibly?

Or are they all incipient killers? *Cf. Dickens* v. *Ryan*, 688 F.3d 1054, 1085 (9th Cir. 2012)

(Reinhardt, J., dissenting) ("Carrying a gun, which is a Second Amendment right . . . cannot

legally lead to a finding that the individual is likely to murder someone; if it could, half or even

more of the people in some of our states would qualify as likely murderers").

---

[6]The Court should take judicial notice of information contained on government websites. *Denius* v. *Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003).

[7]*See* FBI, *Uniform Crime Reports: Crime in the United States 2013*, Table 4, available at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2013/crime-in-the-u.s.-2013/tables/4tabled atadecoverviewpdf/table_4_crime_in_the_united_states_by_region_geographic_division_and_sta te_2012-2013.xls (last visited Feb. 27, 2015).

[8]*Id.* (averaging Massachusetts, 404.0; New Jersey, 285.6; New York, 389.8; Illinois, 372.5; **District of Columbia, 1289.1**; Maryland, 467.8; California, 396.2; Hawaii, 245.3; and Puerto Rico, 257.8. Plaintiffs excluded Delaware (479.1), where concealed carry permits are generally unavailable but open carrying is permissible).

Hard data confirms that law-abiding, responsible American adults who have undergone the type of licensing to which Defendants already subject mere handgun possessors are quite safe and responsible in carrying handguns for self-defense. Through June 30, 2013, Michigan has issued 118,025 handgun carry licenses and revoked only 1402, barely over 1%, for *any* reason.[9] Tennessee, which currently has 482,073 handgun carry permits, revoked just 367 last year for any reason.[10] These revocations did not necessarily involve misuse of a firearm.

Texas and Florida, highly populated states with significant urban populations, who have issued handgun carry licenses for many years, provide additional information regarding the outcomes for licensed handgun carriers. For 2012, of 63,272 total serious criminal convictions in Texas, only 120—or 0.1897%—involved individuals licensed to carry defensive handguns, though not necessarily involving handguns or their public carriage.[11] Since 1987, Florida has issued 2,780,338 handgun carry licenses, and has revoked only 9,366 for any reason—barely over a third of one percent—of which at least 943 were later reinstated. Through 2010, only 168 revocations in that state involved the use of a firearm, though not necessarily in a public setting

---

[9]Michigan State Police Criminal Justice Information Center, *Concealed Pistol License Annual Report, July 1, 2012 to June 30, 2013*, available at http://www.michigan.gov/documents/msp/CPLAnnual_Report2013_463317_7.pdf (last visited Feb. 27, 2015).

[10]*Current Valid Tennessee Handgun Permits by County*, available at http://www.tn.gov/safety/stats/DL_Handgun/Handgun/Current_HG_PermitHolders.pdf (last visited Dec. 11, 2014); Tennessee Dep't of Safety & Homeland Security, *Handgun Carry Permit Statistics Calendar Year 2013*, available at http://www.tn.gov/safety/stats/DL_Handgun/Handgun/HandgunReport2013Full.pdf (last visited Feb. 27, 2015).

[11]Texas Dep't of Public Safety, *Conviction Rates for Concealed Handgun License Holders, Reporting Period 1/1/2012-12/31/2012*, available at http://www.txdps.state.tx.us/RSD/CHL/Reports/Conviction RatesReport2012.pdf (last visited Feb. 27, 2015).

or involving violence.[12]

Apart from their claim that the right itself is dangerous, Defendants do not attempt to show that their "good reason" requirements target any specifically dangerous people or behavior. And since Defendants admit that they are targeting the right itself, it is difficult to see how they might prove that the measure is properly tailored under any level of scrutiny. In sum, Defendants are merely trying to do again what they failed to do in *Heller*: "prove" that a fundamental Second Amendment right harms society, and thereby justify its violation. Even were Defendants able to prove their point, it would not legally justify their conduct.

Finally, as for the prior restraint argument, Defendants err in suggesting that the doctrine is limited to the First Amendment. It is not. The Supreme Court speaks of the doctrine as securing "freedoms which the Constitution guarantees." *Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958). That no court has yet to apply the doctrine in the Second Amendment context is not surprising, considering just how novel Second Amendment litigation still is. Defendants' arguments that Second Amendment rights are relatively easier to regulate than are First Amendment rights, without worrying about an unintentional infringement, merely speaks to their low regard for the Second Amendment. After all, the city does not believe that *Heller* was correctly decided and has not accommodated itself to *Palmer*.

But here, as elsewhere, Defendants seem not to fully grasp the nature of Plaintiffs' arguments. To be sure, Plaintiffs assert that the "good reason" requirement is an unlawful prior

---

[12]Florida Department of Agriculture and Consumer Services Division of Licensing, *Concealed Weapon or Firearm License Summary Report October 1, 1987 - June 30, 2015*, available at http://www.freshfromflorida.com/content/download/7499/118851/cw_monthly.pdf (last visited Feb. 27, 2015).

