# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN WRENN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | Action No. 1:15-cv-00162-CKK |
| | ) | |
| , | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS

BRADY CENTER TO PREVENT GUN
VIOLENCE

Jonathan Lowy
Alla Lefkowitz
Kelly Sampson
840 First Street, N.E. Suite 400
Washington, D.C. 20002
(202) 370-8104
jlowy@bradymail.org

HOGAN LOVELLS US LLP

Adam K. Levin - DC Bar # 460362
James W. Clayton - DC Bar # 1014582
Anna M. Kelly - DC Bar # 1021763
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
adam.levin@hoganlovells.com
james.clayton@hoganlovells.com
anna.kelly@hoganlovells.com

## <u>CORPORATE DISCLOSURE STATEMENT</u>

The Brady Center to Prevent Gun Violence has no parent company, nor does any publicly-held company have a 10% or greater ownership interest (such as stock or partnership shares) in the Center.

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................................................i

TABLE OF AUTHORITIES .................................................................................................... iii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ...............................................................1

INTRODUCTION ....................................................................................................................1

ARGUMENT ............................................................................................................................3

I.   THE "GOOD REASON" / "PROPER REASON" REQUIREMENT
     DOES NOT VIOLATE THE SECOND AMENDMENT..........................................3

     A.   The District's Concealed Carry Regime Conforms With "May
          Issue" Regimes Upheld By Other Circuits As Constitutional .........................3

     B.   The Plaintiffs' Suggestion to Import A First Amendment
          Framework As An Alternative To The "May Issue" Regime Is
          Problematic .........................................................................................................6

II.  SOCIAL SCIENCE CONFIRMS THAT THE DISTRICT'S "GOOD
     REASON" / "PROPER REASON" REQUIREMENT FURTHERS
     AN IMPORTANT GOVERNMENT INTEREST IN PUBLIC
     SAFETY.....................................................................................................................7

     A.   The Lethality Of Guns Creates Unique Dangers In The Public
          Sphere .................................................................................................................8

     B.   Public Carrying Increases Violent Crime ..........................................................9

     C.   Permissive Concealed Carry Laws Hinder Law Enforcement's
          Ability to Protect Themselves and the Public...................................................12

CONCLUSION.......................................................................................................................13

# TABLE OF AUTHORITIES

<u>Page(s)</u>

CASES:

*Bonidy v. United States Postal Serv.,*
790 F.3d 1121 (10th Cir. 2015)...........................................................................6

*Commonwealth v. Robinson,*
600 A.2d 957 (Pa. Super. Ct. 1991) ...................................................................12

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .............................................................................................1

*\*Drake v. Filko,*
724 F.3d 426 (3d Cir. 2013) .................................................................................5

*Kachalsky v. Cnty. of Westchester,*
No. 10-cv-5413 (S.D.N.Y. 2011).........................................................................9

*\*Kachalsky v. Cnty. of Westchester,*
701 F.3d 81 (2d Cir. 2012) ..........................................................................5, 6, 7

*Peruta v. Cnty. of San Diego,*
742 F.3d 1144 (9th Cir. 2014), *reh'g en banc granted,*
No. 10-56971(Mar. 26, 2015)...........................................................................1, 4

*Singleton v. United States,*
998 A.2d 295 (D.C. Ct. App. 2010) ...................................................................13

*Turner Broad. Sys., Inc. v. FCC,*
520 U.S. 180 (1997) .............................................................................................5

*United States v. Masciandaro,*
638 F.3d 458 (4th Cir. 2011) ...............................................................................7

*\*Woollard v. Gallagher,*
712 F.3d 865 (4th Cir. 2013) ...............................................................................5

STATUTES:

Cal. Penal Code §§ 26150 – 26225.............................................................................4

Conn. Gen. Stat. §§ 29-28 – 29-30 .............................................................................4

Conn. Gen. Stat. § 29-32 .............................................................................................4

Conn. Gen. Stat. § 29-32b ...........................................................................................4

Conn. Gen. Stat. § 29-35 ...........................................................................................4

Conn. Gen. Stat. § 29-37 ...........................................................................................4

D.C. Code § 22-4506(a) .............................................................................................3

Del. Code Ann. tit. 11, § 1441 ...................................................................................4

Del. Code Ann. tit. 11, § 1442 ...................................................................................4

