# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRIAN WRENN, *et al.*,<br><br>     Plaintiffs,<br><br>     v.<br><br>DISTRICT OF COLUMBIA, *et al.,*<br><br>     Defendants. | Civ. Action No. 15-cv-00162 (CKK) |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION[1]

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General
Public Interest Division

TONI MICHELLE JACKSON (#453765)
Chief, Equity Section

ANDREW J. SAINDON (#456987)
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
Email: andy.saindon@dc.gov

CHAD A. NASO (#1001694)
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Facsimile: (202) 741-8951
Email: chad.naso@dc.gov

---

[1]     In accordance with the Court's February 12, 2016 Minute Order, this Opposition replaces the Opposition filed by the District on February 20, 2015 (Doc. No. 9).

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 2

STANDARDS FOR A PRELIMINARY INJUNCTION .............................................................. 6

ARGUMENT ................................................................................................................................ 7

     I.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM; RATHER, THE DISTRICT IS LIKELY TO PREVAIL. ........... 7

          A.     Because regulation of public carrying in cities is longstanding, the District's "good reason" standard is beyond the scope of the Second Amendment. ................................................................................. 8

          B.     Alternatively, the licensing regime is likely to survive heightened scrutiny. ...................................................................................................... 15

     II.    PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY ........................ 36

     III.   THE BALANCE OF EQUITIES TIPS HEAVILY IN FAVOR OF THE DEFENDANTS ............................................................................................... 39

     IV.   ALLOWING BROAD CARRYING OF CONCEALED WEAPONS IS NOT IN THE PUBLIC INTEREST .................................................................... 40

CONCLUSION ........................................................................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*Baze v. Rees*,
  553 U.S. 35 (2008) ....................................................................................... 24, 27

*Bonidy v. USPS*,
  790 F.3d 1121 (10th Cir. 2015) ................................................................... 22, 36

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ..................................................................... 38, 37

*Cincinnati v. Discovery Network*,
  507 U.S. 410 (1993) ........................................................................................... 23

*CityFed Fin. v. Office of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ............................................................................. 36

*Cobell v. Norton*,
  455 F.3d 301 (D.C. Cir. 2006) ............................................................................. 6

*Dearth v. Lynch*,
  791 F.3d 32 (D.C. Cir. 2015) ............................................................................. 21

*Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*,
  412 F.2d 165 (D.C. Cir. 1969) ............................................................................. 6

*District of Columbia v. Heller* (*Heller I*),
  554 U.S. 570 (2008) ................................................................................... passim

*Drake v. Filko*,
  724 F.3d 426 (3d Cir. 2013) ...................................................................... passim

*Edenfield v. Fane*,
  507 U.S. 761 (1993) ........................................................................................... 23

*Edwards v. District of Columbia*,
  755 F.3d 996 (D.C. Cir. 2014) ........................................................................... 27

*Fyock v. City of Sunnyvale*,
  25 F. Supp. 3d 1267 (N.D. Cal. 2014) ............................................................... 40

*Gonzales v. Carhart*,
  550 U.S. 124 (2007) ..................................................................................... 16, 27

i

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) .................................................................................. 37

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) .................................................................................................... 40

*Heller v. District of Columbia* (*Heller II*),
  670 F.3d 1244 (D.C. Cir. 2011) ...........................................................................passim

*Heller v. District of Columbia*,
  801 F.3d 264 (D.C. Cir. 2015) .................................................................................. 19

*Hightower v. City of Boston*,
  693 F.3d 61 (1st Cir. 2012) ................................................................................. 19, 20

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) .................................................................................................. 26, 16

*Horsley v. Trame*,
  808 F.3d 1126 (7th Cir. 2015)…………………………………………………..18, 22

*In re Navy Chaplaincy*,
  738 F.3d 425 (D.C. Cir 2013) .................................................................................... 6

*Kachalsky v. Cacace*,
  817 F.Supp.2d 235 (S.D.N.Y. 2011) .................................................................. 18, 19

*Kachalsky v. Cty. of Westchester*,
  701 F.3d 81 (2d Cir. 2012) .....................................................................................passim

*Keystone Bituminous Coal v. DeBenedictis*,
  480 U.S. 470 (1987) .................................................................................................. 23

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) .................................................................................................. 27

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .................................................................................................. 37

*Maryland v. King*,
  133 S. Ct. 1 (2012) .................................................................................................... 39

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .................................................................................................... 7

*McDonald v. City of Chi.*,
   561 U.S. 742 (2010) ................................................................................ 3, 7

*Mills v. District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009) ............................................................... 38

*Moore v. Madigan*,
   702 F.3d 933 (7th Cir. 2012) ................................................................... 10

*Mosby v. Devine*,
   851 A.2d 1031 (R.I. 2004) ....................................................................... 19

*Neb. Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.*,
   435 F.3d 326, (D.C. Cir. 2006) ................................................................ 39

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................. 6

*Ohralik v. Ohio State Bar Ass'n*,
   436 U.S. 447, 456 (1978) (1978) ........................................................ 23, 24

*Palmer v. District of Columbia*,
   59 F. Supp. 3d 173 (D.D.C. 2014) ............................................................ 3

*Peruta v. County of San Diego*,
   742 F.3d 1144 (9th Cir. 2014) ............................................................... 9, 18

*Reichle v. Howards*,
   132 S. Ct. 2088 (2012) ............................................................................ 16

*Rumber v. District of Columbia*,
   595 F.3d 1298 (D.C. Cir. 2010) ............................................................... 39

*Schrader v. Holder*,
   704 F.3d 980 (D.C. Cir. 2013) ......................................................... passim

*Sherbert v. Verner*,
   374 U.S. 398 (1963) ............................................................................ 23, 24

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ................................................................. 6

*Sweis v. U.S. Foreign Claims Settlement Comm'n*,
   950 F.Supp.2d 44 (D.D.C. 2013) .......................................................... 6, 37

*Turner Broadcasting System v. FCC (Turner I)*,
     512 U.S. 622 (1994) .................................................................... 17, 25, 31

*Turner Broadcasting System v. FCC (Turner II)*,
     520 U.S. 180 (1997) .......................................................................... passim

*United States v. Chester*,
     628 F.3d 673 (4th Cir. 2010) ................................................................... 22

*United States v. Masciandaro*,
     638 F.3d 458 (4th Cir. 2011) ...................................................... 19, 22, 38

*United States v. McCane*,
     573 F.3d 1037 (10th Cir. 2009) .............................................................. 14

*United States v. Oakland Cannabis Buyers' Co-op*,
     532 U.S. 483 (2001) ............................................................................... 40

*United States v. O'Brien*,
     391 U.S. 367 (1968) ............................................................................... 23

*United States v. Skoien*,
     614 F.3d 638 (7th Cir. 2010) .......................................................... 25, 18

*United States v. Williams*,
     616 F.3d 685 (7th Cir. 2010) .......................................................... 10, 18

*United States v. Yancey*,
     621 F.3d 681 (7th Cir. 2010) ................................................................. 18

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
     425 U.S. 748 (1976) ............................................................................... 23

*Ward v. Rock Against Racism*,
     491 U.S. 781 (1989) ............................................................................... 25

*Weinberger v. Romero-Barcelo*,
     456 U.S. 305 (1982) ............................................................................... 40

*Winter v. Nat. Res. Def. Council*,
     555 U.S. 7 (2008) ............................................................................... 6, 37

*Wisc. Gas Co. v. FERC*,
     758 F.2d 669 (D.C. Cir. 1985) .............................................................. 37

*Woollard v. Gallagher*,
  712 F.3d 865 (4th Cir. 2013) ........................................................................ passim

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) .................................................................................... 23

**Statutes**

18 U.S.C. § 926A ........................................................................................ 17

18 U.S.C. § 930 .......................................................................................... 18

D.C. Code § 22-4504 (2009 Supp.) ............................................................... 3

D.C. Code § 22-4504.01 ............................................................................. 17

D.C. Code § 22-4506(a) ........................................................................... 1, 3

D.C. Code § 7-2502.02(a)(4) ....................................................................... 3

D.C. Code § 7-2509.06(a) .......................................................................... 18

D.C. Code § 7-2509.11(1)(A) ...................................................................... 3

D.C. Code § 7-2509.11(1)(B) ...................................................................... 3

D.C. Code § 7-2509.11(1) ......................................................................... 20

D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001) ....................................... 2

**DCMR**

24 DCMR § 2333.1 ...............................................................................5

24 DCMR § 2333.2 ...............................................................................5

24 DCMR § 2333.4 ...............................................................................5

24 DCMR § 2334.1 ...............................................................................6

1 DCMR § 1202 ...................................................................................6

1 DCMR § 1221.6 ................................................................................6

**Other Authorities**

1870 S.C. Laws 402 ................................................................................................. 9

1870 W. Va. Laws 702 ........................................................................................... 10

1873 Minn. Laws 1025 ........................................................................................... 10

*Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,*
 86 J. Crim. L. & Criminology 150 (1995) ........................................................... 28

Ayres & Donohue, Nondiscretionary Concealed Weapons Laws: A Case Study of Statistics,
 Standards of Proof, and Public Policy,
 1 Am. L. & Econ. Rev. 436 (1999) (1999) ......................................................... 26

Carl Bogus, A Symposium on Firearms, the Militia, and Safe Cities,
 1 Alb. Gov't L. Rev. 440 (2008) ......................................................................... 12

*Criminal Records of Homicide Offenders,*
 294 JAMA 598, 599 (2005) Philip Cook………………………………….……………………35

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel
 Data*, 18 Int'l L. Rev. L. & Econ. 239, 241 (1998)………………..………………………31

*Crime, Deterrence, and Right-to-Carry Concealed Handguns,*
 26 J. Legal Stud. 1 (1997) ................................................................................... 28

*Firearm Localism,*
 123 Yale L.J. 82 (2013)......................................................................................... 11

*Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective,*
 56 UCLA L. Rev. 1041 (2009) ............................................................................ 33

*Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility,*
 75 B.U. L. Rev. 57 (1995)..................................................................................... 24

*Guns, Crime, and the Impact of State Right-to-Carry Laws,*
 73 Fordham L. Rev. 623 (2004)............................................................................ 28

