IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BRIAN WRENN, et al., | ) | Case No. 15-CV-162-CKK |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

COME NOW the Plaintiffs, Brian Wrenn, Joshua Akery, Tyler Whidby, and the Second

Amendment Foundation, Inc., by and through undersigned counsel, and submit their memorandum

of points and authorities in reply to Defendants' opposition to Plaintiffs' motion for a preliminary

injunction.

Dated: February 25, 2016                    Respectfully submitted,

                                            Alan Gura (D.C. Bar No. 453449)
                                            Gura & Possessky, PLLC
                                            916 Prince Street, Suite 107
                                            Alexandria, VA 22314
                                            703.835.9085/Fax 703.997.7665


                                    By:  /s/ Alan Gura_____
                                            Alan Gura
                                            Attorney for Plaintiffs

Table of Contents

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.     Plaintiffs Have Standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    "Mandatory" Injunction Standards Are Inapplicable. . . . . . . . . . . . . . . . . . . . . . . 6

    III.   The Core Second Amendment Right to Carry Handguns for
          Self-Defense Exists In the District of Columbia. . . . . . . . . . . . . . . . . . . . . . . . . . 8

          A.    Res Judicata Bars Defendants' Denial of the Right
                 to Carry Handguns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          B.    Text, History, Tradition—and Precedent—Confirm
                 the Right's Existence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    IV.   Rights Cannot be Rationed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    V.    Defendants' Rationing Scheme Cannot Otherwise Survive Review. . . . . . . . . . . . 22

    VI.   Plaintiffs' Irreparable Harm, the Equitable Balance, and
          the Public Interest All Counsel Entry of a Preliminary Injunction. . . . . . . . . . . . 24

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Table of Authorities

Cases

*Am. Trucking Ass'ns* v. *Fed. Motor Carrier Safety Admin.*,
724 F.3d 243 (D.C. Cir. 2013)................................................. 5

*Andrews* v. *State*,
50 Tenn. 165 (1871) ....................................................... 18

*Bateman* v. *Perdue*,
881 F. Supp. 2d 709 (E.D.N.C. 2012) ...................................... 12

*Bonidy* v. *United States Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015)............................................. 12

*Canonsburg Gen. Hosp.* v. *Sebelius*,
989 F. Supp. 2d 8 (D.D.C. 2013) .......................................... 9

*Columbia Hosp. for Women Found.* v. *Bank of Tokyo-Mitsubishi*, No. 97-7225,
1998 U.S. App. LEXIS 7871 (D.C. Cir. Apr. 17, 1998)..................... 7

*Consol. Edison Co. of N.Y.* v. *Bodman*,
449 F.3d 1254 (D.C. Cir. 2006)............................................. 9

*Davis* v. *Billington*,
76 F. Supp. 3d 59 (D.D.C. 2014) .......................................... 7

*Dearth* v. *Holder*,
641 F.3d 499 (D.C. Cir. 2011)............................................. 6

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008)................................................. passim

*DKT Memorial Fund, Ltd.* v. *Agency for International Dev.*,
810 F.2d 1236 (D.C. Cir. 1987) ........................................... 6

*Drake* v. *Filko*,
724 F.3d 426 (3d Cir. 2013)............................................... 12

*English* v. *State*,
35 Tex. 473 (1871) ...................................................... 17

*Ex parte Thomas*,
    21 Okla. 770, 97 P. 260 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ezell* v. *City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Fife* v. *State*,
    31 Ark. 455 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Friends for All Children, Inc.* v. *Lockheed Aircraft Corp.*,
    746 F.2d 816 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*GeorgiaCarry.Org, Inc* v. *Georgia*,
    687 F.3d 1244 (11th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*GeorgiaCarry.Org, Inc.* v. *U.S. Army Corps of Eng'rs*,
    788 F.3d 1318 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Gordon* v. *Holder*,
    721 F.3d 638 (D.C. Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Griswold* v. *Connecticut*,
    381 U.S. 479 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Heller* v. *District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 19

*Heller* v. *District of Columbia*,
    801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*") . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 20-22

*Kachalsky* v. *Cnty. of Westchester*,
    701 F.3d 81 (2d. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kent* v. *Dulles*,
    357 U.S. 116 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*King* v. *Hutchinson*,
    168 Eng. Rep. 273, 1 Leach 339 (1784) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kwong* v. *Bloomberg*,
    723 F.3d 160 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Mance* v. *Holder*,
    74 F. Supp. 3d 795 (N.D. Tex. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

iii

*Martin* v. *Dep't of Justice*,
    488 F.3d 446 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*McDonald* v. *City of Chicago*,
    561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 19

*Mills* v. *District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Moore* v. *Madigan*,
    702 F.3d 933 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 19

*Moore* v. *Madigan*,
    842 F. Supp. 2d 1092 (C.D. Ill. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Morris* v. *United States Army Corps of Eng'rs*,
    990 F. Supp. 2d 1082 (D. Idaho 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Muscarello* v. *United States*,
    524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol,*
    *Tobacco, Firearms & Explosives*,
    700 F.3d 185 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*,
    719 F.3d 338 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*New Hampshire* v. *Maine*,
    532 U.S. 742 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Nunn* v. *State*,
    1 Ga. 243 (1846). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*O'Neill* v. *State*,
    16 Ala. 65 (1849) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Palmer* v. *District of Columbia*,
    59 F. Supp. 3d 173 (D.D.C. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8-11, 22

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

*Peoples Rights Org.* v. *City of Columbus*,
    152 F.3d 522 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Peruta* v. *Cnt'y of San Diego*,
    742 F.3d 1144 (9th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 24

*Rex* v. *Harwood*, Quarter Sessions at Malton (Oct. 4-5, 1608),
    reprinted in North Riding Record Society,
    Quarter Sess. Recs. 132 (1884). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rex* v. *Knight*,
    38 Comb., 90 Eng. Rep. 330 (K.B. 1686) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Silvester* v. *Harris*,
    41 F. Supp. 3d 927 (E.D. Cal. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Simpson* v. *State*,
    13 Tenn. 356 (1833). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Sir John Knight's Case*,
    87 Eng. Rep. 75 (K.B. 1686). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*State v. Barnett*,
    34 W. Va. 74, 11 S.E. 735 (1890). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*State v. Hogan*,
    63 Ohio St. 202, 58 N.E. 572 (1900). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*State v. Huntly*,
    25 N.C. (3 Ired.) 418 (1843). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*State v. Langford*,
    10 N.C. (3 Hawks) 381 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*State v. Lanier*,
    71 N.C. 288 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*State v. Workman*,
    35 W. Va. 367, 14 S.E. 9 (1891). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Staub v. City of Baxley*,
    355 U.S. 313 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Turner Broadcasting System, Inc.* v. *FCC*,
    520 U.S. 180 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States* v. *Cruikshank*,
    92 U.S. 542 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Weaver*, No. 2:09-CR-00222,
　　　2012 U.S. Dist. LEXIS 29613 (S.D. W. Va. Mar. 7, 2012) . . . . . . . . . . . . . . . . . . . . . . . . 12