19

restraint, much as such "standards" were treated as unlawful prior restraints in *Schubert* v. *De Bard*, 398 N.E.2d 1339 (Ind. App. 1980) and *People* v. *Zerillo*, 219 Mich. 635, 189 N.W. 927 (1922), and challenged more recently in cases like *Kachalsky* and *Drake.*

But unlike those cases, there is an additional, overarching prior restraint at issue here. D.C. Code § 22-4506(a) provides that Defendant Lanier "may" issue a license to applicants who satisfy all the requirements, including "good/other proper reason." Even if "good reason" is sufficiently well-defined so as to limit the Chief's discretion in some predictable, objective (if inappropriate) manner, "may" is not. "May" is totally untethered to any standard. When the police chief "may," without more, withhold or permit the exercise of a fundamental right, the prior restraint doctrine is invoked.

V.   PLAINTIFFS ARE IRREPARABLY HARMED, AS THERE IS NO SPECULATION THAT DEFENDANTS HAVE DENIED THEM THE ABILITY TO EXERCISE A FUNDAMENTAL CONSTITUTIONAL RIGHT.

The notion that Plaintiffs' injuries are speculative, because they have not yet established the denial of a constitutional right, is nonsense. Since it is not the object of a preliminary injunction motion to enter a final judgment, the city could defeat *any* preliminary injunction motion on irreparable harm grounds by claiming that the case is at a preliminary stage.

That is not how such motions work. In the preliminary injunction context, the decision as to whether Plaintiffs have established a likelihood of success on the merits answers the question of whether their rights are being violated. So, yes, it is true that "plaintiffs have not yet established that they have an absolute right to carry a handgun in public for self-defense without being subject to reasonable government regulation." Opp. 29. Indeed, Plaintiffs will *never* establish that they have an "absolute right" to be free of regulation because they have not asserted

that sort of claim, which is plainly false. However, Plaintiffs *have* established that they were denied permits to exercise their right to bear arms, and they *have* established a high likelihood of success on the merits of their claim.

Defendants may not be "aware of any controlling case extending this proposition"—that constitutional violations cause irreparable harm—"to the rights protected under the Second Amendment," Opp. 29, but they are aware of the proposition—so what is so special about Second Amendment rights that they are the only type of rights whose violation does not constitute irreparable harm?  Are there any other constitutional rights that may be violated without recourse to a preliminary injunction? And *Ezell* may not be "controlling," but it is persuasive enough on this point. It can scarcely be imagined that on appeal, the D.C. Circuit would concoct some theory as to why the violations of all rights constitute irreparable harm—except for this one.

VI.    THE BALANCE OF EQUITIES, AND THE PUBLIC INTEREST, FAVOR PLAINTIFFS AND OTHER LAW-ABIDING, RESPONSIBLE AMERICANS.

An injunction here would not result in unlicensed handgun carrying. The District would still have among the most stringent handgun carry licensing requirements in the country, requiring not just extensive training and background checks for applicants and registration of carried guns, but the full panoply of extreme (and dubious) restrictions upon licensed handgun carriers.

Defendants claim that "[s]urely the District has the right to check for itself to determine whether self-declared 'otherwise eligible' applicants are responsible and law-abiding." Opp. 31 n.22. Indeed it does. The injunction will not stop background checks, or training, or

registration, or any other thing that the District wishes to impose on handgun carry license applicants. It will stop *only* the "good/proper reason" requirement, and nothing else.

Considering the extreme level of regulation untouched by the injunction, and the wealth of evidence demonstrating how licensed handgun carriers actually behave, *supra*, the threat to the public harm would be virtually zero.

But the benefit to individuals, who could defend themselves from violent crime, would be significant. "The Defendants aver that the risk of a gun-related tragedy—accidental or deliberate—outweighs plaintiffs' speculative fears about any imminent need to defend themselves from public attack." Opp. 32. This much ignores reality, and is itself wildly speculative. Gun-related tragedies caused by the carrying of handguns by law-abiding, responsible citizens— especially subject to stringent licensing—are blessedly rare. Considering the District's extreme crime rate, the idea that licensed gun carrying here will cause more unintended tragedies than the crime that might be averted is far-fetched speculation. What is not speculative is that each successful applicant will have some measure of peace of mind that comes with knowing that one has a realistic means of defending life and limb from unlawful violence.

And of course, there is the matter that enforcing the Constitution is *always* in the public interest.

22

CONCLUSION

The Court should enter a preliminary injunction.

Dated: February 27, 2015                    Respectfully submitted,

                                            Alan Gura (D.C. Bar No. 453449)
                                            Gura & Possessky, PLLC
                                            105 Oronoco Street, Suite 305
                                            Alexandria, VA 22314
                                            703.835.9085/Fax 703.997.7665

                                    By:   /s/ Alan Gura
                                          Alan Gura
                                          Attorney for Plaintiffs

23