Haw. Rev. Stat. Ann. § 134-9 .....................................................................................4

Ind. Code Ann. § 35-47-2-3(e) ...................................................................................4

Md. Code Ann., Pub. Safety §§ 5-301 – 5-314 ...........................................................4

N.H. Rev. Stat. Ann. § 159:6(I)(b) .............................................................................4

N.J. Stat. Ann. § 2C:39-5 ...........................................................................................4

N.J. Stat. Ann. § 2C:58-3 ...........................................................................................4

N.J. Stat. Ann. § 2C:58-4 ...........................................................................................4

N.Y. Penal Law § 400.00 ............................................................................................4

R.I. Gen. Laws § 11-47-8 –11-47-18 ..........................................................................4

**LEGISLATIVE MATERIALS:**

*Council of the District of Columbia, Committee of the Whole, Committee Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014" (Dec. 2, 2014) .................7

*Council of the District of Columbia, Committee on the Judiciary & Public Safety, Committee Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014" (Nov. 25, 2014) ..........................................................................................6

**OTHER AUTHORITIES:**

*Abhay Aneja, John J. Donohue III, & Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* 80-81 (National Bureau of Economic Research Working Paper No. 18294, 2014)..........................................................................................................................9

Ian Ayres & John J. Donohue III, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006*, 6 Econ. J. Watch 218 (May 2009) ..............................................10

Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stanford L. Rev. 1194 (2003) ....................................................10

Ian Ayres & John J. Donohue III, *Yet Another Refutation of the More Guns, Less Crime Hypothesis—With Some Help From Moody and Marvell*, 6 Econ J. Watch 351 (Jan. 2009) ........................................................................10

Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034 (2009)..................................................................12

Philip Cook & Jens Ludwig, *Public Policy Perspectives Principles for Effective Gun Policy*, 73 Fordham L. Rev. 589 (2004).............................................................8, 11

Monica Davey & Mitch Smith, *Murder Rates Rising Sharply in Many U.S. Cities*, The New York Times (Aug. 31, 2015) ........................................................................1

Will Greenberg, *Police chiefs from around the country meet in D.C. to discuss violent summer*, The Washington Post (Aug. 3, 2015)......................................................2

David Hemenway, *et al.*, *Gun use in the United States: results from two national surveys*, 6 Injury Prevention 263 (2000)..................................................................12

David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. of Crim. L. and Criminology 1430 (1997) ............12

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature*, 9 Aggression & Violent Behav. 417 (2004)..................................10

Spencer Hsu & Rachel Weiner, *Federal appeals court lets new D.C. gun law stand, pending final ruling*, The Washington Post (June 29, 2015)...................................8

Law Center to Prevent Gun Violence, *Concealed Weapons Permitting Policy Summary* (Sept. 10, 2015)..........................................................................................4, 11

Law Center to Prevent Gun Violence, *Annual Gun Law State Scorecard 2014* (Dec. 2014)..............................................................................................................11

Colin Loftin, *et al.*, *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, 325 New Eng. J. Med. 1615 (1991) .............................................................................11

Aamer Madhani, *Several big U.S. cities see homicide rates surge*, USA Today (July 10, 2014)........................................................................................2

David McDowall, *et al.*, *Easing Concealed Firearms Laws*, 86 Crim. L. & Criminology 193 (1995) ...........................................................................11

Matthew Miller, *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis & Prevention 477 (Jul. 2000) ................................................10

Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States, 1988–1997*, 92 Am. J. Pub. Health 1988 (Dec. 2002)..................................................................10

Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, Stanford News (Nov. 14, 2014) ...................................................................9

Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Pub. Health 49 (2015)....................................11

Perry Stein, *D.C.'s summer gun violence: By the numbers and neighborhoods*, The Washington Post (Aug. 6, 2015)...........................................................................................2

Violence Policy Center, *Concealed Carry Killers*........................................................................8

*Washington, DC 2013 Visitor Statistics*, Destination DC (2013)..................................................8

Chuck Williams, *Alabama sheriffs question gun laws in wake of Rusty Houser shooting*, Ledger-Enquirer (Aug. 11, 2015)..............................................................................................5

*Authorities upon which we chiefly rely are marked with asterisks.