*The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical
 Evaluation of Law and Policy* (Sept. 4, 2014) (Donohue 2014)………………………………28

*Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun,*
 Gary Kleck & Marc Gertz,
 86 J. Crim. L. & Criminology 150, 180 (1995)………………………………….………………..28

*Firearms and Violence*,
A Critical Review (2004) Nat'l Research Council……………………………...…………………28

*Laws and Requirements for Concealed Carry Permits*
 Vary Across the Nation, U.S., GAO-12-717………………………………………………………15

*Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ.
 Rev. 468, 473 (1998) Hashem Dezhbakhsh & Paul Rubin…………………………………....32

*Scrutinizing the Second Amendment*,
 105 Mich. L. Rev. 683 (2007)..................................................................................................... 20

*Shooting Down the "More Guns, Less Crime" Hypothesis*,
 55 Stan. L. Rev. 1193 (2003) ..................................................................................................... 28

*The Faces of the Second Amendment Outside the Home:*
*History Versus Ahistorical Standards of Review*,
 60 Clev. St. L. Rev. 1 (2012) ...................................................................................................... 8

*The* Woollard *Decision and The Lessons of the Trayvon Martin Tragedy*,
 71 Md. L. Rev. 1188 (2012)......................................................................................................... 9

*The Social Costs of Gun Ownership*, 90 J. Pub. Econ.
379, 387 (2006)……………………………………………………………………..……33

*Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034,
2037 (2009) Charles Branas…………………………………………………..……………32

*Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*,
125 Yale L.J. F. 121, 129 (2015)…………………………………………………..…………9, 13

*Treatise of the Pleas of the Crown*,
ch.63, § 9 (1716)………………………………………………………………………14

*Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, U.S. Government Accountability Office, Report to Congressional Requesters,
GAO-12-717  (July 2012)……………………………………………………………….……………15

## INTRODUCTION

Under District of Columbia law, the Chief of Police "may" issue licenses for the public carrying of concealed handguns if, among other requirements, the applicant has "good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol[.]" D.C. Code § 22-4506(a). Plaintiffs Brian Wrenn, Joshua Akery, Tyler Whidby, and the Second Amendment Foundation (SAF) (collectively, plaintiffs) argue that the District's concealed-carry licensing regime "amounts to nothing more than a rationing system" subject to the "unbridled discretion" of the Chief of Police, which they contend "destroys the Second Amendment right." P.Mem. at 11, 18–19. They ask the Court to issue an order preliminarily enjoining the District from (1) "denying handgun carry licenses to applicants who meet … [the] current requirements for the possession and carrying of handguns under District of Columbia law"; and (2) enforcing the "good reason" requirement against the individual plaintiffs and "other SAF members." *See* Doc. No. 6-12 (plaintiffs' proposed order).

Plaintiffs are not entitled to this extraordinary relief. Three federal courts of appeals have found the "good reason" standard constitutional, and the District is just as likely to prevail here. Neither the D.C. Circuit, nor any controlling court, has held that there is an absolute right to carry guns in public for self-defense, and there is a long history of restricting the public carrying of firearms in cities. The District's "good reason" requirement is neither a ban on public carrying nor a "rationing system," but rather a mechanism that furthers the District's important public safety interests by ensuring that the public carrying of firearms is limited to those individuals who have a particularized need for self-defense.

Moreover, plaintiffs cannot establish irreparable injury, as is necessary for a preliminary injunction to issue, and indeed they concede that they cannot demonstrate any particularized

reason to fear harm. In contrast, the overbroad injunction plaintiffs demand would threaten the safety of the public, a risk that weighs heavily against granting such relief.

The District has a compelling interest in public safety, prevention of crime, and the protection of law-enforcement officers. Plaintiffs do not dispute these obvious points. Nor do they contest—or even mention—the evidence relied on by the Council of the District of Columbia when it enacted the "good reason" standard. The Council found the standard necessary to prevent crime and promote public safety, and this finding is entitled to deference under any level of scrutiny. Plaintiffs have failed to meet their burden for the extraordinary and drastic relief of a mandatory preliminary injunction, and their motion should be denied.

## STATEMENT OF FACTS

For more than a century, the District of Columbia has regulated the carrying of handguns in public. *See* Committee on the Judiciary and Public Safety, D.C. Council, Report on Bill 20-930 (Nov. 26, 2014), Defendants' Appendix (DA), attached, 2–3.[2] For much of that time, some carrying was allowed under a licensing scheme. *See*, *e.g.*, 27 Stat. 116 (1892); 57 Stat. 586, ch. 296 (1943). Starting in 1976, however, the District generally banned the possession of handguns. D.C. Code §§ 7-2502.01(a), 7-2502.02(a)(4) (2001).

In *District of Columbia v. Heller*, 554 U.S. 570 (2008) (*Heller I*), the Supreme Court held that this ban violated the Second Amendment, which directs that "the right of the people to keep and bear Arms, shall not be infringed." The Court held that the Second Amendment codified a pre-existing, individual right and that, "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in

---

[2]     The Committee Report and its relevant attachments are included in the Defendants' Appendix. The complete report (188 pages long, including attachments) is available online at http://lims.dccouncil.us/Download/32576/B20-0930-CommitteeReport1.pdf (last visited Feb. 17, 2016). A video of the public hearing of October 16, 2014, on the legislation is available at http://dc.granicus.com/MediaPlayer.php?view_id=28&clip_id=2407 (last visited Feb. 17, 2016).

defense of hearth and home." 554 U.S. at 592, 635. In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court found this right "fully applicable to the States," but assured that "state and local experimentation with reasonable firearms regulation will continue." *Id.* at 750, 785.

In response to *Heller I*, the Council of the District of Columbia amended the law to allow the possession of handguns for self-defense in the home, which the Court described as the core right enshrined in the Second Amendment. D.C. Code § 7-2502.02(a)(4); *Heller I*, 554 U.S. at 628–30. Carrying handguns in public remained prohibited. D.C. Code § 22-4504 (2009 Supp.). The district court struck down this carrying ban in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). In response, the Council enacted comprehensive legislation to permit the issuance of concealed-carry licenses if, among other qualifications, the applicant has either "good reason to fear injury to his or her person or property" or "any other proper reason for carrying a pistol." D.C. Law 20-279, § 3(b), 62 D.C. Reg. 1944 (effective June 16, 2015) (codified at D.C. Code § 22-4506(a)). To show "good reason to fear injury," an applicant must demonstrate "a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life." D.C. Law 20-279, § 2(f) (codified at D.C. Code § 7-2509.11(1)(A)). "[O]ther proper reason … shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person." D.C. Code § 7-2509.11(1)(B).

The Council based the "good reason" standard on similar provisions in New York, Maryland, and New Jersey, all of which "have withstood constitutional challenges in federal courts of appeal." DA 1, 9 & n.39 (citing *Kachalsky v. Cty. of Westchester*, 701 F.3d 81 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir.

2013), *cert. denied*, 134 S. Ct. 422; *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 2134 (2014)). This "revival of the original concealed carry law reinstates the District as a 'may issue' jurisdiction," unlike states with "'shall issue' laws, which require the issuing authority to grant most permits." DA 8. The Council credited empirical studies demonstrating that the "right-to-carry laws" enacted in "shall issue" states "are associated with substantially higher rates of aggravated assault, rape, robbery and murder." DA 17; *see id*. 133–240. It found "undeniable" that "introducing a gun into any conflict can escalate a limited danger into a lethal situation," and that this "danger extends to bystanders and the public at large." DA 18. Given the "substantial governmental interest in public safety and crime prevention," the Council concluded that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense." DA 18–19.

The Council also found the licensing regime necessary to prevent federal and local law enforcement agencies from "turn[ing] the District into a semi-police state" in an effort to protect its thousands of "high-value security targets." DA 5, 17. Unlike any state, the District's "68 square miles … is completely contained in a dense urban setting." DA 7. And compared to other large cities, the District has greater "public safety and national security concerns" given that "[i]t is the home of the President" and "all high-ranking federal officials and members of Congress," many of whom "are under constant protection" by the Secret Service or Capitol Police. DA 4, 7. It also "is home to a diplomatic corps more extensive and omnipresent than anywhere else in the country"—"approximately 3,000 foreign dignitaries spend[] time in our city each year"—and "threats are a constan[t] for the diplomatic corps." DA 5, 6. The Metropolitan Police Department (MPD) "also provides security support for more than 4,000 special events annually." DA 6.

Moreover, the Council noted, the District is already "heavily patrolled and protected by the more than two dozen law enforcement entities that operate here," few of which fall under the District's authority. DA 7. Without the licensing regime, these entities would have to account for the increased risk associated with increased carrying—a result that, the Council found, would unfairly infringe on the constitutional rights of its citizenry. DA 4–7. "At some point the presence of law enforcement crosses a psychological line between providing public safety and infringing upon a sense of freedom. Citizens of the United States take pride in the freedom granted to them through the Constitution—freedom of expression, freedom of movement." DA 7. "But increasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society." *Id.* Thus, "[t]he circumstances unique to the District require a regulatory system different than perhaps any other jurisdiction, and especially, far different than what would be necessary for public safety in a rural place." *Id.*

Just like the Council's law, the regulations issued by MPD were modeled on standards applied in New York, Maryland, and New Jersey. They define "good reason" as a "special need for self-protection distinguishable from the general community." 24 DCMR § 2333.1. To satisfy this standard, an applicant must "allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person," and that "the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution." 24 DCMR § 2333.2. "The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason ... for the issuance of a concealed carry license." 24 DCMR § 2333.4. Alternatively, an applicant can demonstrate any "other proper reason" for carrying a handgun in public, such as employment that requires the personal

transport of "large amounts of cash or other highly valuable objects" or the need to protect a family member who has "good reason" but "cannot act in defense of himself or herself." 24 DCMR § 2334.1. If the Chief of Police denies an application for a concealed-carry license, the applicant may appeal to the Concealed Pistol Licensing Review Board, 1 DCMR § 1202, and then "pursue judicial review" if needed, 1 DCMR § 1221.6, in the local District courts.