*West Virginia Ass'n of Community Health Centers, Inc.* v. *Heckler*,
　　　734 F.2d 1570 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Wilson* v. *State*,
　　　33 Ark. 557 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Woollard* v. *Gallagher*,
　　　712 F.3d 865 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Yamaha Corp. of America* v. *United States*,
　　　961 F.2d 245 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9


Statutes

1 W. & M., Sess. 2, c.2, § 1 (1689). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

D.C. Code § 22-4506(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23

D.C. Code § § 7-2509.11(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21


Other Authorities

Alexi Mostrous, "White House Backs Right To Arms, Even Outside Obama
　　　Events, if State Laws Allow," *Washington Post*, Aug. 19, 2009,
　　　available at http://www.washingtonpost.com/wp-dyn/content/article/
　　　2009/08/18/ AR2009081803416.html (last visited Feb. 24, 2016). . . . . . . . . . . . . . . . . . 19

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW
　　　IN FORCE IN KENTUCKY (1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Clayton E. Cramer, *The Statute of Northampton (1328) and*
　　　*Prohibitions on the Carrying of Arms* (Sept. 19, 2015),
　　　available at SSRN: http://ssrn.com/abstract= 2662910
　　　or http://dx.doi.org/10.2139/ssrn.2662910 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

Colin Greenwood, FIREARMS CONTROL: A STUDY OF
　　　ARMED CRIME AND FIREARMS CONTROL IN
　　　ENGLAND AND WALES (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Jerry L. Mashow, *Administrative Due Process As Social Cost Accounting*,
    9 Hofstra L. Rev. 1423 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

John A. Dunlap, THE NEW-YORK JUSTICE (1815) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS:
    THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994). . . . . . . . . . . . . . . . . . . . . . . . . 13

Michael D. Cicchini, *An Economics Perspective on the Exclusionary Rule*
    *and Deterrence*, 75 Mo. L. Rev. 459 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Peter F. Nardulli, *The Societal Cost of the Exclusionary Rule: An*
    *Empirical Assessment*, 8 Am. Bar Found. Research J. 585 (1983). . . . . . . . . . . . . . . . 2

Richard A. Posner, *Free Speech In An Economic Perspective*,
    20 Suffolk U. L. Rev. 1 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Robert J. Cottrol and Raymond T. Diamond,
    *"Never Intended to be Applied to the White Population":*
    *Firearms Regulation and Racial Disparity—the*
    *Redeemed South's Legacy to a National Jurisprudence?*,
    70 CHI.-KENT L. REV. 1307 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Tonja Jacobi, *The Law and Economics of the Exclusionary Rule*,
    87 Notre Dame L. Rev. 585 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

William Blackstone, COMMENTARIES ON THE
    LAWS OF ENGLAND (1769) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

William Hawkins, TREATISE OF THE PLEAS OF THE CROWN (1716). . . . . . . . . . . . . . . . . . . 13

WORKS OF THE HONOURABLE JAMES WILSON
    (Bird Wilson ed., 1804). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Memorandum of Points and Authorities in Reply to Defendants' Opposition
to Plaintiffs' Motion for Preliminary Injunction

Preliminary Statement

There is no point in revisiting the question of whether the Second Amendment guarantees the right to carry handguns for self-defense. Virtually every federal court to consider the question, including this one, has held that it does. The city has already presented the Supreme Court with an argument about the meaning of "bear arms," and the Court's lengthy response is dispositive of that issue. Arguably of greater practical significance, if Defendants wished to deny the right's existence, they should not have dismissed their appeal of *Palmer* v. *District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). To the extent that Defendants suggest that there is no Second Amendment right to carry handguns in public in Washington, D.C., they have entered the realm of issue preclusion. The same parties having conclusively litigated the same issue in this same court not one year ago today, see Dkt. 12 (Apr. 2, 2015), res judicata requires the same outcome.

Marshaling commentators whose views the Supreme Court has soundly rejected in recent years, Defendants go to great lengths to establish that the right to carry guns has long been regulated. So stipulated, but so what? The fact that rights have been regulated historically does not mean that any and all regulations are constitutional. In any event, even were the District's "good reason" law considered "longstanding," circuit precedent would assign that status no presumptive value because the "good reason" law plainly imposes a greater than "de minimis" burden on Plaintiffs' right. *Heller* v. *District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("*Heller II*"). Precedent, and common sense, likewise foreclose Defendants' vision of our Nation's capital as a uniquely Constitution-free "Forbidden City" where the rights of common citizens yield in the presence of (well-protected) dignitaries. This, too, has already been litigated.

1

Nor is it productive to knock down strawman arguments about "absolute" rights. Def. Opp.

Br., Dkt. 48, ("Opp.") at 1. Contrary to Defendants' misrepresentation, *id.* at 7 & 35, Plaintiffs

invoke no "absolute" rights. Again, the second sentence from Plaintiffs' moving brief:

> Of course, the city remains free to regulate the carriage of guns in the interest of public
> safety, *e.g.,* by imposing time, place and manner restrictions, or preventing violent felons and
> the mentally ill from accessing handguns.

Pl. Br., Dkt. 6-2, at 1. The question is not whether the right to carry is "absolute." It is not. The

question is whether the right, which must have *some* scope, is being violated.

In another forum, Plaintiffs would more vigorously contest Defendants' ideas regarding, as

one of their authorities entitles it, "[t]he Social Costs of Gun Ownership." Plaintiffs would concede

that gun ownership, and gun carrying, have "social costs," but dispute those costs' extent, and point

out that those costs are outweighed by social and individual benefits. The debate is a familiar one,

and it is a perfectly legitimate debate worth having. But the broader policy dispute over the wisdom

of gun rights or gun control, in whatever respective measure, has nothing to do with this case.

While Defendants spill much ink attacking the "more guns, less crime" theory, Plaintiffs

have never invoked it, and their claims do not turn on the theory's merit. Indeed, Plaintiffs do not

ask the Court to decide whether carrying guns for self-defense is a good idea. As far as their

argument is concerned, it might well be a terrible idea—as bad as Defendants claim or even worse.

While the Second Amendment might be a new feature of applied constitutional law, the notion that

constitutional rights carry "social costs" is established.[1] "The right to keep and bear arms . . . is not

---

[1]*See, e.g.,* Tonja Jacobi, *The Law and Economics of the Exclusionary Rule,* 87 Notre
Dame L. Rev. 585 (2011); Michael D. Cicchini, *An Economics Perspective on the Exclusionary
Rule and Deterrence,* 75 Mo. L. Rev. 459 (2010); Richard A. Posner, *Free Speech In An
Economic Perspective,* 20 Suffolk U. L. Rev. 1 (1986); Peter F. Nardulli, *The Societal Cost of the
Exclusionary Rule: An Empirical Assessment,* 8 Am. Bar Found. Research J. 585 (1983); Jerry L.
Mashow, *Administrative Due Process As Social Cost Accounting,* 9 Hofstra L. Rev. 1423 (1981).

the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald* v. *City of Chicago*, 561 U.S. 742, 783 (2010).