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

The Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving both state and federal gun laws, including *McDonald v. City of Chicago*, 561 U.S. 742, 870 n.13, 887 n.30, 891 n.34 (2010) (Stevens, J., dissenting) (citing Brady Center brief), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), *District of Columbia v. Heller*, 554 U.S. 570 (2008), *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) (reheard en banc on June 16, 2015), and *Wrenn v. District of Columbia*, No. 15–162, (D.C. Cir.). To this case, *amicus* brings a broad and deep perspective on the issues raised and has a compelling interest in the federal courts' interpretation of Second Amendment issues.[1]

## INTRODUCTION

Firearms are responsible for more than twice as many deaths in the District of Columbia as motor vehicles, *see* Josh Sugarmann, *Gun Deaths Now Outpace Motor Vehicle Deaths in 21 States*, The Huffington Post (Jan. 15, 2016),[2] and that disparity is only growing; at the end of 2015, the District's homicide rate was up 54% from the previous year. Ryan M. McDermott, *D.C. Sees 54% Increase in Homicides*, The Washington Times (Dec. 30, 2015)[3]; *see also* Monica Davey & Mitch Smith, *Murder Rates Rising Sharply in Many U.S. Cities*, The New

---

[1]     This brief is being filed pursuant to the Court's February 12, 2016 Minute Order, which granted *amici curiae* leave to file no later than February 18, 2016. *Amicus curiae* certifies that no party or party's counsel authored this brief in whole or in part. It further certifies that no party, party's counsel, or person other than amici, its members, or its counsel contributed money intended to fund preparation and submission of this brief.

[2]     *Available at* http://www.huffingtonpost.com/josh-sugarmann/gun-deaths-now-outpace-mo_b_8990858.html (last visited Feb. 16, 2016).

[3]     *Available at* http://www.washingtontimes.com/news/2015/dec/30/dc-sees-54-increase-in-homicides/ (last visited Feb. 16, 2016).

York Times (Aug. 31, 2015) (reporting that, as of August 2015, the homicide rate in the District rose 44% relative to the same time in 2014).[4]  Gun crimes in the District in June and July also went up nearly 30% from the same time in 2014.  Perry Stein, *D.C.'s summer gun violence: By the numbers and neighborhoods*, The Washington Post (Aug. 6, 2015)[5]  This surge is nearly unprecedented; as D.C. Chief of Police Cathy L. Lanier explained, "We have not seen what we're seeing now in decades."  Will Greenberg, *Police chiefs from around the country meet in D.C. to discuss violent summer*, The Washington Post (Aug. 3, 2015).[6]  "[P]eople are dying[.]" *Id.*

This dramatic increase in violence in D.C., as well as other major U.S. cities,[7] prompted police chiefs from across the country to meet in Washington, D.C. last year to discuss possible explanations for the increase and propose solutions.  *Id.*  The recommended prescription: "more stringent gun laws" —not more guns in public.  *Id.*; *see also* McDermott *supra* note 3 (reporting that an Assistant Police Chief for the District partially attributed the jump in homicides to more guns on the streets).  And this prescription was echoed last month when the Attorneys General of the District, Maryland, and Virginia met to discuss more effectively "enforcing the laws and

---

[4]     *Available at* http://www.nytimes.com/2015/09/01/us/murder-rates-rising-sharply-in-many-us-cities.html?_r=0 (last visited Feb. 16, 2016).

[5]     *Available at* http://www.washingtonpost.com/news/local/wp/2015/08/06/d-c-s-summer-gun-violence-by-the-numbers-and-neighborhoods/ (last visited Feb. 16, 2015).

[6]     *Available at* http://www.washingtonpost.com/local/crime/police-chiefs-from-around-the-country-meet-in-dc-to-discuss-violent-summer/2015/08/03/e2ec8a9c-3a06-11e5-8e98-115a3cf7d7ae_story.html (last visited Feb. 16, 2015).