## STANDARDS FOR A PRELIMINARY INJUNCTION

A plaintiff seeking a preliminary injunction must establish that: (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because injunctive relief is such an extraordinary remedy, a plaintiff seeking such relief must prove all four prongs of the standard before relief can be granted. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008); *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir 2013).

"The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *Cobell v. Norton*, 455 F.3d 301, 314 (D.C. Cir. 2006) (quoting *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969)). Where a plaintiff seeks a "mandatory injunction"—*i.e.*, one that would compel a positive act by the defendant—this Court has required the plaintiff to meet a higher standard and show "extreme or very serious damage" or that he is "clearly entitled" to immediate relief. *Sweis v. U.S. Foreign Claims Settlement Comm'n*, 950 F.Supp. 2d 44, 48 (D.D.C. 2013) (citations omitted)). Because the plaintiffs here seek a "mandatory injunction" that would require the District to issue concealed-carry licenses to the individual plaintiffs and the "other SAF members" who, apart from the "good

reason" requirement are eligible for a concealed carry license, in derogation of the status quo, the Court should hold them to this higher standard.

## ARGUMENT

## I.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM; RATHER, THE DISTRICT IS LIKELY TO PREVAIL.

The District of Columbia is unique. Unlike any state, its jurisdiction is entirely urban and densely populated. Unlike any city, it is filled with thousands of high-ranking federal officials and diplomats from around the world, and it hosts hundreds of heavily attended events each year, including numerous political marches and protests. The Second Amendment preserves the ability of local jurisdictions "to devise solutions to social problems that suit local needs and values," *McDonald*, 561 U.S. at 784–85, and that is precisely what the Council has done through the "good reason" standard.

Against the weight of established precedent and the Council's considered judgment, plaintiffs contend that the Second Amendment requires the District—and every jurisdiction in the nation, irrespective of local conditions—to allow carrying of handguns in public spaces without considering any particular license applicant's self-defense needs. Anything else, they say, "destroys" the right, which they take as an absolute right to carry a firearm in public without a good reason. P.Mem. at 10–16. They argue that the circuits that unanimously conclude otherwise are wrong, and that the quarter of the American population in "may issue" jurisdictions must change to "shall issue," no matter what they and their elected representatives wish and what the public-safety consequences will be. *See id.* at n.1.

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v.*

*Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11 A.C. Wright, A. Miller, & M. Kane, *Federal*

*Practice and Procedure* § 2948 (2d ed. 1995). Plaintiffs cannot meet this high standard.

> **A.**     **Because regulation of public carrying in cities is longstanding, the District's "good reason" standard is beyond the scope of the Second Amendment.**

"Constitutional rights are enshrined with the scope they were understood to have when

the people adopted them." *Heller I*, 554 U.S. at 634–35. "[L]ongstanding" firearm prohibitions,

those in place during the Framing era, and those reaching into the early 20th Century, are

considered "presumptively lawful." *Id.* at 626–27 & n.6; *see also Heller v. District of Columbia*,

670 F.3d 1244, 1253 (D.C. Cir. 2011) (*Heller II*) (noting that "[t]he Court in *Heller* considered

'prohibitions on the possession of firearms by felons' to be 'longstanding' although states did not

start to enact them until the early 20th century"). Contrary to plaintiffs' conclusory assertion that

the District's licensing regime "has no remotely analogous antecedents in the Framing Era"

(P.Mem. at 20), the District's regulation of public carrying—providing licenses only to

individuals who have a particularized self-defense need—is *less* restrictive than longstanding

prohibitions on public carrying, and therefore does not infringe any Second Amendment right.

For as long as citizens have owned firearms, English and American law has restricted any

right to carry in populated public places. In 1328, England enacted the Statute of Northampton,

which stated that "no Man great nor small" shall "go nor ride armed by night nor by day, in

Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere."

2 Edw. 3, 258, ch. 3 (1328). The statute reflected a general rule that, in populated public places,

"the authority to ensure the public peace rested with the local government authorities," not

individually armed citizens.[3] Patrick Charles, *The Faces of the Second Amendment Outside the*

---

[3]     Indeed, the Statute explicitly excluded from its prohibition "the King's servants in his
presence," "his ministers," and citizens summoned to "keep the peace," 2 Edw. 3, 258, ch. 3,
making it consistent with the Second Amendment's prefatory "militia" clause.

*Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 20 (2012) ("Charles 2012"); *see also Peruta v. County of San Diego*, 742 F.3d 1144, 1182 (9th Cir. 2014) (Thomas, J., dissenting) ("Restrictions on the carrying of open and concealed weapons in public have a long pedigree in England."), *vacated*, 781 F.3d 1106 (9th Cir. Mar. 26, 2015).

Legal commentators William Blackstone and William Hawkins, along with virtually every other legal scholar at the time, acknowledged the continued vitality of the Statute of Northampton's broad prohibition on public carrying.  Historian Patrick Charles has examined the treatises, restatements, and prosecutorial records published from the sixteenth to early-eighteenth centuries and found it "abundantly clear" that the Statute barred "the carrying of dangerous weapons in the public concourse" "without the license of government."  Charles, *The Statute of Northampton by the Late Eighteenth Century: Clarifying the Intellectual Legacy*, 41 Fordham Urb. L.J. City Square 10, 21 (2013) ("Charles 2013"); *see also* Charles 2012, *supra*, at 32-33 (analyzing additional historical material); *see* Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 129 (2015).

The Statute of Northampton's broad prohibition on public carrying continued into the 17th and 18th centuries, Charles 2013 at 23–25, and the "tradition of restricting both the concealed and the open carry of firearms in public places … was reflected in various state laws immediately following the ratification of the Constitution." Dennis Henigan, *The* Woollard *Decision and The Lessons of the Trayvon Martin Tragedy*, 71 Md. L. Rev. 1188, 1202 (2012). Massachusetts, Virginia, North Carolina, Tennessee, Maine, Delaware, New Mexico, and South Carolina all adopted the public-carrying ban of the Statute of Northampton,[4] and it was in effect

---

[4]      *See* Eric Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 126 Yale L.J. Forum 121, 129 n.43 (2015); 1694 Mass. Laws 12, No. 6; 1859 N.M. Laws 94, § 2; 1870 S.C. Laws 402, No. 288.

through common law in New York, Connecticut, New Jersey, and Maryland.[5] And "[m]ost states enacted laws banning the carrying of concealed weapons." *Kachalsky*, 701 F.3d at 95 (citing statutes); *see also Moore v. Madigan*, 702 F.3d 933, 944 (7th Cir. 2012) (Williams, J., dissenting) ("In contrast to inside the home, where one could largely do what he wished, there was a long history of regulating arms in public.").

When Congress established the District's judicial systems in 1801, it adopted "the laws of the state of Maryland as they now exist." DA 305–307, District of Columbia Organic Act, 2 Stat. 103 (1801). Maryland had adopted the common law of England, Md. Const. of 1776, art. III, § 1, where "the Statute of Northampton and regulations touching upon public carriage were alive and well." Charles 2013, *supra*, at 20. The first codification of the District's common law, completed by Judge William Cranch in 1818, included the Statute's ban on public carrying. DA 314–15, D.C. Code of 1818 at 253–54. When the District's common law was again put in writing in 1857, the ban was tempered by the precursor to the "good reason" standard—public carrying was allowed only for people with "reasonable cause to fear an assault or other injury or violence to his person." DA 318, Revised Code of the District of Columbia at 570. Similar laws were adopted in Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, Pennsylvania, Texas, and West Virginia.[6] From that point on, the District's laws strictly

---

[5]     *See* A Bill for the Office of Coroner and Constable (Mar. 1, 1882) (N.J. Constable Oath); John A. Dunlapp, The New York Justice (New York 1815); John M. Niles, The Connecticut Civil Officer: In Three Parts…: with Suitable and approved forms for each: together with numerous legal forms of common use and general convenience. 2nd ed., ch. 14 (Hartford, Conn. 1833); Md. Const. of 1776, art. III, § 1 (adopting English common law).

[6]     *See* Ruben & Cornell, *supra*, at 130–31 & n.52–53, 132–33 & n.61 (quoting statutes); 1870 W. Va. Laws 702, ch. 153, § 8; 1871 Tex. Laws 1322, art. 6512; 1873 Minn. Laws 1025, § 17.

regulated open and/or concealed carrying, at some points banning public carrying altogether.[7]
*See*, *e.g.*, DA 320, An Act to Prevent the Carrying of Dangerous Weapons in the City of
Washington (Nov. 4, 1857) (banning carrying); DA 321, An Act to Prevent the Carrying of
Concealed and Dangerous Weapons in the City of Washington (Nov. 18, 1858) (banning
concealed carrying without repealing ban on open carrying); DA 322–23, 27 Stat. 116 (1892)
(banning concealed carrying without a license, which required good reason); DA 324–28, 47
Stat. 651, ch. 465, § 4 (1932) (similar); DA 329, 57 Stat. 586, ch. 296 (1943) (banning all
carrying without a license, which required good reason).