And yet "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia* v. *Heller*, 554 U.S. 570, 634 (2008). "The power to decide on a case-by-case basis whether [a] right is *really worth* insisting upon" is an apt description of what Defendants hope to constitutionalize here. Starting from the premise "that the issuance of *any* public-carry permit, regardless of whether it is based on 'good reason,' increases the likelihood of public harm," Opp. at 36, the city will tolerate the bearing of arms only when Chief Lanier determines that an exceptional "good reason" exists for doing so.

Being allowed to do something upon the rare circumstance of the police chief's approval is not the same thing as choosing to exercise a right guaranteed by the Constitution. Plaintiffs cannot overemphasize the point that laws targeting some aspect of gun carrying, in an effort to make carrying safer or delineate the right's traditional exercises from its historic exceptions, would present very different questions. But as the Supreme Court, and this Court, have determined that Plaintiffs enjoy this right, legislative opinions of the right's *generalized* desirability are irrelevant. The Constitution reflects many policy choices, and it contains many proscriptions and commandments as to what city officials must and cannot do. They don't have to like any of it.

Accordingly, the problem with Defendants' position is not so much that they are wrong about gun-carrying as a matter of public policy (though Plaintiffs would so argue), but that their opinion is unimportant in this context. This case presents, at bottom, the question of whether fundamental rights may be rationed because the government feels that they are inherently harmful.

3

While answering this question was not difficult the first time this Court decided Plaintiffs' motion, the answer is now supplied by controlling D.C. Circuit precedent: no. *See Heller* v. *District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*").

Unless *Heller III* is overturned, Plaintiffs will win this case. Whatever else the city may do to regulate the carrying of guns, the rationing of Second Amendment rights as a means of reducing social harm is now explicitly off the table as a matter of circuit precedent. That Plaintiffs are irreparably harmed by the violation of Second Amendment rights, and that enforcing the Constitution is an imperative public interest, are givens. The motion should be granted.

ARGUMENT

I.   PLAINTIFFS HAVE STANDING.

Plaintiffs are initially constrained to respond to two undeveloped suggestions that they lack standing. Though insubstantial in their own right, these standing arguments merit response as they reveal important misconceptions about Plaintiffs' claims. First, Defendants suggest that Plaintiffs' claims are speculative in that "[i]t is not enough for plaintiffs to claim that it is *possible* that they will suffer injury without the ability to carry a handgun in public." Opp. at 37. Under this view, nobody could challenge the law—those with a particularized and compelling fear of imminent violence (as Defendants see it) would qualify for a permit, and those lacking a "good reason" suffer no real injury.

The argument fails on multiple levels. Dick Heller could not prove that he would suffer an imminent burglary requiring armed self-defense, but the D.C. Circuit acknowledged Chief Ramsey's denial of Heller's permit application as an obvious Article III injury. *Parker* v. *District of Columbia*, 478 F.3d 370, 376 (D.C. Cir. 2007), *aff'd sub nom. Heller*. Likewise, Wrenn, Akery

4

and Whidby have not only pre-enforcement standing owing to their coerced compliance with the

law, but administrative denial standing owing to Defendant Lanier's rejection of their applications.

More critically, the right to bear arms is not the right to engage in a gunfight. It is the right to

"wear, bear, or carry [arms] . . . upon the person or in the clothing or in a pocket, for the purpose . . .

of being armed and ready for offensive or defensive action in a case of conflict with another person."

*Heller*, 554 U.S. at 584 (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (Ginsburg, J.,

dissenting)). Plaintiffs have a right to carry guns, whether those guns come into practical use either

by being fired or displayed to thwart an attack or—and this is not a small point—by providing

Plaintiffs an important sense of security. Lanier plainly deprived Plaintiffs of this right, thereby

completing an Article III injury-in-fact regardless of the ultimate merits of Plaintiffs' case. Had

Lanier deprived Plaintiffs of contraception, *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), she

could not argue that Plaintiffs' injuries were speculative in that there were no guarantees that they

would conceive but for the contraceptives, or conversely, that the contraception would be effective.

Defendants' second standing argument, that "Plaintiffs, of course, only have standing to

assert their *own* rights," Opp. at 39 n.17 (citation omitted), is specious. Plaintiff Second Amendment

Foundation ("SAF") plainly has associational standing on behalf of its members. *Am. Trucking

Ass'ns* v. *Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013).[2] Defendants

---

[2] Courts routinely uphold SAF's associational standing. "The Second Amendment
Foundation . . . [has] many members who reside in Chicago and easily meet the requirements for
associational standing." *Ezell* v. *City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011); see also
*Silvester* v. *Harris*, 41 F. Supp. 3d 927, 942 (E.D. Cal. 2014); *Moore* v. *Madigan*, 842 F. Supp. 2d
1092, 1098 (C.D. Ill.), *rev'd on other grounds*, 702 F.3d 933 (7th Cir. 2012). The same holds true
for other gun rights membership organizations. See, *e.g.*, *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of
Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 191 & n.5 (5th Cir. 2012); *Peoples
Rights Org.* v. *City of Columbus*, 152 F.3d 522, 531 (6th Cir. 1998); *Mance* v. *Holder*, 74 F.
Supp. 3d 795, 802 (N.D. Tex. 2015); contra *Kwong* v. *Bloomberg*, 876 F. Supp. 2d 246, 252
(S.D.N.Y. 2012), *aff'd*, 723 F.3d 160 (2d Cir. 2013) (unique (and wrong) Second Circuit rule

compound their error by claiming that "[t]he unnamed SAF members could not possibly all be

beneficiaries of an injunction requiring the issuance of concealed-carry licenses" because "surely the

District has the right to check for itself to determine whether self-declared 'otherwise eligible'

applicants are responsible and law-abiding." Opp. at 39 n.17 (citation omitted). "Surely"

Defendants could have read the quoted pleading more carefully. Nowhere do Plaintiffs seek "an

injunction requiring the issuance of concealed-carry licenses" to people who are *not* otherwise

qualified under District law. Paragraph 1 of Plaintiffs' prayer for relief seeks to enjoin the denial of

permits to "applicants who meet the requirements of D.C. Code § 22-4506(a) and all other current

requirements." The second and third paragraphs of the prayer for relief address *only* the "good

reason" requirement. As with their "absolute right" strawman, Defendants fail to acknowledge the

complaint's limited scope.

   Moreover, "[t]he Supreme Court has recognized that  otherwise qualified non-applicants

may have standing to challenge a disqualifying statute or regulation." *DKT Memorial Fund, Ltd*. v.

*Agency for International Dev*., 810 F.2d 1236, 1238 (D.C. Cir. 1987) (citation omitted). Erecting

schemes that putative applicants cannot satisfy confers standing. *Dearth* v. *Holder*, 641 F.3d 499,

502 (D.C. Cir. 2011). And where non-applicant standing is concerned, "[c]ertainty of success" in

applying, but for the challenged factor, "[is] not required." *West Virginia Ass'n of Community*

*Health Centers, Inc*. v. *Heckler*, 734 F.2d 1570, 1575 (D.C. Cir. 1984) (footnote omitted).