[7]     Aamer Madhani, *Several big U.S. cities see homicide rates surge*, USA Today (July 10, 2015), http://www.usatoday.com/story/news/2015/07/09/us-cities-homicide-surge-2015/29879091/ (explaining that the murder rate in Baltimore, New Orleans, and St. Louis has jumped more than 33% from July 2014 and that the number of shooting incidents in Chicago has increased by 21%).

stopping gun trafficking and gun violence[.]"  Troy Jefferson, *Attorneys general aim to curb regional gun violence, trafficking*, The Frederick News-Post (Jan. 15, 2016).[8]

Against this background, the District is fighting to simply maintain one of the principal tools it has to combat gun violence—its  current concealed carry permitting scheme, which limits the concealed carry of firearms to those individuals with a "good reason" / "proper reason" to do so.  *See* D.C. Code § 22-4506(a).  The District's scheme is modeled after statutes held constitutional by three different federal Courts of Appeal[9] and is based on sound social science evidence.[10]  Disregarding this precedent and evidence, the Plaintiffs would have this Court grant a preliminary injunction preventing the District from enforcing one of its primary methods of reducing the number of guns in the streets of the nation's capital.  Now is not the time to decrease gun regulation in the District—the public interest demands that the preliminary injunction be denied.  Lives depend on it.

## ARGUMENT

I.   **THE "GOOD REASON" / "PROPER REASON" REQUIREMENT DOES NOT VIOLATE THE SECOND AMENDMENT**

A.   **The District's Concealed Carry Regime Conforms With "May Issue" Regimes Upheld By Other Circuits As Constitutional**

The District's "good reason" / "proper reason" requirement is far from a novel approach to gun violence prevention.  Similar provisions that grant law enforcement limited discretion

---

[8]      *Available at* http://www.fredericknewspost.com/news/crime_and_justice/cops_and_crime/attorneys-general-aim-to-curb-regional-gun-violence-trafficking/article_376944a8-6c83-53a1-81bb-afa3fd226511.html (last visited Feb. 16, 2016).
[9]      *See infra* Section I.
[10]     *See infra* Section II.

3

when issuing concealed carry permits have been upheld as constitutional in every state in which

they have been challenged.[11]

Generally, states regulate the carrying of concealed weapons in one of three ways: (1)

enactment of "may issue" laws; (2) enactment of "shall issue" laws; or (3) imposing no permit

requirement.[12]  Only six states fall into the final category.  The District joins nine "may issue"

states.[13]  In these states, law enforcement officials are vested with the authority to determine

whether to issue a concealed carry permit, but are guided by certain statutory criteria.  The

remaining states fall into the broad "shall issue" category where the state will issue a permit if

the applicant meets certain criteria.  In seventeen of the so-called "shall issue" states, officials

retain some discretion to evaluate an application based on more qualitative criteria.[14]  Thus,

officials in twenty-six states and D.C. retain some authority to make determinations regarding

who may carry a concealed weapon in public spaces.  In other words, the "good reason" /

---

[11]     *See* Section I.A, *infra*, at 5-6.  *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) did not address a concealed carry permitting regime but instead a flat prohibition on carrying firearms outside the home.  In *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), a three-judge panel held that San Diego County's "good cause" permitting requirement violated the Second Amendment.  *Id.* at 1167-68.  Despite the Plaintiffs' misguided reliance on this holding, *Peruta* is no longer good law as the Ninth Circuit vacated the panel opinion and decided *sua sponte* to rehear the case en banc.  *Peruta v. Cnty. of San Diego*, No. 10-56971 (Mar. 26, 2015) (order granting petition for rehearing).  Argument was held on June 16, 2015 and the final ruling in *Peruta* is pending.

[12]     *See generally* Law Center to Prevent Gun Violence, *Concealed Weapons Permitting Policy Summary* (Sept. 10, 2015), http://smartgunlaws.org/concealed-weapons-permitting-policy-summary/#footnote_26_5701 [hereinafter Concealed Weapons Permitting Policy Summary].

[13]     The "may issue" states are as follows: California, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, New Jersey, New York, and Rhode Island.  *See* Cal. Penal Code §§ 26150-26225; Conn. Gen. Stat. §§ 29-28 – 29-30, 29-32, 29-32b, 29-35, 29-37; Del. Code Ann. tit. 11, §§ 1441, 1442; Haw. Rev. Stat. Ann. § 134-9; Md. Code Ann., Pub. Safety §§ 5-301 – 5-314; N.J. Stat. Ann. §§ 2C:58-3, 2C:58-4, 2C:39-5; N.Y. Penal Law § 400.00; R.I. Gen. Laws §§ 11-47-8-11-47-18.

[14]     For example, just as in the District of Columbia, two "shall issue" states, Indiana and North Dakota, require applicants to demonstrate a "proper purpose" for requiring a concealed carry permit.  Ind. Code Ann. §§ 35-47-2-3(e); N.H. Rev. Stat. Ann. §§ 159:6(I)(b).