The District's actions in this compact, urban jurisdiction were consistent with how the
Statute of Northampton's public carrying ban was "geographically contextual and tailored to
public places like 'Fairs' and 'Markets.'" Joseph Blocher, *Firearm Localism*, 123 Yale L.J. 82,
113 (2013). London began enacting gun-control laws "[a]s early as the 1300s." *Id.* at 112; *see
also Heller I*, 554 U.S. at 587 n.10 (quoting a 1704 law barring any person from "bear[ing] any
Arms within London, and the Suburbs"). And in America, "[u]rban gun control was … a
nationwide phenomenon, reaching from the harbors of Boston to the dusty streets of
Tombstone." Blocher, *supra*, at 120. Indeed, this "urban/rural divide appears to have been even
more pronounced out West," where "even the towns most associated with gun violence ...
required people to leave their weapons at the city limits when arriving in town." Blocher, *supra*,
at 117 (citing Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 13
(2011); Dodge City, Kan., City Ordinances no. 16, § 11 (Sept. 22, 1876)). "Almost everyone

---

[7]     Other jurisdictions' longstanding regulations likewise demonstrate that the "good reason"
requirement does not implicate Second Amendment rights. *See Drake*, 724 F.3d at 434 ("We
discern no hint in the Second Amendment jurisprudence of either the Supreme Court or this
Court that the analysis of a particular regulation in a particular jurisdiction should turn entirely
on the historical experience of that jurisdiction alone.").

carried firearms in the untamed wilderness," but "[i]n the frontier towns, … where people lived and businesses operated, the law often forbade people from toting their guns around." *Id.* (quoting Winkler, *supra*, at 165); *see also* Carl Bogus, *A Symposium on Firearms, the Militia, and Safe Cities*, 1 Alb. Gov't L. Rev. 440, 464 (2008) (explaining that, even in the "Wild West," "'[t]hose entering the towns had to come disarmed, since it was against the law for anyone but law enforcement officials to carry a gun'"). By the late 1800s, many cities completely banned public carrying.[8]

In previous briefing in this case, plaintiffs have urged an alternative reading of the Statute of Northampton, arguing that the Statute banned "go[ing] … armed" only "in a manner which deliberately terrifies people."[9] *See* Brief for the Appellees (App.Br.) at 33-35, *Wrenn v. District of Columbia*, No. 15-7057 (D.C. Cir. 2015) (Doc. No. 1575770); Brief of *Amici Curiae* Historians, Legal Scholars, and CRPA Foundation (Historians.Br.) at 6, *Wrenn v. District of Columbia*, No. 15-7057 (D.C. Cir. 2015) (Doc. No. 1577261). This strained reading does not survive textual or historical scrutiny; instead, "affray" included frightening conduct that was not intended to be frightening. Historian Patrick Charles has examined the treatises, restatements, and prosecutorial records published from the sixteenth to early-eighteenth centuries and found it "abundantly clear … that the carrying of dangerous weapons in the public concourse—without the license of government—is what placed the people in great fear or terror, … not some

---

[8]     *See, e.g.*, Nebraska City, Neb., Ordinance no. 7 (1872); Nashville, Tenn., Ordinance Ch. 108 (1873); Los Angeles, Cal., Ordinance Nos. 35-36 (1878); Salina, Kan., Ordinance No. 268 (1879); Syracuse, N.Y., Ordinances Ch. 27 (1885); Dallas, Tex., Ordinance of July 18, 1887 (1887); Checotah, Okla., Ordinance No. 11 (1890); Rawlins, Wyo., Rev. Ordinances Art. 7 (1893); Wichita, Kan., Ordinance No. 1641 (1899); McKinney, Tex., Ordinance No. 20 (1899).

[9]     Plaintiffs alternatively argue, quoting *Simpson v. State*, 13 Tenn. 356 (Tenn. 1833), that "our constitution has completely abrogated [the Statute]." App.Br. at 38. But *Simpson* interprets the *Tennessee*, rather than the *federal* constitution. As such, it says nothing about the scope of "*pre-existing* right" that was codified by the Second Amendment. *See Heller I*, 554 U.S. at 592.

particularized conduct." Charles 2013 at 21; *see also* Charles 2012 at 32-33. Carrying dangerous weapons in the public concourse was an "affray" *because* it was likely to cause terror. Charles 2013, *supra*, at 16; *see* Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. F. 121, 129 (2015) (http://bit.ly/1U4WwLc) ("[T]errorizing the public was the consequence of going armed.").

Plaintiffs' reading creates textual inconsistencies because the Statute explicitly excludes from its prohibition "the King's servants in his presence," "his ministers," and citizens summoned to "keep the peace." These exclusions would be superfluous if the Statute only banned the deliberate misuse of weapons to terrify the people. There are no inconsistencies, however, when the Statute is read to prohibit carrying in the public concourse *because* it would cause terror. Public carrying by the King's servants in his presence, noblemen charged with keeping public order, and citizens responding to a "hue and cry" was expected (indeed required, *see* Historians.Br. at 11) and therefore did not create affray in the manner of a civilian carrying dangerous weapons in a public concourse.

This interpretation is consistent with treatises written before and during the Framing era. *See* Charles 2013, *supra*, at 13-25; Ruben & Cornell, *supra*, at 129-30. Some substitute the word "terror" for "affray," but none articulate an element of intent. *See*, *e.g.*, App.Br. at 33-34 (quoting William Blackstone, who wrote that "going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*"), 36 (quoting James Wilson, who wrote that a man could not "arm[] himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people*"), 37 (quoting John Dunlap) (similar).

This interpretation also resolves the inconsistency created by plaintiffs' reading of William Hawkins's treatise. App.Br. at 35. They seize on his comment that "no wearing of arms is within the meaning of this Statute, unless it be accompanied by such circumstances as are apt to terrify the People," 1 *Treatise of the Pleas of the Crown*, ch.63, § 9 (1716), as imposing an intent requirement. But he also wrote that a man commits affray when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people," such as "in fairs" and "markets," and that he "cannot excuse the wearing of such Armor in Public[], by alleging that … he wears it for the Safety of his Person from Assault," *id.* §§ 4, 8, indicating that carrying alone violates the law when it is not within one of the Statute's enumerated exceptions.  Hawkins then listed these exceptions, which would have been superfluous if intent to terrorize was required. *Id.* § 10. Under the proper reading of the Statute, these apparent inconsistencies disappear, and it makes sense for Hawkins to clarify that "Persons of Quality" could "wear[] common Weapons … for their Ornament or Defence, in such Places, and upon such Occupations, in which it is the common Fashion to make use of them, without causing the least suspicion of an Intent to commit any Act of Violence or Disturbance of the Peace." *Id.* § 9.

For these reasons, the historical record here is at least as persuasive as the evidence supporting other regulations found presumptively lawful in *Heller I*, like the ban on possession by felons, 554 U.S. at 626–27, whose history is neither uniform nor centuries old, *United States v. McCane*, 573 F.3d 1037, 1047–49 (10th Cir. 2009) (Tymkovich, J., concurring). And although the historical evidence introduced thus far is not as extensive as what can be expected on a full record, it heightens the likelihood that the District, not plaintiffs, will prevail on the merits, because it suggests that the "pre-existing right" that the Second Amendment codified, *Heller I*,

554 U.S. at 592, did not encompass carrying in densely populated cities, let alone doing so without "good reason."

**B.      Alternatively, the licensing regime is likely to survive heightened scrutiny.**

1.      The "good reason" standard is not categorically unconstitutional.

Plaintiffs argue that the District's concealed-carry licensing regime, like the handgun ban at issue in *Heller I*, "fails any level of scrutiny" and is thus categorically unconstitutional. P.Mem. at 21. But the "good reason" standard is nothing like the handgun ban struck down in *Heller I*. "Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." *Heller I*, 554 U.S. at 629. The "good reason" standard, in contrast, currently applies in New York, New Jersey, Maryland, and California, which make up 23 percent of the population of the United States.[10] Delaware, Connecticut, Rhode Island, and Massachusetts also have "may-issue" laws that allow licensing officials to exercise discretion. *Gun Control: States' Laws and Requirements for Concealed Carry Permits Vary Across the Nation*, U.S. Government Accountability Office, Report to Congressional Requesters, GAO-12-717, at 5, 11 (July 2012) (http://www.gao.gov/assets/600/592552.pdf). And, unlike the ban at issue in *Heller I*, the "good reason" requirement does not "destroy" any individual's ability to carry an operable handgun in the District. *cf. Heller I*, 554 U.S. at 630 (striking down law requiring firearms in the home to be kept inoperable, without an exception for self-defense).

Plaintiffs' argument depends on an unsupported logical leap: that "the Second Amendment secures an individual right to carry handguns outside one's home for self-defense," P.Mem. at 9, and that the "good reason" standard categorically destroys this right, *id.* at 20–21. What is burdened by the District's law, however, is not the broad right to "bear arms" outside the

---

[10]      Census data is available at http://quickfacts.census.gov/qfd/index.html (last visited Feb. 17, 2016).

home, but something much narrower, tailored to match exactly what the "good reason" standard precludes: carrying a handgun in a densely populated city, filled with unique, high-risk security targets, without any specific self-defense reason. *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010) (holding that issue was "more refined than" "whether the Government may prohibit pure political speech," as plaintiffs framed it). The circular reasoning relied on by plaintiffs—defining a "right" as precisely what a law precludes, then arguing that it is categorically unconstitutional—could be used to evade means-ends scrutiny in any situation. A humanitarian organization could claim that, because it has a broad right to "pure political speech," its "right" to provide humanitarian speech to foreign terrorist organizations is "destroyed" by a material-aid ban. *But see id.* at 28–36. Or a woman could argue that, because she has a broad right to obtain an abortion, her "right" to a partial-birth abortion is "destroyed" by a law banning that procedure. *But see Gonzales v. Carhart*, 550 U.S. 124, 166–67 (2007). This is not how rights are analyzed. *Cf. Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (explaining that, in qualified-immunity analyses, "right" must be established in a "particularized" sense, not as a "broad general proposition").

Moreover, even assuming that the Second Amendment protects a right to "bear arms" outside the home,[11] that right is not at the Amendment's core, and the "good reason" standard does not "destroy" it. The standard applies only in the District, a jurisdiction "completely contained in a dense urban setting" filled with "critical official and symbolic buildings, monuments, and events, and high-profile public officials." DA 7, 20. Of course, the Second Amendment applies in the District, but the right it codifies has always been sensitive to context. As a practical matter, "presumptively lawful" regulations, such as "laws forbidding the carrying

---

[11]     It is not clear that this is so. As the Seventh Circuit explained in *Moore*, "the Supreme Court has not yet addressed th[at] question." 702 F.3d at 935.

of firearms in sensitive places such as schools and government buildings," make it impossible for many Americans to carry guns to work, school, or other sensitive places that make up their daily lives. *Heller I*, 554 U.S at 626. The District's unique status as the densely populated Nation's capital means that laws that are a poor fit in rural areas and wilderness may justifiably apply to the entire jurisdiction. And a public-carry license is not needed to transport a properly secured firearm to a firing range, or outside the District for some other lawful purpose, such as hunting. D.C. Code § 22-4504.01; 18 U.S.C. § 926A.