II.     "MANDATORY" INJUNCTION STANDARDS ARE INAPPLICABLE.

   Defendants argue that this motion is subject to a more-stringent preliminary injunction

standard reserved for so-called "mandatory" injunctions, which alter the status quo, as opposed to

---

barring associational standing in Section 1983 cases).

injunctions that merely prohibit new conduct. Opp. at 6. "In this circuit, however, no case seems to squarely require a heightened showing." *Friends for All Children, Inc.* v. *Lockheed Aircraft Corp.*, 746 F.2d 816, 834 n.31 (D.C. Cir. 1984); *Columbia Hosp. for Women Found.* v. *Bank of Tokyo-Mitsubishi*, No. 97-7225, 1998 U.S. App. LEXIS 7871, at *2 (D.C. Cir. Apr. 17, 1998); *Davis* v. *Billington*, 76 F. Supp. 3d 59, 69 n.15 (D.D.C. 2014) ("the standard has yet to be adopted—or rejected—by th[is] Circuit").

Whatever its merit, applying the "mandatory" standard requires first identifying the status quo ante. But from what point in time is the status quo measured when plaintiffs seek to enjoin a new legislative enactment? Legislation is inherently reactive, and Defendants fail to explain why this Court must assume that the "status quo" began with the challenged provisions' enactment. Previous authorization for gun carry licenses having long fallen into desuetude, the City repealed Defendant Lanier's authority to issue handgun carry licenses in 2009. Consequently, for a brief time in *Palmer*'s wake, Americans were free to carry handguns throughout Washington, D.C., without proving a special reason for doing so or even bothering with a license. Many did.

An injunction would not change the status quo ante—*Defendants* changed the status quo when they adopted the challenged regulations, and Plaintiffs sued immediately upon those regulations' implementation. As this Court noted, "this case pertains to a different statute than the one that was at issue in [*Palmer*]." Minute Order (Feb. 9, 2016). The requested injunction would restore the status quo ante, barring the new practice. For purposes of considering whether to apply a "mandatory" standard, the "status quo" clock is set at the state of affairs that preceded the city's initiation of the current controversy. To peg the "status quo" at the new scheme's inception would not acknowledge the legislation's reactionary nature. In any event, the requested injunction here is prohibitive, not mandatory. Plaintiffs seek only to bar the new "good"/ "proper" reason requirement,

7

leaving Defendants free to add, remove, or otherwise amend their licensing criteria and carrying

regulations as they see fit (so long as any new regulations are constitutional).

III.   THE CORE SECOND AMENDMENT RIGHT TO CARRY HANDGUNS FOR SELF-DEFENSE
       EXISTS IN THE DISTRICT OF COLUMBIA.

    A.    Res Judicata Bars Defendants' Denial of the Right to Carry Handguns.

The laws challenged here may differ from those examined in *Palmer*, and thus the claim is

different. But the foundational *issue*—the existence of a core Second Amendment right to carry guns

for self-defense in the District of Columbia—is identical to *Palmer*'s. Yet straining a history that

begins with the Statute of Northampton, which allegedly contained "a broad prohibition on public

carrying," Opp. at 9, Defendants claim that their law "does not infringe any Second Amendment

right," Opp. at 8. "[E]ven assuming that the Second Amendment protects a right to 'bear arms'

outside the home, that right is not at the Amendment's core . . ." Opp. at 16. Footnoting their

conjectural assumption of the right, Defendants add, "[i]t is not clear that this is so." *Id.* n.11.

But it is indeed "clear that this is so," and not only because the Supreme Court in *Heller*

unambiguously defined the right to "bear arms" to include the right to carry guns for self-defense.

This Court decided precisely that much in *Palmer*—that a "core" Second Amendment right to carry

handguns outside the home for self-defense exists in the District of Columbia, *Palmer*, 59 F. Supp.

3d at 181-82—in a case involving the same litigants on both sides: SAF on behalf of its membership

v. the city and its police chief.[3] The issue is closed to relitigation.

Issue preclusion, an aspect of res judicata, "bars 'successive litigation of an issue of fact or

law actually litigated and resolved in a valid court determination essential to the prior judgment,

---

[3]While it is enough that SAF and the Defendants were parties in the previous litigation, the
individual plaintiffs here would be entitled to the benefit of issue preclusion even in SAF's absence.
*See Yamaha Corp. of America* v. *United States*, 961 F.2d 245, 254 n.11 (D.C. Cir. 1992).

even if the issue recurs in the context of a different claim.'" *Canonsburg Gen. Hosp.* v. *Sebelius*, 989 F. Supp. 2d 8, 16  (D.D.C. 2013) (quoting *New Hampshire* v. *Maine*, 532 U.S. 742, 892 & n.5 (2001)). "A court conducting an issue preclusion analysis does not review the merits of the determinations in the earlier litigation." *Consol. Edison Co. of N.Y.* v. *Bodman*, 449 F.3d 1254, 1257 (D.C. Cir. 2006). And "once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." *Yamaha*, 961 F.2d at 254 (citations omitted).

Defendants' attack on the existence of a core right to carry handguns for self-defense in the District of Columbia plainly meets all three issue preclusion elements:

> [1], the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case[; 2] the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case[; and] [3] preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

*Canonsburg*, 989 F. Supp. 2d at 16-17 (quoting *Martin* v. *Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007)). Let us examine the issue preclusion factors:

1.     Whether individuals have a core Second Amendment right to carry handguns for self-defense in this city was the central issue raised in *Palmer*, contested by parties to both cases, and submitted there for judicial determination. Indeed, all of these same arguments—Northampton, the city's status as a locus of dignitaries, the supposed harmful effects of public carrying—featured in *Palmer*, where the Defendants even took the extraordinary step of submitting and adopting the exhaustive briefing on the losing side of *Moore* v. *Madigan*, 702 F.3d 933 (7th Cir. 2012).

2.     This Court, of competent jurisdiction in *Palmer*, actually and necessarily determined the carry right issue. It was the judgment's central holding.

3.     There is nothing unfair about binding Defendants to *Palmer*'s holding, as they are sophisticated and frequent litigants before this Court whose decision to dismiss the *Palmer* appeal was well-counseled. Had they maintained their *Palmer* appeal, they might well have already obtained an appellate decision on the issue.

Defendants remain free to claim, as they do, that the "good reason" law does not violate the Second Amendment right conclusively established in *Palmer*, and Plaintiffs respond to those arguments *infra*. But much of Defendants' opposition brief simply goes over the same old ground already covered, settled and determined in *Palmer*. Respectfully, *Palmer* is over, and as a matter of issue preclusion, this Court is bound to start its analysis where *Palmer* left off.