"proper reason" standard represents the considered judgment of the majority of state legislatures that limiting the number of concealed weapons on the street furthers public safety.[15]

Not only are concealed-carry permitting schemes such as the District's far from novel, they have survived repeated constitutional challenge. The Second, Third, and Fourth Circuits have upheld similar concealed-carry permitting regimes when confronted with Second Amendment challenges. *See Drake v. Filko*, 724 F.3d 426, 439-40 (3d Cir. 2013) (upholding New Jersey's "justifiable need" requirement); *Woollard v. Gallagher*, 712 F.3d 865, 880 (4th Cir. 2013) (upholding Maryland's "good and substantial reason" requirement); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 100-01 (2d Cir. 2012) (upholding New York's "proper cause" requirement). The Second Circuit recognized that, "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 98 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997)). Relying on these constitutionally-approved regimes, D.C. explicitly "follow[ed] the models of . . . New York, New Jersey, and Maryland" in crafting its own

---

[15] Notably, sheriffs in Alabama, currently a "shall issue" state, have begun "speaking out about what they call serious concerns with the state's gun laws." Chuck Williams, *Alabama sheriffs question gun laws in wake of Rusty Houser shooting,* Ledger-Enquirer (Aug. 11, 2015), http://www.ledger-enquirer.com/news/local/crime/article30723480.html. John Russell Houser, who killed two people then himself on July 23, 2015 in a Lafayette, La., movie theater, was denied a concealed carry permit by the Russell County, Alabama Sheriff's Office in 2006. *Id.* Since then, the Alabama legislature changed the state's gun laws from "may issue" to "shall issue." *Id.* As the sheriff who denied Houser's concealed permit carry explained, "[i]f he had walked into our office last month under the same set of circumstances, I would not have been able to deny him that permit. You have taken the discretion away from the sheriffs." *Id.* The sheriff continued, "when you start carrying a gun outside your house, there has to be forethought about public safety. And the Alabama legislature is taking away the tools we have to deal with the issue . . . the most important tool is giving sheriffs the ability to use common sense and judgment." *Id.*

legislation.  Council of the District of Columbia, Committee on the Judiciary & Public Safety,

Committee Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014" 2 (Nov.

25, 2014) ("Judiciary & Public Safety Committee Report").[16]  Yet, the Plaintiffs would have this

Court be the first to strike down a concealed carry regime like the District's.

> **B.     The Plaintiffs' Suggestion to Import A First Amendment Framework As An Alternative To The "May Issue" Regime Is Problematic**

The Plaintiffs' proposed importation of the First Amendment's "time, place, and

manner" restrictions into the Second Amendment context is problematic because,

although the First Amendment can sometimes provide a useful analytical comparison,

there are real and obvious differences between speech rights and carrying a gun in public.

While prior restraint of speech restricts debate that is crucial to a healthy democracy,

restrictions on gun use can save lives.[17]  Second Amendment analysis is different from

analysis under the First Amendment.  *Cf. Kachalsky*, 701 F.3d at 100 (rejecting plaintiffs'

comparison of Second Amendment rights to the right to vote because "[s]tate regulation

under the Second Amendment has always been more robust than of other enumerated

rights"); *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015)

("The risk inherent in firearms   . . . distinguishes the Second Amendment right from

other fundamental rights . . . which can be exercised without creating a direct risk to

others.").

Further, alternative time, place, and manner restrictions that take effect *after* guns

have entered the public sphere could create prohibitive administrability problems in the

District of Columbia.  For example, if more narrowly tailored restrictions allowed

---

[16]     *Available at* http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport1.pdf (last visited Feb. 16, 2016).
[17]     *See infra* Section II.

concealed carry of guns in certain areas or during certain times, D.C. law enforcement would need to ascertain whether concealed carry of guns is permitted during a specific situation before acting to prevent violent escalation.  Injecting nuanced considerations into emotionally-charged and volatile situations involving guns prevents law enforcement from acting quickly to protect the public.  *See* Dkt. 62, Declaration of Andrew Lunetta, NYPD, at ¶ 14, *Kachalsky v. County of Westchester*, No. 10-cv-5413 (S.D.N.Y. 2011) ("The tactics and split-second decisions required during these encounters could become more complicated, and therefore more dangerous...").