The "good reason" standard is akin to the "time, place, and manner restrictions" of protected speech, which "are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broadcasting System v. FCC*, 512 U.S. 622, 642 (1994) (*Turner I*). In essence, the standard speaks not to who may carry a handgun, but when a handgun may be carried: after the applicant develops a non-speculative need for armed self-defense. That some people will never encounter such a need does not mean that any right has been destroyed. Any person could, at some point in time, find himself particularly threatened. When that happens, the District's law allows him to apply for a carry license—there is no quota or limit to the number of licenses that can be issued. As a federal court explained in upholding a similar licensing scheme in New York:

> The statute does not function as an outright ban on concealed carry, but rather calls for individualized, case-by-case determinations regarding whether full-carry permit applicants have an actual and articulable—rather than merely speculative, potential, or even specious—need for self-defense. As crafted, the statute seeks to limit the use of handguns to self-defensive purposes—a use which, although in this context existing outside the home, is nonetheless a hallmark of *Heller*—rather than for some other use that has not been recognized as falling within the protections of the Second Amendment.

*Kachalsky v. Cacace*, 817 F.Supp.2d 235, 271 (S.D.N.Y. 2011), *aff'd*, 701 F.3d 81 (2d Cir. 2012).

The Supreme Court has made clear that limitations on carrying do not necessarily destroy a Second Amendment right. It has recognized the presumptive validity of "[l]aws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *Heller I*, 554 U.S. at 626, and this alone effectively makes public carrying impossible for many people who live and work in the District. *See* 18 U.S.C. § 930 (barring carrying in federal facilities); D.C. Code § 7-2509.06(a) (barring carrying in District buildings). Plaintiffs do not suggest that these restrictions destroy those individuals' Second Amendment right, because these restrictions—no different from the "good reason" standard—constitute permissible regulation, not destruction of a right. As the Seventh Circuit noted in *Horsley v. Trame*, 808 F.3d 1126, 1132 n. 2 (7th Cir. 2015), courts "have affirmed categorical bans on firearm possession in other instances." *Id.* at *12 n.2 (citing *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (affirming categorical ban on possession of firearms by felons); *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010) (unlawful users of controlled substances); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (domestic violence misdemeanants)). And, as explained, the good reason requirement is not a categorical ban.

Plaintiffs rely heavily on the analysis of the panel in *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *see* P.Mem at 12–14, 17, 19 & 21, but they fail to note that the decision in *Peruta* was vacated a month after filing their motion, pending rehearing *en banc*, and is no longer good law. *See* 781 F.3d 1106 (9th Cir. Mar. 26, 2015); http://www.ca9.uscourts.gov/ content/ view.php?pk_id=0000000722 (online public docket) (last visited Feb. 15, 2016). Aside from *Peruta*, the only authority plaintiffs cite striking down a "good reason" licensing standard

are a case from an Indiana intermediate appellate court from 1980, and a Michigan Supreme Court case from 1922.[12] *See* P.Mem. at 12, 14–15. These cases simply lack the persuasive force of *Kachalsky*, *Drake*, and *Woollard*—all of which are recent, on point, and issued by a federal appellate court.

In addition, the D.C. Circuit's decision in *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) (*Heller III*), does not support plaintiffs' assertion that the "good reason" requirement is unconstitutional. *See* Pls' Notice of Supp. Auth. (Doc. No. 40). As discussed above, unlike the law found unconstitutional in *Heller III*, which prohibited the registration (and thus legal possession) of more than one pistol every thirty days, 801 F.3d at 280, the "good reason" requirement imposes no quota or limit on the number of concealed-carry licenses that may be issued. Further, unlike the one-pistol-per-thirty-day limitation, the "good reason" requirement does not burden the core right at the heart of the Second Amendment—the right to keep arms in the home. *See id.* (noting that the one-pistol-per-thirty-day limit "restrict[s] an individual's undoubted constitutional right to keep arms (plural) in his or her home"); *see also Heller I*, 554 U.S. at 635.

Plaintiffs also wrongly suggest that the District's law is analogous to a "prior restraint" on free speech. P.Mem. at 17–19. But the doctrine prohibiting prior restraints "is specific to the First Amendment" and stems from a concern that "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, [will] intimidate[] parties into censoring their own speech." *Hightower v. City of Boston*, 693 F.3d 61, 81 (1st Cir. 2012). It "is not a label

---

[12]     Plaintiffs also cite *dicta* from another case, *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004), but that case does not help them. *See id.* at 1044 ("Even in jurisdictions that have declared the right to keep and bear arms to be a fundamental constitutional right, a strict scrutiny analysis has been rejected in favor of a reasonableness test[.]").

that may be attached to allow any facial challenge, whatever the constitutional ground." *Id.* at 80. And the prior restraint doctrine cannot apply here, because—contrary to plaintiffs' repeated assertions—the District's law does not give Chief Lanier "unbridled discretion." P.Mem. at 18; *see Hightower,* 693 F.3d at 80. D.C. Code § 7-2509.11(1) requires rulemaking to "establish criteria for determining when an applicant has" demonstrated "good reason" and "suitability." The regulations issued under this statute provide unambiguous standards and guarantee substantive administrative and judicial review. 24 DCMR §§ 1202, 1221.6, 2333.1–.4. As the Second Circuit explained in its rejection of an identical argument in *Kachalsky*, "[p]laintiffs' complaint is not that the proper cause requirement is standardless; rather, they simply do not like the standard—that licenses are limited to those with a special need for self-protection." 701 F.3d at 92. "Plaintiffs question New York's ability to limit handgun possession to those demonstrating a threat to their safety. This is precisely the type of argument that should be addressed by examining the purpose and impact of the law in light of the Plaintiffs' Second Amendment right." *Id.*

> 2.   Even if constitutional scrutiny is warranted, the appropriate standard is intermediate scrutiny.

Plaintiffs assert that "strict scrutiny" is required here, because the right to bear arms is "fundamental." P.Mem. at 20. But "[t]he [Supreme] Court has not said, … and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake." *Heller II*, 670 F.3d at 1256. "Many, indeed most, of the Bill of Rights guarantees do not trigger strict scrutiny." Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 694 (2007). In their consideration of statutes similar to the "good reason" requirement, the Second, Third, and Fourth Circuits all found that the laws were subject only to intermediate scrutiny,

because they do not completely prohibit the exercise of any core Second Amendment right.[13]

*Drake*, 724 F.3d at 430; *Kachalsky*, 701 F.3d at 93 & n.17; *Woollard*, 712 F.3d at 876. The D.C.

Circuit previously has found intermediate scrutiny appropriate for the District's gun registration

laws because they do "not severely limit" the core Second Amendment right, *see Heller II*, 670

F.3d at 1257; the District's ban on assault weapons and large-capacity ammunition magazines

because the law does not "prevent a person from keeping a suitable and commonly used weapon

for protection in the home," *id.* at 1262; and a federal law barring firearm possession by

convicted criminals because, although the burden "is certainly severe, it falls on individuals who

cannot be said to be exercising the core of the Second Amendment right identified in *Heller, i.e.*,

'the right of law-abiding, responsible citizens to use arms in defense of hearth and home,'" *see*

*Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013). In fact, "the overwhelming majority of

cases from [the D.C. Circuit's] sister circuits" also have "applied intermediate scrutiny to various

statutes regulating firearms." *Dearth v. Lynch*, 791 F.3d 32, 39 (D.C. Cir. 2015) (Henderson, J.,

dissenting) (remanded for unrelated findings).[14] Moreover, in *Heller III*, the D.C. Circuit found

that intermediate scrutiny was the appropriate level of review for the one-pistol-per-thirty-day

limitation, even though it burdened "core" Second Amendment conduct.  801 F.3d at 280.

If the District's "good reason" standard implicates the Second Amendment at all, it

should also be measured under this standard. Anything stricter than intermediate scrutiny would

---

[13]    The Third Circuit held that the "good reason" standard was so longstanding that it did not even implicate the Second Amendment. *Drake*, 724 F.3d at 430. However, "because of the important constitutional issues presented," the court applied heightened scrutiny in the alternative—holding that the law should be examined under intermediate scrutiny. *Id*.

[14]    Although the Fourth Circuit recently applied strict scrutiny to a law banning the possession of semi-automatic rifles and larger-capacity magazines, it did so based on its conclusion that that law substantially burdened the "core right of self-defense in the home." *See Kolbe v. Hogan*, ___ F.3d ___, 2016 WL 425829, at *11-*13 (4th Cir. Feb. 4, 2016). The "good reason" requirement simply does not implicate that "core" right.

be inconsistent with the Supreme Court's recognition that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller I*, 554 U.S. at 634–35. As explained, "longstanding" prohibitions, those in place during the Framing era as well as those reaching well into the 1800s, are "presumptively lawful." *Id.* at 626–27 & n.6. And the historical evidence at least demonstrates that the "good reason" standard does not implicate any right at the Second Amendment's *core*, making it inappropriate to apply any test more rigorous than intermediate scrutiny. *See, e.g.*, *Woollard*, 712 F.3d at 876 (applying intermediate scrutiny to "good reason" standard); *Kachalsky*, 701 F.3d at 96 (same); *Horsely*, 808 F.3d at 1132-33 (applying intermediate scrutiny to law requiring parental consent for carrying license to adults under 21); *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (applying intermediate scrutiny to ban on possession by domestic violence misdemeanant); *cf. United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("Since historical meaning enjoys a privileged interpretative role in the Second Amendment context, this longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable." (citations omitted)).

The reasons for restricting public carrying in early American cities apply with even greater force today. *See* Charles 2012, *supra*, at 48 (comparing the Framing-era gunman's ability to inflict "two deaths per minute" with the current "twelve, twenty-four, or as high as forty-eight potential deaths per minute"). "The risk inherent in firearms … distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test, such as the right to marry and the right to be free from viewpoint discrimination, which can be exercised without creating a direct risk to others." *Bonidy v. USPS*, 790 F.3d 1121, 1126 (10th Cir. 2015). Intermediate scrutiny "places the burden on the

government to justify its restrictions, while also giving governments considerable flexibility to regulate gun safety." *Id.* Thus, "while the state's ability to regulate firearms is circumscribed in the home, 'outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense.'" *Kachalsky*, 701 F.3d at 94.