B.     Text, History, Tradition—and Precedent—Confirm the Right's Existence.

Although Defendants are stuck with *Palmer*'s holding as a matter of res judicata, "[u]nderstanding the scope of the right is not just necessary, it is key" to evaluating the challenged provisions. *Peruta* v. *Cnt'y of San Diego*, 742 F.3d 1144, 1167 (9th Cir. 2014), *reh'g en banc granted*, 781 F.3d 1106 (9th Cir. 2015). Plaintiffs are thus constrained to respond to some of Defendants' arguments re-litigating *Palmer*, and to touch upon, if briefly, the nature and extent of this right before examining how it applies on the facts before the Court.

In *Heller*, the city's theory of the Second Amendment as securing collective rather than individual action relied on reading the term "bear arms" as having a primarily militaristic idiomatic meaning. The Supreme Court was thus called upon to define that term—and held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted);

*Palmer*, 59 F. Supp. 3d at 180. Although "the need for defense of self, family, and property is most

acute" in the home, *Heller*, 554 U.S. at 628, and the right to arms is secured "most notably for

self-defense within the home," *McDonald*, 561 U.S. at 780 (plurality opinion), "that doesn't mean

[the need] is not acute outside the home." *Moore*, 702 F.3d at 935; *Palmer*, 59 F. Supp. 3d at 180-

81. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case

of confrontation." *Heller*, 554 U.S. at 592. "[C]onfrontation is not limited to the home." *Palmer*, 59

F. Supp. 3d at 180 (quotations and punctuation omitted).

Even circuits adopting the most parsimonious view of the right to bear arms acknowledge or

assume that the Second Amendment extends beyond the home. Taking a more deferential attitude

toward the right outside the home, the Second and Fourth Circuits upheld laws barring the carrying

of handguns by anyone lacking "proper cause" and "good and substantial reason" to do so,

respectively. *Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81 (2d. Cir. 2012); *Woollard* v.

*Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013). Yet both courts insisted that their conclusions

assumed that the right extends beyond the home.

> Although the Supreme Court's cases applying the Second Amendment have arisen only in
> connection with prohibitions on the possession of firearms in the home, the Court's analysis
> suggests, as Justice Stevens's dissent in *Heller* and Defendants in this case before us
> acknowledge, that the Amendment must have *some* application in the very different context
> of the public possession of firearms. Our analysis proceeds on this assumption.

*Kachalsky*, 701 F.3d at 89 (footnote omitted). The Fourth Circuit did not go quite this far, but for

argument's sake "merely assume[d] that the *Heller* right exists outside the home and that such right

of Appellee Woollard has been infringed." *Woollard*, 712 F.3d at 876.

The Fifth Circuit likewise apparently assumed a right to carry handguns exists, upholding a

prohibition on its exercise by adults aged 18-20 on account of their youth. *Nat'l Rifle Ass'n of Am.,*

*Inc.* v. *McCraw*, 719 F.3d 338 (5th Cir. 2013). The Tenth Circuit termed the Second Amendment's application outside the home "a reasonable assumption." *Bonidy* v. *United States Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015). "'[B]ear' certainly implies the possibility and even the likelihood that the arms will be carried outside the home," and "[t]he need for self-defense" upon which the right is predicated, "albeit less acute, certainly exists outside the home as well." *Id.* (citations omitted). The Eleventh Circuit has twice upheld carrying restrictions as properly targeting specific places, rather than by denying the right's existence. *GeorgiaCarry.Org, Inc.* v. *U.S. Army Corps of Eng'rs*, 788 F.3d 1318 (11th Cir. 2015); *GeorgiaCarry.Org, Inc* v. *Georgia*, 687 F.3d 1244 (11th Cir. 2012).[4]

Defendants deny the right to bear arms' historical pedigree by citing to the unremarkable fact that the carrying of weapons has long been regulated. They rely heavily on the 1328 Statute of Northampton and its progeny, which had been interpreted as not banning the carriage of weapons since at least the 1600s; and various state and local regulations dating from a time that states and localities were unbound by the Second Amendment. Their alternative history does not measure up.

_____

[4] *See also Morris* v. *United States Army Corps of Eng'rs*, 990 F. Supp. 2d 1082, 1086 (D. Idaho 2014) (striking down gun carry ban); *Bateman* v. *Perdue*, 881 F. Supp. 2d 709, 714 (E.D.N.C. 2012) (striking down gun carry ban during emergencies, Second Amendment "undoubtedly is not limited to the confines of the home"). "The fact that courts may be reluctant to recognize the protection of the Second Amendment outside the home says more about the courts than the Second Amendment." *United States* v. *Weaver*, No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS 29613, at *14 n.7 (S.D. W. Va. Mar. 7, 2012).

Alone among the federal courts, a Third Circuit panel majority found that a law demanding "justifiable need" to carry a handgun "regulates conduct falling outside the Second Amendment's guarantee." *Drake* v. *Filko*, 724 F.3d 426 (3d Cir. 2013). The majority "recognize[d] that the Second Amendment's individual right to bear arms *may* have some application beyond the home." *Id.* at 431. But notwithstanding its "assum[ption]" that the Second Amendment confers upon individuals some right to carry arms outside the home," and its assumption that the "justifiable need" prerequisite is incompatible with a right, the majority offered that enactment of the twentieth century regulation informed (and thus limited) the right's scope.

Referencing the Statute of Northampton, Blackstone offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148 (1769) (emphasis added). It was this offense that *Heller* spoke of in referencing "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" *Heller*, 554 U.S. at 627 (citations omitted), as opposed to "bearing arms for a lawful purpose," *id.* at 620.

By the time of the American Revolution, affray's prohibition on the carrying of weapons applied only when done with evil intent. Sir John Knight, charged with entering a church "in the time of divine service, with a gun, to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686), was notably acquitted. *Knight* held that Northampton's "meaning" was "to punish people who go armed to terrify the king's subjects." *Id.* The statute was "almost gone in desuetudinem" but "where the crime shall appear to be malo animo, it will come within the Act (tho' now there be a general connivance to gentlemen to ride armed for their security)." *Rex* v. *Knight*, 38 Comb., 90 Eng. Rep. 330 (K.B. 1686) (different reporter). As the leading early-eighteenth century treatise explained,

> [N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons . . . for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace . . . .

William Hawkins, 1 TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994). To the extent that the wearing of "arms" could in and of itself be considered alarming, the reference here might well have been to armor. *See* Clayton E. Cramer, *The Statute of Northampton (1328)*

13

*and Prohibitions on the Carrying of Arms* (Sept. 19, 2015) at 2, available at SSRN:

http://ssrn.com/abstract= 2662910 or http://dx.doi.org/10.2139/ssrn.2662910 ("Cramer").

Amicus Everytown's alternative historical survey is as dubious as it is exhaustive.

Everytown, for example, briefly cites three ancient cases for the proposition that mere carriage of

arms sufficed to constitute an affray under Northampton. Everytown Br. at 5-6. But as historians

have shown, Everytown's quotation and description of these cases is selective. Everytown's

quotation of the indictment in *Rex* v. *Harwood*, Quarter Sessions at Malton (Oct. 4-5, 1608),

reprinted in North Riding Record Society, Quarter Sess. Recs. 132 (1884), omits the fact that

Harwood was indicted for going armed "to the great terrour." See Amicus Historians' Br*., Wrenn* v.