It is not the judiciary's role to second-guess the District's judgment in this realm given the legislature's "considerable authority—enshrined within the Second Amendment—to regulate firearm possession in public." *Kachalsky*, 701 F.3d at 97.  The consequences of failing to appropriately regulate firearms are simply too dire to allow judicial usurpation. *See United States v. Masciandaro*, 638 F.3d 458, 475-76 (4th Cir. 2011) ("We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights.").

## II.   SOCIAL SCIENCE CONFIRMS THAT THE DISTRICT'S "GOOD REASON" / "PROPER REASON" REQUIREMENT FURTHERS AN IMPORTANT GOVERNMENT INTEREST IN PUBLIC SAFETY

The District of Columbia's stated interest in enacting its "good reason" / "proper reason" requirement—"to protect the public safety"[18]—conforms with the most up-to-date social science research demonstrating that more guns in public lead to increased violence.  The presence of firearms in the public sphere augments the risk of gun violence in at least three ways.

---

[18]     Council of the District of Columbia, Committee of the Whole, Committee Report on Bill 20-930, "License to Carry a Pistol Amendment Act of 2014" 2 (Dec. 2, 2014) ("Committee of the Whole Report"), *available at* http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport2.pdf (last visited Feb. 16, 2016).

**A.      The Lethality Of Guns Creates Unique Dangers In The Public Sphere**

First, guns create unique dangers in the public sphere.  *See* Philip Cook & Jens Ludwig,

*Public Policy Perspectives Principles for Effective Gun Policy*, 73 FORDHAM L. REV. 589, 590

(2004) ("Relative to other types of readily available weapons, guns are intrinsically more lethal,

providing the assailant with the power to kill quickly, at a distance, and with little effort or

sustained intent.").  These dangers will multiply if the District is enjoined from enforcing the

"good reason" / "proper reason" requirement.  *See* Spencer Hsu & Rachel Weiner, *Federal*

*appeals court lets new D.C. gun law stand, pending final ruling*, The Washington Post (June 29,

2015) ("After the order [granting the preliminary injunction], D.C. police reported receiving a

surge of new applicants—96 in less than four weeks, compared with 109 over the previous seven

months.").[19]  If the Plaintiffs prevail, more guns will enter public spaces, meaning that more

people will be within range of a lethal firearm.

In fact, since 2007, at least 849 people have been killed by individuals with concealed

carry permits.  *See* Violence Policy Center, *Concealed Carry Killers*, *available at*

http://concealedcarrykillers.org/ (last visited Feb. 16, 2016).  This number includes 17 law

enforcement officers.  *Id.*  Importantly, a significant number of these 849 deaths occurred during

29 mass shootings committed by individuals with concealed carry permits.  *Id.*  The fact that

more guns in public threaten public safety may seem obvious, but it cannot be overstated,

particularly in D.C. which, apart from its over 650,000 residents, attracts over *19 million* tourists

each year.[20]

---

[19]      *Available at* http://www.washingtonpost.com/local/crime/federal-appeals-court-lets-new-
dc-gun-law-stand-pending-final-ruling/2015/06/29/3aa1bd2a-1e78-11e5-bf41-
c23f5d3face1_story.html (last visited Feb. 16, 2016).
[20]      *Washington, DC 2013 Visitor Statistics*, Destination DC (2013), *available at*
http://destinationdc.dmplocal.com/dsc/collateral/Washington_DC_2013_Visitor_Statistics_updat

### B. Public Carrying Increases Violent Crime

Second, public carrying increases violent crime.  Critically, the most up-to-date research in this area has concluded that:

> [t]he totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws[21] are associated with substantially higher rates of aggravated assault, rape, robbery, and murder.

Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, Stanford News (Nov. 14, 2014) (internal quotation omitted);[22] *see also* Abhay Aneja, John J. Donohue III, & Alexandria Zhang, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* 80-81 (National Bureau of Economic Research Working Paper No. 18294, 2014) (suggesting that "RTC laws *increased every crime category* by at least 8 percent, except murder (in that model, murder rose 3 percent but it is not statistically significant).") (emphasis added).[23]  Daniel Webster, professor at Johns Hopkins Bloomberg School of Public Health, concluded that Aneja, Donohue, and Zhang's research is the "most scientifically rigorous" to date, and reiterated that the research "suggests that laws giving law enforcement discretion in issuing permits to carry concealed

---

ed3-18-15.pdf (last visited Feb. 16, 2016).  This number includes over 3,000 foreign dignitaries making official visits to Washington, D.C. each year.  Judiciary & Public Safety Committee Report, at 6.