Intermediate scrutiny is applied to laws regulating the exercise of other fundamental rights for similar reasons. Commercial speech is "indispensable to the proper allocation of resources in a free enterprise system," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 765 (1976), but even the most burdensome content-based restrictions may be measured under intermediate scrutiny, *see, e.g.*, *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 647 (1985). This is because commercial speech "is 'linked inextricably' with the commercial arrangement that it proposes," *Edenfield v. Fane*, 507 U.S. 761, 767 (1993), and commerce is "an area traditionally subject to government regulation," *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). Thus, the government's "interest in preventing commercial harms justifies more intensive regulation." *Cincinnati v. Discovery Network*, 507 U.S. 410, 426 n.21 (1993). And "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

So too for the free exercise of religion, where intermediate scrutiny applies to laws that ban "overt acts" that "pose[] some substantial threat to public safety, peace or order." *Sherbert v. Verner*, 374 U.S. 398, 403 (1963). And an individual's right to use his private property for economic gain, protected under the Fifth Amendment, is subject to regulation to ensure it is not "injurious to the health, morals, or safety of the community." *Keystone Bituminous Coal v.*

*DeBenedictis*, 480 U.S. 470, 489 (1987). These restrictions are "properly treated as part of the burden of common citizenship"—"[w]hile each of us is burdened somewhat by such restrictions, we, in turn, benefit greatly from the restrictions that are placed on others." *Id.* at 491.

The government has an even greater interest in regulating the conduct of its citizenry when that conduct involves carrying a deadly weapon in a populated public place. Just as there is a "'common-sense' distinction" between commercial and noncommercial speech, *Ohralik*, 436 U.S. at 455–56, and between religious beliefs and overt acts, *Sherbert*, 374 U.S. at 403, there is a common-sense distinction between carrying a handgun in one's home or business and carrying a handgun on the crowded streets of the nation's capital. A handgun in the home may increase the risk of domestic homicide, suicide, or accidental injury, *see Heller I*, 554 U.S. at 703 (Breyer, J., dissenting), but that risk is largely borne by those who live in or visit that home. Not so for public carrying, where a stray bullet can instantly destroy the lives of anyone who happens to be in the area. *See* Andrew Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U. L. Rev. 57, 60 n.7 (1995) ("[S]tray bullets are a particular problem in large cities.").

What is more, public carrying creates new potential for armed conflict, increasing the chances that "[i]ncidents such as bar fights and road rage" will "take on deadly implications," criminals will target carriers "precisely because they possess handguns," or "an additional person bearing a gun" will cause confusion during a police operation. *Woollard*, 712 F.3d at 779–80 (citing experts). "It is axiomatic that if the gun carrier accidentally discharges his gun in public, decides to settle an argument with his gun in public, makes a mistake in judgment with his gun in public, or commits a crime with his gun in public, the community-at-large is at risk of death or serious injury from those actions." Henigan, *supra*, at 1200. "Were [courts] to require strict

scrutiny for firearm restrictions outside the home, they 'would likely foreclose an extraordinary number of regulatory measures, thus handcuffing lawmakers' ability to 'prevent[] armed mayhem' in public places," *Masciandaro*, 638 F.3d at 471 (quoting *Skoien*, 614 F.3d at 642), and "depriving them of 'a variety of tools for combating that problem,'" *id.* (quoting *Heller I*, 554 U.S. at 636).

        3.       The "good reason" standard survives intermediate scrutiny.

In *Heller II*, the D.C. Circuit adopted the intermediate-scrutiny test articulated in *Turner I* and 520 U.S. 180 (1997) (*Turner II*). 670 F.3d at 1257–59. It again applied intermediate scrutiny to firearm regulations in *Schrader*. Both decisions recognized that, under intermediate scrutiny, the "fit" between the challenged law and the important governmental interest "[need only] be reasonable, not perfect." *Schrader*, 704 F.3d at 990. It "is satisfied 'so long as the … regulation promotes a substantial government interest that would be achieved less effectively absent the regulation,'" and "the means chosen are not substantially broader than necessary to achieve the government's interest." *Heller II*, 670 F.3d at 1258 (quoting, in parenthetical, *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 (1989)).

In assessing whether a law is "substantially related to an important governmental objective," *Heller II*, 670 F.3d at 1258, the D.C. Circuit "afford[s] 'substantial deference to the predictive judgments of [the legislature],'" *Schrader*, 704 F.3d at 990. In doing so, it must defer to the legislature both "as to the harm to be avoided and to the remedial measures adopted for that end," *Turner II*, 520 U.S. at 196, because the legislature "'is "far better equipped than the judiciary" to make sensitive public policy judgments … concerning the dangers in carrying firearms and the manner to combat those risks,'" *Schrader*, 704 F.3d at 990. Thus, in reviewing a law, the courts' role is simply to "'assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence.'" *Heller II*, 670 F.3d at 1259.

This Court also should defer to the Council's predictive judgments regarding the question of "fit"—whether the "good reason" standard is "not substantially broader than necessary to achieve" the stated interest. *Turner II* deferred to Congress's assessment of "fit" when it rejected a "more limited set of must-carry rules," noting that Congress had considered this option but made "a deliberate congressional choice to adopt the present levels of protection, *to which this Court must defer*." 580 U.S. at 219 (citing legislative history) (emphasis added); *id.* at 213 ("afford[ing] the Government latitude in designing a regulatory solution"); *see id.* at 220–21 (affording deference to Congress's decision to reject "'A/B' switches" as less-burdensome alternative).[15] And in *Humanitarian Law Project*, the Supreme Court again deferred to Congress on whether a law burdened a constitutional right substantially more than necessary, upholding a ban on the provision of "material support" to foreign terrorist organizations when it precluded pure speech that advanced only legitimate activities. 561 U.S. at 28–29, 33.

This makes sense. If the Council is better equipped than the judiciary to determine "the degree to which" District laws should promote public safety, *see Turner II*, 520 U.S. at 193, and whether a firearm regulation will likely do so, *see Heller II*, 670 F.3d at 1269, it is also better equipped to determine whether the regulation is necessary to accomplish that goal. Indeed, these factors often are so intertwined they are treated as one. *See*, *e.g.*, *Turner II*, 520 U.S. at 211 (considering whether the challenged law "is necessary to prevent a substantial number of broadcast stations from losing cable carriage and suffering significant financial hardship"); *Schrader*, 704 F.3d at 990 (considering whether "to accomplish the goal of preventing gun violence 'firearms must be kept away from persons, such as those convicted of serious crimes, who might be expected to misuse them'"). And the Council's expertise in policy matters "is not

---

[15]    *Turner II* also explained that, under this test, laws "are not 'invalid simply because there is some imaginable alternative that might be less burdensome.'" 520 U.S. at 217.

the sum of the matter"—courts "owe [a legislature's] findings an additional measure of deference out of respect for [its] authority to exercise the legislative power." *Turner II*, 520 U.S. at 196. To hold otherwise would "infringe on traditional legislative authority to make predictive judgments when enacting … regulatory policy." *Id.*; *cf. Gonzalez*, 550 U.S. at 163 ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty." (citing cases)); *Baze v. Rees*, 553 U.S. 35, 90 (2008) (Scalia, J., concurring) ("It is simply not our place to choose one set of responsible empirical studies over another in interpreting the Constitution. Nor is it our place to demand that state legislatures support their criminal sanctions with foolproof empirical studies, rather than commonsense predictions about human behavior.").

The District's "good reason" requirement easily survives intermediate scrutiny. Even in cases alleging infringement of the First Amendment, the Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014) (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001)). The Council based its findings on considerable evidence, and the District will introduce even more evidence here.

a.      The evidence relied on by the Council.

The Council substantiated its finding that the "good reason" standard will help prevent crime and promote public safety. It primarily relied on a 2014 Stanford University study led by Professor John Donohue III, an economist, legal scholar, and leading empirical researcher, who explained that "[t]he totality of the evidence based on educated judgments about the best statistical models suggests that right-to-carry laws are associated with substantially higher rates

of aggravated assault, rape, robbery and murder." DA 17; *see* DA 133–240, Donohue, *The Impact of Right to Carry Laws and the NRC Report: The Latest Lessons for the Empirical Evaluation of Law and Policy* (Sept. 4, 2014) (Donohue 2014).

Plaintiffs ignore this data and instead rely on a single study, published more than 10 years ago, suggesting that, in the United States, "defensive gun use … probably is substantially more common than criminal gun use." P.Mem. at 22 (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 180 (1995)). The empirical basis for this study, and others like it, has been thoroughly discredited.[16] Professor Donohue and Yale Law School Professor Ian Ayres began researching the effect of right-to-carry laws in response to a 1997 study that reported that they *decreased* violent crime. DA 137–139 (citing John Lott & David Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. Legal Stud. 1 (1997)); *see* Ayres & Donohue, *Nondiscretionary Concealed Weapons Laws: A Case Study of Statistics, Standards of Proof, and Public Policy*, 1 Am. L. & Econ. Rev. 436 (1999). They found the "more guns, less crime" conclusion impossible to replicate. *See*, *e.g.*, Ayres & Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis*, 55 Stan. L. Rev. 1193 (2003) ("Ayres & Donohue 2003"); Donohue, *Guns, Crime, and the Impact of State Right-to-Carry Laws*, 73 Fordham L. Rev. 623 (2004).

In 2004, the National Research Council convened a panel of researchers who extended the "more guns, less crime" study to 2000; they too found no credible statistical evidence to support the claim. DA 147–52 (citing Nat'l Research Council, *Firearms and Violence: A Critical*

---

[16]     *See*, *e.g.*, David Hemenway, "The Myth of Millions of Annual Self-Defense Gun Uses: A Case Study of Survey Overestimates of Rare Events," 10 *Chance* No. 3 (American Statistical Ass'n 1997) (*available at* https://stat.duke.edu/~dalene/chance/chanceweb/103.myth0.pdf).