*District of Columbia*, D.C. Cir. No. 15-7057, at 8 (Oct. 8, 2015). Everytown claim another man

was imprisoned for wearing arms under his garments, "even though he had not threatened anyone

and had done so only to 'safeguard his life,'" Everytown Br. at 5-6 (quotation omitted), but Amici

Historians note this is not a compete description of what occurred. "Figett 'went armed under his

garments, *as well in the palace, as before the justice of the king's bench; for both which* upon

complaint made, he was arrested . . . .'" Historians' Br. at 9 (adding emphasis) (quotation omitted).

And another case that Everytown claims involved the mere carrying of a cutlass also involved a

conviction for assault. *Id.* Indeed, the understanding of menacing conduct as an element of affray

under Northampton survived in English courts into the nineteenth and twentieth centuries. *See*

Historians' Br. at 9-10.[5]

---

[5]Everytown cites *King* v. *Hutchinson*, 168 Eng. Rep. 273, 274, 1 Leach 339, 342 (1784)
for the unremarkable proposition that firearms were considered "offensive" weapons. But
*Hutchinson* did so by setting out *two* necessary elements for the crime there charged, namely,
providing armed aid or assistance in smuggling. The case had nothing to do with carrying arms in
public, as "the Smugglers were not seen to use any offensive weapons," and the incident took place
at the yard of Hutchinson's house. 1 Leach at 340. Arms were "to be seized only if they were

In addition to Northampton's narrowing interpretation by English courts, the 1689 Declaration of Rights provided "[t]hat the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." 1 W. & M., Sess. 2, c.2, § 1 (1689). To avoid constitutional infirmity, military orders to disarm the citizens of London in response to the Gordon Riots of 1780 were construed narrowly to apply only to law-breakers. *See* Cramer, at 3-4.

Americans, too, accepted that menacing conduct was a necessary element of affray. Multiple sources *Heller* referenced in discussing the doctrine make this clear. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people.*" 3 WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people.*" John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added); *O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State* v. *Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed); *State* v. *Langford*, 10 N.C. (3 Hawks) 381 (1824) (affray when guns fired at home of elderly widow, killing her dog).

Other opinions reflect that settled view. "A man may carry a gun for any lawful purpose, for business or amusement, but he cannot go about with that or any other dangerous weapon to terrify

---

possessed for 'any purpose dangerous to the public peace." Cramer, at 5 (quoting Colin Greenwood, FIREARMS CONTROL: A STUDY OF ARMED CRIME AND FIREARMS CONTROL IN ENGLAND AND WALES 14 (1972)).

and alarm a peaceful people." *State v. Hogan*, 63 Ohio St. 202, 219, 58 N.E. 572, 575-76 (1900).

> [T]he carrying of a gun per se constitutes no offence. For any lawful purpose--either of business or amusement--the citizen is at perfect liberty to carry his gun. It is the wicked purpose--and the mischievous result--which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people.

*State* v. *Huntly*, 25 N.C. (3 Ired.) 418, 422-23 (1843).

Indeed, without viewing menacing conduct as an element of the crime, there is no way to reconcile affray's early American codification with the contemporaneous adoption of constitutional provisions securing the right to carry arms. *Heller*'s sources made this point, rejecting claims that the Statute of Northampton and its progeny can be read to limit the constitutional right to bear arms.

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . But here it should be remembered, that in this country the constitution guarranties [sic] to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *Heller*, 554 U.S. at 588 n.10 (quoting same).

"But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them, this English statute, or portion of the common law, our constitution has completely abrogated it." *Simpson* v. *State*, 13 Tenn. 356, 359-60 (1833). Reciting Tennessee's Second Amendment analog, the state's high court continued, "neither, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed, such a necessarily consequent operation as terror to the people to be incurred thereby." *Id.* at 360.

Defendants anticipate this argument by claiming, without explanation, that Tennessee's arms-bearing provision is broader than the Second Amendment. Of course, the Supreme Court has already disagreed, having cited *Simpson* in support of its definition of "bear arms." See *Heller*, 554

16

U.S. at 584 n.9. More to the point, Defendants' argument is that their pre-1688 view of Northampton survived not only *Knight* and the Glorious Revolution, but the traditional American view of right to arms. *Simpson*, Humphreys, and just about every American source from the nineteenth century, many endorsed in *Heller*, demolish that view. Beyond their res judicata problem, if Defendants wish to overcome the fundamental, enumerated right to bear arms, they will have to do better than a 1328 English statute that English courts had narrowed over three hundred years ago to reach only menacing conduct. American courts and commentators have always so limited Northampton, often by adding that the constitutional right to bear arms requires that limitation.

The opposition's historical survey of American gun carrying regulation is likewise unavailing. For all the copious citations to various laws regulating the right to carry guns, there is precious little in the way of pre-twentieth century laws actually resembling the provisions here at issue. The claims are overstated, as in Defendants' citation to an 1857 District of Columbia law for the proposition that "public carrying was allowed only for people with 'reasonable cause to fear an assault or other injury or violence to his person.'" Opp. at 10 (selective quotation omitted). This law, and others like it, imposed no prior restraint on one's ability to carry a gun. It provided only that upon a complaint—not of anyone, but of someone who had "reasonable cause to fear" the individual's gun-carrying—the individual "may" have been required to post a security. DA 318. Everytown suggests a relevant antecedent in an 1887 West Virginia law barred all handgun carrying absent proof of good character and specific self-defense need. Everytown Br., at 14-15 (citing *State* v. *Barnett*, 34 W. Va. 74, 11 S.E. 735 (1890)). The law, however, was understood to address, specifically, concealed carry. *See State* v. *Workman*, 35 W. Va. 367, 368, 371, 14 S.E. 9 (1891).

Everytown also makes much of Texas's 1871 pistol carrying prohibition, but that law did not reach *all* pistols. *See English* v. *State*, 35 Tex. 473, 476 (1871) (Second Amendment protects

"holster pistols" and "side arms"); *Fife* v. *State*, 31 Ark. 455, 460-61 (1876) (distinguishing "army

and navy repeaters" from prohibited "pistol"); *Andrews* v. *State*, 50 Tenn. 165, 188 (1871) (carry

ban fails "as to this weapon"); *Ex parte Thomas*, 21 Okla. 770, 777-78, 97 P. 260, 263 (1908)

("horseman's pistols" among protected "arms"). Such laws "render[ed] safe the high quality,

expensive, military issue handguns that many former Confederate soldiers still maintained but that

were often out of financial reach for cash poor freedmen." Robert J. Cottrol and Raymond T.

Diamond, *"Never Intended to be Applied to the White Population": Firearms Regulation and

Racial Disparity—the Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L.