[21]    "Right to Carry" or "RTC" laws (also known as "shall issue" laws) describe laws pursuant to which citizens carry concealed firearms either without a permit or after obtaining a permit from local government or law enforcement.  Clifton B. Parker, *Right-to-carry gun laws linked to increase in violent crime, Stanford research shows*, Stanford News (Nov. 14, 2014).

[22]    *Available at* http://news.stanford.edu/news/2014/november/donohue-guns-study-111414.html (last visited Feb. 16, 2016).

[23]    Professor Donohue further explained that "if anything our 8 percent estimate . . . is likely to understate the true increases in aggravated assault caused by the RTC law."  *Id.*  Some statistical models "generated an estimate of a nearly 33 percent increase in assaults with firearms associated with RTC laws."  Committee of the Whole Report, at 69 (Attachment; Letter from Daniel Webster to Chairman of the D.C. Council).

firearms ["may issue" laws] protect against gun violence."  Committee of the Whole Report, at 69 (Attachment; Letter from Daniel Webster to Chairman of the D.C. Council).[24]

These latest findings underscore earlier research that has repeatedly demonstrated that RTC laws lead to increased crime rates.[25]  *See e.g.*, Ian Ayres & John J. Donohue III, *Yet Another Refutation of the More Guns, Less Crime Hypothesis—With Some Help From Moody and Marvell*, 6 Econ J. Watch 35, 41 (Jan. 2009) ("[T]he vast bulk of the estimated effects . . . were suggestive of crime *increases* caused by RTC laws for seven of the nine FBI Index I crime categories.") (emphasis in original); Ian Ayres & John J. Donohue III, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006*, 6 Econ. J. Watch 218, 229 (May 2009) ("The one consistent finding that is statistically significant ... is that RTC laws increase aggravated assault."); Matthew Miller, *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 Accident Analysis & Prevention 477, 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

It is now clear, at the very least, that "[n]o longer can any plausible case be made on statistical grounds that shall-issue laws are likely to reduce crime for all or even most states." Ian Ayres & John J. Donohue III, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stanford L. Rev. 1194, 1296 (2003).  Instead, the majority of relevant research demonstrates that

---

[24]      Notably, even within the home, gun possession has been linked to increased violence. *See e.g.*, Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide:  A Review of the Literature*, 9 Aggression & Violent Behav. 417 (2004) ("[H]ouseholds with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership."); Matthew Miller, *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States,_1988–1997*, 92 Am. J. Pub. Health 1988, 1988 (Dec. 2002) ("[I]n areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide.").  Logically, an increase of guns in the streets is also likely to lead to an increase in guns in D.C. homes.

[25]      These latest findings also belie the claim by the Plaintiffs that the social science research in this area is "far from settled[.]" *See* Dkt. 10 at 22..

"policies to discourage firearms in public may help prevent violence."  David McDowall, *et al.*, *Easing Concealed Firearms Laws*, 86 Crim. L. & Criminology 193, 203 (1995); *see also* Kara E. Rudolph, *et al.*, *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 Am. J. of Pub. Health 49, 49 (2015) (concluding that Connecticut's permit-to-purchase law "was associated with a 40% reduction in Connecticut's firearm homicides rates during the first 10 years that the law was in place"); Philip Cook & Jens Ludwig, *Public Policy Perspectives Principles for Effective Gun Policy*, 73 Fordham L. Rev. at 592 ("[E]vidence suggests that… separat[ing] guns from violence would sharply reduce the number of victims killed in domestic violence, robberies, and routine altercations.").[26]

This conclusion has specifically been borne out in the District of Columbia:

> [r]estrictive licensing of handguns was associated with a prompt decline in homicides and suicides by firearms in the District of Columbia.  No such decline was seen in adjacent metropolitan areas where restrictive licensing did not apply.