*Review* (2004)). Over the next ten years, Ayres and Donohue tested the models applied in these earlier studies—correcting for errors they uncovered, gathering more reliable crime data, and extending the study up to 2010. DA 153–207; *see also* Ayres & Donohue, *Yet Another Refutation of the More Guns, Less Crime Hypothesis*, 6 Econ. J. Watch 35 (2009); Ayres & Donohue, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977–2006*, 6 Econ. J. Watch 218 (2009). Finally, in 2014, Donohue concluded that right-to-carry laws were likely to result in "substantially higher rates" of violent crime. DA 104–105.

Donohue acknowledged that "it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." DA 212. "But not being able to 'determine' with the level of certainty one strives for in academic work does not mean that one cannot offer conclusions at some lower level of certainty such as 'more probable than not.'" DA 212. "Since policymakers need to act, it is more useful to offer guidance as to which evidence is likely to be most reliable than to simply reject all evidence until the highest level of certainty has been attained." DA 212. And, Donohue reported, for each of the seven crime categories they studied, at least one of the most-favored models demonstrated a substantial increase in crime after right-to-carry laws were enacted. DA 212. One model "suggest[ed] that [right-to-carry] laws increased every crime category [except murder] by at least 8 percent," DA 212–13, and this "may understate the true harmful impact of [right-to-carry] laws" on "gun assaults," DA 134..

These increased risks—which plaintiffs entirely ignore—could have unparalleled consequences in this unique jurisdiction. The District "is completely contained in a dense urban setting" and gun violence is particularly devastating in large cities, where there are "higher rates of violent crime than suburbs and rural areas," and where crowded public spaces make it all too likely that a stray bullet will hit an innocent bystander. DA 7. It also "is the home of the

President," "all high-ranking federal officials and members of Congress," and "a diplomatic corps more extensive and omnipresent than anywhere else in the country." DA 4–5, 7. As a result, "the likelihood of attack is higher" in the District than in any other city, "and the challenges to protecting the city are greater." DA 6. The Council predicted that a significant increase in public carrying would force federal law enforcement agencies to step up protection of thousands of high-risk targets, which could interfere with the rights of the people who live, visit, and work here. DA 7. "[I]ncreasing the posting of armed officers, or clearing streets of all automobiles and restricting pedestrian movement except through checkpoints, tips society away from the freedom and openness we value in our society." DA 7.

The Council also relied on the predictive judgments of the legislatures of New York, New Jersey, and Maryland, all of which have found the "good reason" standard necessary to prevent crime (and had those findings upheld by federal circuit courts). *See* DA 2, 9 & n.39. The court in *Kachalsky* noted, in upholding New York's "proper cause" requirement under intermediate scrutiny, that "studies and data demonstrat[e] that widespread access to handguns in public increases the likelihood that felonies will result in death and fundamentally alters the safety and character of public spaces." 701 F.3d at 99. The court in *Woollard* identified several different ways in which Maryland's "good reason" standard "protects citizens and inhibits crime," citing expert testimony of key law enforcement specialists. 713 F.3d at 879–80. And the court in *Drake* upheld New Jersey's determination that the "good reason" standard "combat[s] handgun violence" and improves public safety by "combating the dangers and risks associated with the misuse and accidental use of handguns" and "reduc[ing] the use of handguns in crimes." 724 F.3d at 437–38.

This evidence applies with even greater force here. Unlike those states, the District has no rural or unpopulated areas—it "is completely contained in a dense urban setting," with correspondingly "higher rates of violent crime than suburbs and rural areas." DA 4, 7. And "as the seat of the federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day," the District is "filled with sensitive places from a public safety perspective." DA 5.

The Council also relied on expert testimony from Chief Lanier and information from the Secret Service and Capitol Police explaining the District's special security concerns. *See* DA 20, 23, 24. It relied on anecdotal evidence, noting that "much of the District's violent crime is the result of gang members carrying guns" and, regardless of the illegality of the practice, "the fact that [gang members] are carrying provokes gun violence, rather than lessens it." DA 18. And it relied on common sense, finding it "undeniable" that "introducing a gun into any conflict can escalate a limited danger into a lethal situation" and that, "[w]hen the deadly force being used is a gun, the danger extends to bystanders and the public at large." *Id.*

In light of the above, the District is likely to demonstrate that the "good reason" requirement is "substantially related to an important governmental objective," *see Heller II*, 670 F.3d at 1258, and thus constitutional under intermediate scrutiny

b.      The evidence the District will introduce here.

This Court should also consider evidence presented in this Opposition, as well as what the District will likely present on a full record. *See Turner I*, 512 U.S. at 667–68; *Heller II*, 670 F.3d at 1259–60 (remanding for additional factual development even after judgment had been entered). "An impressive body of empirical evidence now shows that state laws making it easier to carry concealed weapons in public … have had the net effect of making those states more dangerous." Henigan, *supra*, at 1201. This is not limited to the 2014 Donohue study. For

example, in 1998, a Georgetown University professor tested the "more guns, less crime" theory by using juveniles (who cannot qualify for public-carry permits) as a control group, and concluded that "shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates." DA 243, Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 Int'l L. Rev. L. & Econ. 239, 241 (1998). Another study that year applied corrected models to the "more guns, less crime" data and found that, "[f]or robbery, many states experience increases in crime" after enacting right-to-carry laws. DA 262, Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, 88 Am. Econ. Rev. 468, 473 (1998). Indeed, recent data shows that gun-related deaths are more than four times higher in jurisdictions with lax (or non-existent) controls on public carrying. Libby Isenstein, *The States with the Most Gun Laws See the Fewest Gun-Related Deaths*, National Journal (Aug. 28, 2015), *available at* http://www.nationaljournal.com/s/53345/states-with-most-gun-laws-see-fewest-gun-related-deaths.

Further, the risks inherent in public carrying are not confined to the potential misuse of the weapon by the owner. A 2009 study of Philadelphia residents found that individuals who possessed a gun during an assault were 4.46 times more likely to be shot, and these odds *increased* to 5.45 when the victim had an opportunity to resist. DA 280, Charles Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 Am. J. Pub. Health 2034, 2037 (2009). Handguns are often stolen and used against the carrier or used to commit a host of other crimes. *See Woollard*, 712 F.3d at 879 (quoting Baltimore Police Department Commissioner, who attested that "criminals often target victims '*precisely because* they possess handguns,' and that Baltimore police have 'frequently investigated homicides and robberies where it appears that one, if not the primary, goal of the attacker was to deprive the victim of his

handgun or other weapons'"); Ayres & Donohue 2003, *supra*, at 1205 ("[S]ome estimates suggest[] that as many as one million or more guns are stolen each year."). And an upswing in public carrying may well encourage criminals to "shift toward greater lethality, and hence greater harm to the community." DA 272, Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, 90 J. Pub. Econ. 379, 387 (2006). "Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun." Philip Cook, *et al.*, *Gun Control After* Heller*: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. Rev. 1041, 1081 (2009). "If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal." *Id.*

"Shall-issue" laws can also affect how police officers interact with the law-abiding public. According to a former Baltimore Police Commissioner, the presence of a third person with a handgun in a confrontation between an officer and a suspect can "cause confusion as to which side of the confrontation the person is on, which could lead to hesitation by the police officer," with "potentially tragic circumstances" for "innocent victims, including the permit holder, innocent bystanders, and police officers." *Woollard*, 712 F.3d at 879–80. A former Police Chief for Baltimore County added that, "[i]f the number of legal handguns on the streets increased significantly, [police] officers would have no choice but to take extra precautions before engaging citizens, effectively treating encounters between police and the community that now are routine, friendly, and trusting, as high-risk stops, which demand a much more rigid protocol." *Id.* at 880.

33

And again, to the extent a judgment must be made on uncertain data, it is the Council's judgment that is entitled to deference, not plaintiffs'. *Turner II*, 520 U.S. at 199; *Heller II*, 670 F.3d at 1269.

c.    The Council's tailoring of the "good reason" standard to accomplish its objectives

This Court should also defer to the Council's conclusion that the "good reason" standard is not substantially more burdensome than necessary to accomplish its objectives. Intermediate scrutiny requires only that "the fit … be reasonable, not perfect." *Schrader*, 704 F.3d at 990. And the District offers ample evidence of fit. The Council relied on the 2014 Donohue study, which demonstrates that it is more likely than not that public-carry laws significantly increase violent crime. DA 133–240. It relied on the persuasive judgment of legislatures in New York, New Jersey, and Maryland, all of which found the "good reason" standard reasonably tailored to prevent an increase in gun violence. *Kachalsky*, 701 F.3d at 99; *Woollard*, 713 F.3d at 879–80; *Drake*, 724 F.3d at 437–38. And it heard the lay and expert witness testimony describing the District's unique security concerns. DA 4–7, 17–19, 89–99.

The Council's conclusion that the "good reason" standard is reasonably tailored flows naturally from this evidence. *See* DA 19 (finding that the "good reason" standard "offers a reasonable, balanced approach to protecting the public safety and meeting an individual's specific need for self-defense"). If an increase in public carrying is likely to increase violent crime, escalate conflicts that otherwise might dissipate, and make it more likely that innocent bystanders will be shot, it is reasonable to conclude that a law limiting public carrying to those with a special self-defense need will help prevent these harms. And if federal law enforcement agencies are likely to respond to a substantial increase in public carrying by taking protective measures that interfere with the public's right to freely travel in the District, it is reasonable to

34

conclude that limiting public carrying to those with a special self-defense need will discourage such measures.

Plaintiffs have not suggested an alternative that would prevent the increase in crime associated with right-to-carry laws. *Cf. Turner II*, 520 U.S. at 222 (rejecting subsidies as a less-burdensome alternative to challenged law because plaintiff cable operators "ha[d] not proposed any particular subsidy scheme"). Instead, in accordance with plaintiffs' absolutist view of the Second Amendment, the preliminary injunction they seek would bar the District from enacting *any* measure that would ensure that the public bears this risk only for individuals with a special self-defense reason to carry a handgun in public. It is based on a theory that the District must be a "shall-issue" regime, required to face the very dangers the Council meant to prevent by enacting the "good reason" standard.