REV. 1307, 1333 (1995) (footnote omitted). Arkansas's Supreme Court summed up the general

rule. Reciting approval of time (no hunting or amusement on the Sabbath), place (church, elections),

and manner regulations (concealment), that court added:

> But to prohibit the citizen from wearing or carrying a war arm [with exceptions] is an
> unwarranted restriction upon his constitutional right to keep and bear arms. If cowardly and
> dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be
> prevented by the penitentiary and gallows, and not by a general deprivation of a
> constitutional privilege.

*Wilson* v. *State*, 33 Ark. 557, 560 (1878).

The District's claim that "[b]y the late 1800s, many cities completely banned public

carrying," Opp. at 12, should have been amended to read "almost no cities," Historians' Br. at 27.

"Of the ten cities listed, only two (Syracuse and Nashville) appeared in Census Bureau's 1880

listing of the top *one hundred* most populous cities in the United States. So, 98 cities had no carry

restriction, but two did." *Id.* (footnote omitted). Moreover, not every arms-bearing restriction or

regulation was tested in court, though the only total carry ban litigated in the nineteenth century was

struck down on Second Amendment grounds. *Nunn* v. *State*, 1 Ga. 243 (1846). In any event,

reliance on later nineteenth and twentieth century carrying restrictions (many less severe than the

District's) is inapposite, having been enacted by legislative bodies doubtless aware that they were not bound to respect Second Amendment rights. *See United States* v. *Cruikshank*, 92 U.S. 542, 553 (1876) (Fourteenth Amendment does not apply Second Amendment as against the States), *overruled*, *McDonald*. Moreover, "future legislatures" could not override "the scope [rights] were understood to have when the people adopted them," *Heller*, 554 U.S. at 634. Thus, "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning." *Moore*, 702 F.3d at 935 (citations omitted); *but see Heller II*, 670 F.3d at 1253-54 ("longstanding" regulations dating to early twentieth century).

In any event, the point of Defendants' arguments is unclear. All of this ink is in service of the notion that the "good reason" requirement is "longstanding." But "longstanding" restrictions enjoy presumptive validity only when they impose "de minimis" burdens upon the right. *Heller II*, 670 F.3d at 1253. Because the "good reason" requirement acts as a complete bar to Plaintiffs' exercise of their right, the Court cannot presume its validity. If some level of scrutiny is to be applied (Plaintiffs do not view this as a scrutiny case, but Defendants do), Defendants retain the burden.

To the extent Defendants suggest that individual rights are diminished in Washington, D.C. owing to special security needs in the Nation's capital, "the Supreme Court has unambiguously held that the Constitution and Bill of Rights are in effect in the District." *Parker*, 478 F.3d at 395 (citations omitted). Unlicensed open handgun carrying existed here as late as 1943. Government facilities and dignitaries are found nationwide, and deranged or politically motivated assassins are unlikely to be influenced by gun regulations. And as President Obama's Press Secretary once offered, state and local gun laws "don't change when the president comes to your state or locality."[6]

---

[6]Alexi Mostrous, "White House Backs Right To Arms, Even Outside Obama Events, if State Laws Allow," *Washington Post*, Aug. 19, 2009, available at http://www.washingtonpost.com/

IV.     RIGHTS CANNOT BE RATIONED.

On their brief's first page, Defendants declare that their scheme is not a "rationing system."

By page 36, they explain that "the issuance of *any* public-carry permit, regardless of whether it is

based on 'good reason,' increases the likelihood of public harm," so the "good reason" requirement

is their way of "accepting some additional public risk." In other words, a rationing system. The right

inherently carries some risk, and Defendants will determine how much risk they feel like tolerating.

Nothing limits this discretion; presumably, they could accept *no* additional "risk," but that wouldn't

look too good after *Palmer*. So they'll issue a few symbolic permits, and invoke "deference."

Why the struggle to deny that this is a rationing system? Defendants once admitted this

openly, claiming the "right . . . to exercise some control over the quantity of handguns carried in

public." Motion for Stay, *Wrenn v. Dist. of Columbia*, D.C. Cir. No. 15-7057, at 19 (June 11,

2015). How is that not "rationing?" Then there was this:

> The District has an important interest in reducing the number of concealed weapons in
> public in order to reduce the risks to other members of the public. It also has an important
> interest in reducing the number of concealed handguns in public due to their disproportionate
> use in violent crime in public places.

Br. Opp. Prelim. Injunction, ECF Dkt. 9, at 19. "Reducing the number" is called "rationing." And

the D.C. Circuit has just held that Defendants cannot ration Second Amendment rights simply

because they feel that the exercise of those rights is inherently a social evil.

*Heller III* involved, among other issues, a challenge to a D.C. ordinance forbidding residents

from registering more than one handgun per thirty day period. The City argued that this limitation

"would further promote public safety by limiting the number of guns in circulation, as the District

could reasonably conclude that more guns lead to more gun theft, more gun accidents, more gun

_____

wp-dyn/content/article/2009/08/18/ AR2009081803416.html (last visited Feb. 24, 2016).

suicides, and more gun crimes." *Heller III*, 801 F.3d at 280. Its expert testified that "the most effective method of limiting misuse of firearms, including homicide, suicide, and accidental injuries, is to limit the number of firearms present in a home." *Id*. That is no different than the argument advanced here, by which the District essentially claims that "the most effective method of limiting misuse of firearms" in public "is to limit the number of firearms present" on the streets.

The D.C. Circuit rejected the City's argument, and struck down the law:

> Accepting that as true, however, it does not justify restricting an individual's undoubted constitutional right to keep arms (plural) in his or her home, whether for self-defense or hunting or just collecting, because, taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home.

*Id*. (citation omitted). In other words, if the city could ration a fundamental right just because it deems the right dangerous, the "right" would not exist, replaced by the mere dispensation to do what city officials felt like tolerating—and they might not tolerate the right at all.[7]

Defendants claim that unlike the gun-a-month plan, "the 'good reason' requirement imposes no quota or limit on the number of concealed-carry licenses that may be issued," Opp. at 19, but that is false. While the law does not prescribe a particular "quota or limit," leaving that much to Defendant Lanier, it imposes a quota nonetheless, as "good reason" by definition must render an applicant "distinguishable from the general community," D.C. Code § § 7-2509.11(1)(A), which will not enjoy the right. Defendants make very clear that they wish to cap the alleged social harms of carrying by limiting the number of permits. Opp. at 36. But any specific quota is irrelevant for

---

[7]*Heller III* also demonstrates the complete futility of having "experts" in a case such as this. What will "experts" "prove" to a reasonable degree of scientific certainty? That the Second Amendment is bad? Defendants already admit this to be a stretch, one of their experts having "acknowledged that 'it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates.'" Opp. at 29 (quoting DA 212). What if "experts" "proved" that freedom of religion caused sectarian violence? Could the city ration religious exercise, too?