Colin Loftin, *et al.*, *Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia*, 325 New Eng. J. Med. 1615, 1615 (1991).[27]  And the proposition that more stringent gun control measures may prevent violence has also found support in other countries. *See* Austin Ramzy, Michelle Innis & Patrick Boehler, *How a Conservative-Led Australia Ended Mass Killings*, The New York Times (Dec. 4, 2015) ("[T]he rates of intentional firearm deaths

---

[26]   Data on gun deaths in each state supports this conclusion.  *See* Law Center to Prevent Gun Violence, *Annual Gun Law State Scorecard 2014*, http://gunlawscorecard.org/ (Dec. 2014) [hereinafter 2014 Scorecard]. The states with the five highest gun death rates (WY, LA, MS, AK, and AL) are states with either no concealed carry permitting requirement at all (WY, MS, and AK) or weak permitting requirements (LA and AL). *Id.*; Concealed Weapons Permitting Policy Summary, *supra* note 8.  The five states with the *lowest* gun death rates (MA, HI, RI, NY, and NJ) are "may issue" states, similar to the District. *Id.*

[27]   *Available at* http://www.nejm.org/doi/pdf/10.1056/NEJM199112053252305 (last visited Feb. 16, 2016); *see also* Philip Cook & Jens Ludwig, *Public Policy Perspectives Principles for Effective Gun Policy*, 73 Fordham L. Rev. 589, 608 (2004) ("[T]he data do suggest a reduction in gun use in criminal violence in the early years following [the implementation of stricter handgun regulations in Washington D.C.].").

were substantially higher in the 28 years before the gun control measures were adopted in 1996 than in the 17 years after. How much of that decline can be attributed to the new policies can be debated, but the difference is clear.").[28]

Importantly, "guns did not seem to protect [even] those who possessed them from being shot in an assault." Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034, 2037 (2009); *see also* David Hemenway, *et al.*, *Gun use in the United States: results from two national surveys*, 6 Injury Prevention 263, 267 (2000) ("The possibility of using a gun in a social usefully manner—against a criminal during the commission of a crime—will rarely, if ever, occur for the average gun owner.").[29] Instead, "[g]uns are used to threaten and intimidate far more often than they are used for self-defense." *Id.* at 263.

C.     **Permissive Concealed Carry Laws Hinder Law Enforcement's Ability to Protect Themselves and the Public**

Third, law enforcement's ability to protect themselves and the public could be greatly hindered if officers were required to presume that a person carrying a firearm in public was doing so lawfully.  When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600

---

[28]     *Available at* http://www.nytimes.com/2015/12/05/world/australia/australia-gun-ban-shooting.html?_r=1 (last visited Feb. 16, 2016).

[29]     *Available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1730664/pdf/v006p00263.pdf (last visited Feb. 16, 2016); *see also* David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. of Crim. L. and Criminology 1430, 1444 (1997) (concluding that self-reported survey results measuring incidents of gun use for self-defense are "huge overestimates").

A.2d 957, 959 (Pa. Super. Ct. 1991); *accord Singleton v. United States*, 998 A.2d 295, 302 (D.C. Ct. App. 2010) (holding that the officer "had a reasonable articulable suspicion that appellant was carrying a firearm, which permitted the officer to temporarily stop and frisk appellant"). By contrast, under a highly permissive concealed carry regime, an officer might not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public.

## CONCLUSION

The Court should deny the Plaintiffs' application for a preliminary injunction.

February 18, 2016                        Respectfully submitted,

                                         /s/Adam K. Levin_____
                                         Adam K. Levin - DC Bar # 460362
                                         James W. Clayton - DC Bar # 1014582
                                         Anna M. Kelly - DC Bar # 1021763
                                         555 Thirteenth Street, N.W.
                                         Washington, D.C. 20004
                                         (202) 637-5600
                                         adam.levin@hoganlovells.com
                                         james.clayton@hoganlovells.com
                                         anna.kelly@hoganlovells.com

                                         BRADY CENTER TO PREVENT GUN
                                         VIOLENCE
                                         Jonathan Lowy
                                         Alla Lefkowitz
                                         Kelly Sampson
                                         840 First Street, N.E. Suite 400
                                         Washington, D.C. 20002
                                         (202) 370-8104
                                         jlowy@bradymail.org

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 18, 2016, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court for the District of Columbia by using the

CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that

service will be accomplished by the CM/ECF system.


/s/Adam K. Levin_____
Adam K. Levin