Plaintiffs argue that the "good reason" standard is not adequately tailored because it is "not directed at dangerous people." P.Mem. at 19. This criticism, however, misunderstands the purpose of the standard. The Council recognized that, beyond obvious suitability standards that look to criminal and mental-health records (already applied in most "shall-issue" states), it is difficult to predict whether a seemingly responsible person will misuse his handgun. Every citizen is law-abiding until he breaks the law, and the government cannot know in advance who will do so. *See* DA 285, Philip Cook, *et al.*, *Criminal Records of Homicide Offenders*, 294 JAMA 598, 599 (2005) (noting that fewer than half of adults arrested for criminal homicide have prior felony convictions). Gangs, for instance, could travel with arms carried by members who have not acquired criminal records (or they could recruit such members). *See* DA 294, Minnesota Drug & Violent Crime Task Forces, 2011 Annual Report, at 6 ("It is not unusual for some gang members … to have a permit to carry a firearm."). Public carrying also "may create or

exacerbate accidents or deadly encounters, as the longstanding bans on private firearms in airports and courthouses illustrate." *Bonidy*, 790 F.3d at 1126. "Incidents such as bar fights and road rage that now often end with people upset, but not lethally wounded, take on deadly implications when handguns are involved." *Woollard*, 712 F.3d at 879; *cf.* Bogus, *supra*, at 445 ("The largest percentage of murders [in the United States], more than 40%, occurs during arguments.").

The Council properly concluded that the issuance of *any* public-carry permit, regardless of whether it is based on "good reason," increases the likelihood of public harm. At the same time, the Council understood that some individuals do have particularized needs to carry handguns for self-defense. It then engaged in tailoring that is entirely appropriate under the circumstances facing the District—accepting some additional public risk, but only for individuals with a special self-defense need to carry a handgun in public. The "good reason" standard "provides a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry a handgun." *Drake*, 724 F.3d at 437. It is "the result of a 'careful balancing of the interests involved' and not a general animus towards guns." *Kachalsky*, 701 F.3d at 97 n.22; *see Woollard*, 712 F.3d at 881 (similar).

Because plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their claims, their Motion should be denied.

## II.     PLAINTIFFS HAVE NOT SHOWN IRREPARABLE INJURY.

This Court can avoid a premature analysis of the merits and instead deny plaintiffs' request for a preliminary injunction because they have failed to show irreparable injury. A plaintiff seeking emergency injunctive relief must make a threshold showing of irreparable injury. *CityFed Fin. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Indeed,

failure to show any irreparable harm is grounds to deny the requested relief, even if the other factors are in plaintiffs' favor. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The alleged injury "must be both certain and great; it must be actual and not theoretical." *Sweis*, 950 F.Supp.2d at 47 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*)). And where, as here, the relief requested would change rather than preserve the status quo, that standard is even higher: plaintiffs must show "extreme or very serious damage" or that they are "clearly entitled" to immediate relief. *Id.*

Plaintiffs, however, premise their standing on their claim that they *cannot* demonstrate any particularized reason to fear harm and therefore cannot satisfy the "good reason" standard. Compl. ¶¶ 26–28; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (requiring "concrete and particularized" injury). It is not enough for plaintiffs to claim that it is *possible* that they will suffer injury without the ability to carry a handgun in public. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Even if plaintiffs were highly likely to succeed on the merits (and they are not), their inability to point to any imminent, non-speculative harm from the "good reason" standard independently justifies denial of the preliminary injunction.

Plaintiffs argue that the allegation of a violation, without more, satisfies the irreparable injury requirement. *See* P.Mem. at 21. But the D.C. Circuit has rejected this proposition, explaining that, "even though Congress has provided for interlocutory review of preliminary injunctions, premature resolution of difficult constitutional questions is undesirable." *Gordon v. Holder*, 721 F.3d 638, 644–45 (D.C. Cir. 2013). Plaintiffs argue that their right to keep and bear arms under the Second Amendment is like the right to free expression under the First

Amendment, and that these "intangible and unquantifiable interests" "cannot be compensated by damages." P.Mem. at 22. But the rights protected under the First Amendment are inherently different from those protected under the Second Amendment. Rights such as free expression and free exercise of religion are so intrinsically valuable that "the irreparable nature of the harm may be presumed." *Full Gospel Churches*, 454 F.3d at 301 (free exercise of religion); *cf. Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (freedom from unreasonable seizure). The right to keep and bear arms, however, has no intrinsic value—it is not an end in itself. Rather, it is "the inherent right of self-defense" that is "central to the Second Amendment." *Heller I*, 554 U.S. at 628. If no occasion arises where a handgun is needed for self-defense, its absence cannot cause harm.

Moreover, activity under the First Amendment is difficult to regulate without, even accidentally, infringing on its core rights, and those core rights are not typically expressed through conduct that presents an inherent risk of grievous danger to the general public. In contrast, even a temporary injunction barring the enforcement of a firearm regulation could have serious and tragic consequences.

Plaintiffs' theory of the case—that they cannot obtain a license under the "good reason" requirement because they have *no* particularized reason to fear harm, but just the general fear that they could find themselves in a situation where a firearm would be helpful—makes it impossible for them to establish irreparable harm if forced to wait for a license while their challenge is pending in this Court. In essence, they have conceded the speculative nature of their theory of injury, when they are entitled to injunctive relief only if they can show their injury is "both certain and great," "actual and not theoretical." *Chaplaincy*, 454 F.3d at 297.

## III.    THE BALANCE OF EQUITIES TIPS HEAVILY IN FAVOR OF THE DEFENDANTS

"[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers). The District also has an interest in the uniform application of its laws, and an injunction would establish two disparate legal regimes: one for the plaintiffs, and another for everyone else. An injunction would harm the District and its citizens by injecting massive uncertainty into an important public-safety measure.

By their motion, plaintiffs seek to enjoin the implementation of a law of substantial local importance.[17] Enjoining the "good reason" requirement would clearly have a negative impact on thousands of District residents and visitors because of the uncertain public impact of allowing untold numbers of concealed handguns to be carried on the streets of the city. Automatic issuance of concealed-carry licenses would directly affect the District's public spaces. Unlike possession in a person's home, public carrying subjects everyone who occupies those places to the dangers, intentional and accidental, presented by handgun possession. District residents, through their elected representatives, have decided that allowing public carrying of firearms without "good reason" is inconsistent with public safety.

As the analyses in *Kachalsky*, *Woollard*, and *Drake* demonstrate, the "good reason" requirement is an essential component of a system crafted to balance public safety with the needs of individuals particularly at risk. Without this standard, the District becomes a "shall issue"

---

[17]    Plaintiffs, of course, only have standing to assert their *own* rights. *See, e.g., Rumber v. District of Columbia*, 595 F.3d 1298, 1301 (D.C. Cir. 2010). The unnamed SAF members could not possibly all be beneficiaries of an injunction requiring the issuance of concealed-carry licenses. Surely the District has the right to check for itself to determine whether self-declared "otherwise eligible" applicants are responsible and law-abiding. *See Neb. Dep't of Health & Human Servs. v. U.S. Dep't of Health & Human Servs.*, 435 F.3d 326, (D.C. Cir. 2006) ("An injunction must be narrowly tailored to remedy the specific harm shown.").

regime, despite the Council's legislative judgment based on empirical studies that such regimes are "associated with substantially higher rates of aggravated assault, rape, robbery, and murder."[18] DA at 17. As discussed, the Council's finding is entitled to considerable deference.

Plaintiffs' speculative harms are simply not enough to overcome the potential harm to public safety that would arise should a preliminary injunction be erroneously granted. "[B]ecause gun violence threatens the public at large, the court balances the public's interest in preserving its constitutional rights against the public's interest in preventing gun violence." *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1283 (N.D. Cal. 2014); *id.* at 1278 (refusing to enjoin enforcement of a law prohibiting possession of high-capacity magazines, despite finding that the ordinance "comes relatively near the core of the Second Amendment right").

## IV. ALLOWING BROAD CARRYING OF CONCEALED WEAPONS IS NOT IN THE PUBLIC INTEREST

While for "several hundred years" courts sitting in equity have had the discretion to weigh the public interest in granting or denying injunctive relief, such courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496 (2001) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944), and *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Plaintiffs argue that the public has no interest in the enforcement of an unconstitutional law. P.Mem. at 23. But a final determination of the constitutionality of the "good reason" provision should only be made after full development of the record, including discovery, expert testimony, and full briefing. The Council speaks for the people, and its position is plain:

---

[18] Plaintiffs' citation, without context, of a statement by Chief Lanier that "[l]aw-abiding citizens that register firearms, that follow the rules, are not out worry" (Opp. at 23) is of no moment. Chief Lanier is not the Council, and it is the Council's judgment that is entitled to deference.

public carrying comes at a great societal cost, and the public should bear this cost only when an individual has a specific self-defense need. DA 18–19.

In considering the above factors, the D.C. Circuit previously found that the District "satisfied the requirements for a stay pending appeal." *See Wrenn*, No. 15-7057, Order Granting Mot. to Stay (June 29, 2015). These same standards are applicable here, and this Court should follow the Circuit's lead and permit the District to enforce this critical public safety law while this litigation is pending. The review of public-carrying laws is "serious business"; courts "do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of [their] judicial chambers [they] miscalculated as to Second Amendment rights." *Masciandaro*, 638 F.3d at 475 (Wilkinson, J., concurring). "It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square. If ever there was an occasion for restraint, this would seem to be it." *Id.* at 475–76.

## CONCLUSION

Plaintiffs' motion for a preliminary and/or permanent injunction should be denied.

DATE: February 18, 2016.                    Respectfully submitted,

                                            KARL A. RACINE
                                            Attorney General for the District of Columbia

                                            ELIZABETH SARAH GERE
                                            Deputy Attorney General
                                            Public Interest Division

                                            /s/ Toni Michelle Jackson
                                            TONI MICHELLE JACKSON (#453765)
                                            Chief, Equity Section

                                            /s/ Andrew J. Saindon
                                            ANDREW J.SAINDON (#456987)
                                            Senior Assistant Attorney General
                                            441 Fourth Street, N.W., Sixth Floor South

Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
Email: andy.saindon@dc.gov

/s/ Chad A. Naso
CHAD A. NASO (#1001694)
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-7854
Facsimile: (202) 741-8951
chad.naso@dc.gov

*Counsel for the District of Columbia*