*Heller III* purposes. Are Defendants not seeking to "limit the number of firearms?" *Heller III*, 801 F.3d at 280. Defendants' second effort to distinguish *Heller III* is even less persuasive. "[T]he 'good reason' requirement does not burden the core right at the heart of the Second Amendment—the right to keep arms in the home." Opp. at 19. First, *Palmer* already confirmed that there is a core right to carry guns for self-defense. *Palmer*, 59 F. Supp. 3d at 180-81. This was also established in *Heller*, which repeatedly defined "self-defense" as the "core" Second Amendment interest, but *Palmer* was quite specific about this right binding these particular defendants. Second, even if the carry right is less important than the keep right, it is a right nonetheless, and the D.C. Circuit's point in *Heller III* is that rights cannot be rationed.

 *Heller III*, like *Palmer*, and indeed, like the first *Heller* opinion, is controlling. In *this* circuit, precedent foreordains that Defendants will lose.

V. DEFENDANTS' RATIONING SCHEME CANNOT OTHERWISE SURVIVE REVIEW.

 Defendants' argument that they are not destroying the right to bear arms is as circular as arguments come. "What is burdened by the District's law . . . is not the broad right to 'bear arms' outside the home, but something much narrower, tailored to match exactly what the 'good reason' standard precludes: carrying a handgun in [Washington, D.C.]" Opp. at 15-16. Indeed, "the ['good reason'] standard applies only in the District." Opp. at 16. Well *of course* Defendants do not restrict the "broad" right to bear arms beyond their jurisdiction, but this case concerns the bearing of arms *in Washington, D.C.* Incredibly, Defendants then claim that *Plaintiffs* are making a circular argument because they claim the right to do exactly that which the city has foreclosed.

 Defendants' theory is nothing more nor less than an argument that Plaintiffs lack a Second Amendment right to carry handguns for self-defense in Washington, D.C., something that this Court

in *Palmer* has already resolved. And of course, Defendants all but admitted that they have destroyed the right to carry guns in the District, so if that is, indeed a right, the conclusion is obvious.

Nor is the District's law, in any way, a time regulation. The "when" here is not limited to some particular hour of the day, like an ordinance regulating loud speech at night. The time here is "never" for virtually everyone. And while restricting loud speech at night is eminently reasonable, preventing people from defending themselves until *after* they have suffered a threat or attack is not even rational. Crime is often random, and many people, once victimized, have no further need of guns. Defendants generously offer that "[w]hen [it] happens" that a person "find[s] himself particularly threatened . . . the District's law allows him to apply for a carry license." Opp. at 17. Actually, the District's law allows people to apply for a license at any time. But the Second Amendment guarantees them the right to be "armed and ready" in case of confrontation, *Heller*, 554 U.S. at 584, so that when criminal threats emerge, people have access to "arms," not paperwork.

Defendants err in suggesting that the prior restraint doctrine is limited to the First Amendment. It is not. The Supreme Court speaks of the doctrine as securing "freedoms which the Constitution guarantees." *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958); *see, e.g.*, *Kent* v. *Dulles*, 357 U.S. 116, 129 (1958) (no "unbridled discretion to grant or withhold" passport implicating Fifth Amendment travel right). That no court has yet to apply the doctrine in the Second Amendment context is not surprising, considering just how novel Second Amendment litigation still is. The "good reason" "standard" plainly affords the police chief total discretion to speculate as to whether someone might be harmed, balanced against unprovable political beliefs about the value of carrying. Moreover, even where "good reason" is established, D.C. Code § 22-4506(a) provides only that the police chief "may" issue the license. What limits or guides this decision?

Because the actual standard of review is unimportant even if this were to be a means-ends

scrutiny case, Plaintiffs will not dwell on the reasons for employing strict or intermediate scrutiny.

Assuming intermediate scrutiny for the sake of argument, Defendants err in claiming that

intermediate scrutiny demands deference not only to their identification of the problem, but to the

"fit"—that is, to the *legislative* determination of *constitutionality*. Whatever else intermediate

scrutiny allows, it does not allow for the legislative usurpation of the judicial role. No "balancing

test" allows the city to declare a constitutional right a social evil, assign itself an interest in

suppressing the right, and then demand deference to its self-serving conclusion that the right's

suppression has proper constitutional "fit." Deference is only owed to "traditional legislative

authority to make predictive judgments." *Turner Broadcasting System, Inc.* v. *FCC*, 520 U.S. 180,

196 (1997) ("*Turner II*"). In Part II.B of *Turner II*,

> when assessing "the fit between the asserted interests and the means chosen to advance
> them," the Court applied no such deference. Instead, it required the government to prove that
> the statute did not burden the right "substantially more . . . than is necessary to further [the
> government's legitimate] interests."

*Peruta*, 742 F.3d at 1177 (citation and quotations omitted). It could hardly be otherwise. If the

Court must defer to the city as to the constitutionality of the "fit," why have a court?

Defendants' balancing arguments boil down to: (1) the right is a public nuisance, and (2)

curtailing the right's exercise, reasonably fits their nuisance-reducing goals. This is not "scrutiny" of

any kind, only a program targeting a disfavored right for suppression. A law that on its face sets out

to deprive the community at large of a fundamental constitutional right, cannot be properly tailored.

VI.  PLAINTIFFS' IRREPARABLE HARM, THE EQUITABLE BALANCE, AND THE PUBLIC INTEREST
     ALL COUNSEL ENTRY OF A PRELIMINARY INJUNCTION.

The notion that Plaintiffs' injuries are speculative, because they have not established an

immediate need for carrying a gun, is frivolous. Plaintiffs need show no "proof of any injury other

than the threatened constitutional deprivation itself." *Gordon* v. *Holder*, 721 F.3d 638, 653 (D.C.

24

Cir. 2013) (quotation omitted). "[T]he loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills* v. *District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quotation omitted). Defendants' breathtaking claim that "[t]he right to keep and bear arms . . . has no intrinsic value," Opp. at 38, proves only the totality of their contempt for the Second Amendment, whose "intrinsic value" is treasured by most Americans.

An injunction here would not result in unlicensed handgun carrying. The District would still have among the most stringent handgun carry licensing requirements in the country, requiring not just extensive training and background checks for applicants and registration of carried guns, but the full panoply of extreme (and dubious) restrictions upon licensed handgun carriers. For all of Defendants' theories about the harms of licensing gun carriage, the actual data—and there is a great deal of it—shows that individuals licensed to carry handguns for self-defense are remarkably safe and law-abiding. *See* Appellees' Br., *Wrenn* v. *District of Columbia*, No. 15-7057, at 69-70 (Sept. 30, 2015). And no matter how much Defendants disagree with the right to carry, if it is a right, enjoining its violation is inherently in the public interest. Surely Defendants would not argue that it is in the public interest to violate constitutional rights.

CONCLUSION

The Court should enter a preliminary injunction.

Dated: February 25, 2016                     Respectfully submitted,

                                             Alan Gura (D.C. Bar No. 453449)
                                             Gura & Possessky, PLLC
                                             916 Prince Street, Suite 107
                                             Alexandria, VA 22314
                                             703.835.9085/Fax 703.997.7665

                                     By:   /s/ Alan Gura
                                             Alan Gura
                                             Attorney for Plaintiffs

25