UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRIAN WRENN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> Defendants. | Civ. Action No. 15-cv-00162 (CKK) |

## **DEFENDANTS' SURREPLY**

Plaintiffs incorrectly overstate the impact of *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), in arguing that it precludes the District of Columbia's "denial of the right to carry handguns." P.Reply [Doc. No. 51] at 8. *Palmer* did not hold that the Second Amendment protects a right to carry a firearm publicly in the District of Columbia without a particularized self-defense reason for doing so—the specific question facing the Court here. There is thus no bar to the Court's consideration of the issue before it.

## **BACKGROUND**

In *Palmer*, the plaintiffs alleged that the District's "general[] ban [on] the carrying of handguns in public violate[s] the Second Amendment," and sought to enjoin the District from "ban[ning] registration of handguns to be carried for self-defense by law-abiding citizens." 59 F. Supp. 3d at 175 (quoting Complaint ¶ 40). Alternatively, plaintiffs sought an order requiring the District "to issue license[s] to carry handguns to all individuals who desire such licenses and who have satisfied the existing requirements … for the registration of a handgun." *Id*.

The *Palmer* Court held that "the District of Columbia's *complete ban* on the carrying of handguns in public is unconstitutional," and enjoined the District from enforcing a categorical

ban on the registration of handguns to be carried in public, "unless and until such time as the District of Columbia adopts a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms." *Id*. at 183 (emphasis added and footnote omitted). The District then adopted a new licensing scheme, which includes the "good reason" standard challenged here. *Wrenn* Complaint ¶ 11.

## ARGUMENT

### I. *Res Judicata* Does Not Apply Because The Issues In *Palmer* and This Case Are Different.

The doctrine of *res judicata* "usually is parsed into claim preclusion and issue preclusion." *Angelex Ltd. v. United States*, ___ F. Supp. 3d ___, 2015 WL 5011421, *7 (D.D.C. Aug. 24, 2015). Issue preclusion, also called "collateral estoppel … 'bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment[.]'"[1] *Id*. (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)).

The Supreme Court has warned courts to invoke the doctrine "only after careful inquiry," explaining: "Because [it] may govern grounds and defenses not previously litigated … it blockades unexplored paths that may lead to the truth." *Brown v. Felsen*, 442 U.S. 127, 132 (1979). To preclude a party from relitigating an issue, the moving party must demonstrate that (1) "the same issue now being raised" was contested by the parties and submitted for judicial determination earlier; (2) "the issue [was] actually and necessarily determined" by the earlier

---

[1] "Offensive" collateral estoppel is invoked by a plaintiff to bar a defendant's subsequent claim or defense. *Pharm. Care Mgmt. Ass'n v. District of Columbia (PCMA)*, 522 F.3d 443, 446 (D.C. Cir. 2008). "Defensive" collateral estoppel is invoked by a defendant against the plaintiff's claims. *Id*. When a party to the original suit invokes collateral estoppel, it is known as "mutual." When a non-party to the prior suit invokes it, it is "nonmutual." *Modiri v. 1342 Rest. Grp., Inc.*, 904 A.2d 391, 394 (D.C. 2006). Because the Second Amendment Foundation (SAF) was also a plaintiff in *Palmer*, its invocation of collateral estoppel here would be "mutual" and the other plaintiffs' invocation would be "nonmutual."

court; and (3) preclusion would "not work a basic unfairness to the party bound by the first determination." *Canonsburg Gen'l Hosp. v. Burwell*, 807 F.3d 295, 301 (D.C. Cir. 2015) (quoting *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992)).

Plaintiffs fail on the first step. "Fundamental to any application of the doctrine is that the issue or issues previously determined be *identical* to the issue or issues presently barred." *Gould v. Mossinghof*, 711 F.2d 396, 398–99 (D.C. Cir. 1983) (emphasis added) (citing *McCord v. Bailey*, 636 F.2d 606, 609 (D.C. Cir. 1980)); *see also, e.g.*, *Bobby v. Bies*, 556 U.S. 825, 836 (2009) (issue preclusion did not apply because "[m]ental retardation as a mitigator [in death penalty cases] and mental retardation under [Eighth Amendment cases] are discrete legal issues"); *Mayeske v. Int'l Ass'n of Fire Fighters*, 905 F.2d 1548, 1552–53 (D.C. Cir. 1990) (NLRB determination that plaintiff was "employee" for purposes of NLRA did not preclude litigation of issue of whether she was employee for purposes of ERISA).

The issues here are not identical to those in *Palmer*. Plaintiffs here assert that, based on the holding in *Palmer*, the District is precluded from relying on historically longstanding regulations on public carrying in cities to argue that the "good reason" standard does not impinge on conduct protected by the Second Amendment. *See* P.Reply at 8–10; *see also* D.Opp. at 8–15. But *Palmer* held that the District's *complete ban* on public carrying, even for legitimate self-defense purposes, violated the Second Amendment. *Palmer*, 59 F. Supp. 3d at 175. Here, plaintiffs ask this Court to hold something different—that the "good reason" standard, which precludes public carrying *without a particularized self-defense reason*, violates the Second Amendment.[2]

---

[2] In their Reply (at 8), plaintiffs assert that the right at issue in the instant litigation is "the existence of a core Second Amendment right to carry guns for self-defense in the District of

The *Palmer* litigation itself confirms this difference. After *Palmer* struck down the District's ban on carrying, the District enacted the "good reason" standard. The *Palmer* plaintiffs then sought to hold the District in contempt, asserting that its new law violated the injunction barring enforcement of its old law. But the court rejected this claim, finding the new law beyond the scope of *Palmer*: "the Court does not have the authority to determine whether the District of Columbia's newly enacted licensing mechanism meets constitutional muster. [That mechanism] was not part of this action and could not have been because it was not in existence until after the Court rendered its July 24, 2014 Order." Memorandum-Decision and Order at 5, *Palmer v. District of Columbia*, No. 09-1482 (FJS) (May 18, 2015) [Doc. No. 92]; *see also id.* at 8 ("This newly adopted licensing mechanism … constitutes an entirely different statutory scheme than the one that is the subject of this lawsuit."). The Seventh Circuit likewise distinguished the two issues in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), where it struck down Illinois's categorical ban on public carrying, but noted that New York State—whose licensing standard is almost identical to the District's—had "t[aken] a more moderate approach" to regulating public carrying. *Id.* at 941. While the court expressed "reservations" about the analysis applied by Second Circuit in upholding that law, it saw the "good reason" standard as fundamentally different from an absolute ban on public carrying. *Id.*

To be sure, the widespread historical prohibition on public carrying in cities, which was central to the District's argument in *Palmer*, is likewise central here. But that history answers

---

Columbia," P.Reply at 8, but this is too broad. *See North v. Walsh*, 881 F.2d 1088, 1095 (D.C. Cir. 1989) (rejecting assertion of issue preclusion based on "overbroad" characterization of issue; "it swells the concept 'issue' so that the term becomes virtually synonymous with 'demand for relief.' The *objective* of both [plaintiffs'] actions was indeed the same[.] But the *issues* raised were discrete.") (emphasis in original); *cf. Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) (explaining that, in qualified-immunity analysis, "right" must be established in a "particularized" sense, not as a "broad general proposition").

different questions here, such as whether, in light of the longstanding nature of the "good reason" standard, plaintiffs can demonstrate that it imposes a more-than-de-minimis burden on their Second Amendment right to "bear arms," as required under *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011), based on the scope of that right when it was codified. *See* D.Opp. at 12. Or whether, if the Second Amendment codified any right to carry, it was outside the core, warranting review under something less rigorous than strict scrutiny. *See* D.Opp. at 17–20. This is why, "[i]n issue preclusion, it is the prior *judgment* that matters, not the court's opinion explicating the judgment." *Yamaha*, 961 F.2d at 254 (emphasis in original).

In *Palmer*, Judge Scullin explicitly *declined* to grant an injunction allowing everyone with a registered firearm to carry it in public. *See Palmer*, 59 F. Supp. 3d at 175 (noting plaintiffs' alternative relief requested). The judgment awarded in *Palmer* was an injunction prohibiting the District from enforcing its categorical ban on public carrying. The District no longer has such a ban. What plaintiffs now seek is different—an injunction striking down the central feature of the new public-carry regime, the "good reason" standard. While both cases involve the scope of the Second Amendment's guarantee of the right to "bear arms," the similarity ends there. The propriety of the "good reason" standard was neither litigated nor resolved in *Palmer*. Consequently, *res judicata* does not bar the District from litigating that issue here.

## II. Alternatively, Collateral Estoppel Does Not Apply To This Unmixed Question Of Law.

Even if the issues were identical, collateral estoppel should not apply here, because the doctrine "does not apply with the same force to unmixed questions of law as it does to mixed questions of law and fact or to pure questions of fact." *PCMA*, 522 F.3d at 446 (citing *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170–71 (1984), and *Montana v. United States*, 440

U.S. 147, 162–63 (1979)).[3] "Although the Supreme Court has acknowledged that the purpose and application of this exception are not entirely clear, the exception continues to have force." *Id*.

In particular, with regard to *nonmutual* collateral estoppel, which is what is relevant here, "an issue is *not* precluded if it is one of law and treating it as conclusively determined would inappropriately foreclose opportunities for obtaining reconsideration of the legal rule upon which it was based." *Id.* (internal quotation marks omitted). Those criteria are met here. As in *PCMA*, "foreclos[ure] of [the court's] reconsideration of the legal issues would not aid judicial economy," and would "freeze the development of the law in an area of substantial public interest." *Id.* at 447.[4]

### III. Nonmutual Collateral Estoppel Should Not Apply to the District, a Government Litigant, Under The Supreme Court's Decision In *Mendoza*.

Nor should collateral estoppel apply here under the rule and reasoning of the Supreme Court's decision in *United States v. Mendoza*, 464 U.S. 154 (1984). In *Mendoza*, the Supreme Court unanimously announced a broad rule prohibiting the use of nonmutual offensive collateral estoppel against the federal government. 464 U.S. at 162–63. The Court held that the government could relitigate the issue of the constitutionality of a statute that denied a Filipino national citizenship on due process grounds, despite the fact that it had not appealed an adverse decision

---

[3] Here, the collateral estoppel question is whether the Second Amendment applies outside the home, which is a legal question unrelated to the factual/legislative bases for a "good reason" standard.

[4] The only plaintiff here who was a plaintiff in *Palmer* is the SAF; however, as explained, it has not established standing to seek a preliminary injunction. *See* D.Opp. at 37 n.16. In any event, even *mutual* collateral estoppel should not apply "if the issue is one of law and the facts of the cases are substantially unrelated." *PCMA*, 522 F.3d at 446. The issue is one of law, and the facts here are substantially unrelated to those in *Palmer*. There, plaintiffs challenged a categorical ban on public carrying. They sought, and obtained, a judgment finding that ban unconstitutional. Here, plaintiffs challenge a substantive standard to obtain a public-carry license.

in another case involving another Filipino national raising the identical issue. That is because "nonmutual offensive collateral estoppel simply does not apply against the Government in such a way as to preclude relitigation of issues such as those involved in this case." *Id*. at 162.

The Court observed that it had "long recognized that the Government is not in a position identical to that of a private litigant." *Id*. at 159 (internal quotation marks omitted). That was not only "because of the geographic breadth of government litigation," but also, "*most importantly*, because of the nature of the issues the government litigates." *Id.* (emphasis added). These factors distinguished the government from a private litigant, as to whom the Court had previously found that "no significant harm flows from enforcing a rule that affords a litigant only one full and fair opportunity to litigate an issue." *Id*. at 159.

The Court elaborated at length about the compelling reasons to treat the government differently for purposes of nonmutual offensive collateral estoppel. "Government litigation frequently involves legal questions of substantial public importance" and "the government is more likely than any private party to be involved in lawsuits against different parties which nonetheless involve the same legal issues." *Id*. at 160. Thus, one of the dangers of applying nonmutual offensive collateral estoppel against the government is that it would thwart the development of important questions of law by freezing the first final decision rendered on a particular issue. *Id*. 159–60. The Court recognized that governments properly consider a variety of factors before taking an appeal, including limited resources and the court's crowded docket—prudential concerns that would, if nonmutual offensive collateral estoppel were applicable, be abandoned in favor of appealing "every adverse decision in order to avoid foreclosing further review." *Id*. at 161. The Court also was concerned that permitting nonmutual offensive collateral estoppel against the government was inconsistent with the nature of representative government

because it permits the decision of one set of elected officials to forgo an appeal to bind officials elected in the future even though they may be elected by very different mandates. *Id*. at 161–62.

Furthermore, the Court made clear that these concerns would not be satisfied merely by allowing the government to argue against application of nonmutual offensive collateral estoppel on a case-by-case basis. To the contrary, a broad prohibition on the doctrine's application to the government was justified by its need for certainty in "determining when relitigation of a legal issue is to be permitted." *Id*. at 162. Otherwise the government will be "at sea because it cannot possibly anticipate, in determining whether or not to appeal an adverse decision, whether a court will bar relitigation of the issue in a later case." *Id*.

Because the concerns that animated the *Mendoza* Court are not unique to the federal government, a majority of the jurisdictions to have considered the question have applied the *Mendoza* rule to state governments. For example, in *Hercules Carriers, Inc. v. Florida*, 768 F.2d 1558 (11th Cir. 1985), the Eleventh Circuit held that the bar on applying nonmutual collateral estoppel against the federal government applied equally to state governments:

> We hold that the rationale outlined by the Supreme Court in *Mendoza* for not applying nonmutual collateral estoppel against the government is equally applicable to state governments. Indeed, we take notice that the Supreme Court in reaching its holding did not differentiate between federal governmental interests and state governmental interests, nor was there anything to suggest that the concerns expressed by the Supreme Court were peculiar to the federal government.

*Id*. at 1578. Similarly, the Ninth Circuit found that "[t]he same considerations that counsel against applying nonmutual offensive collateral estoppel against the United States government on questions of law appl[ied] to precluding the Idaho Tax Commission from re-litigating the issue" raised there. *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 690 (9th Cir. 2004); *see also, e.g.*, *Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 714 (9th Cir. 2005) ("*Mendoza*'s rationale applies with equal force to [an] attempt to assert

nonmutual defensive collateral estoppel against [a state agency]."); *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 801 (6th Cir. 1998) (same); *Petchem, Inc. v. Canaveral Port Auth.*, 2005 WL 1862412, at *3 (M.D. Fla. Aug. 2, 2005) ("[N]onmutual estoppel does not apply to the Port Authority ….").

Courts in this jurisdiction have not yet ruled on the application of *Mendoza* to the District government. *Cf. Milton S. Kronheim & Co. v. District of Columbia*, 91 F.3d 193, 205 (D.C. Cir. 1996) ("Th[e *Mendoza*] rule may very well apply to the states.") (Silberman, J., concurring). *But cf. Jenkins v. District of Columbia*, 4 F. Supp. 3d 137, 145 (D.D.C. 2013) (police officer's guilty plea to assaulting plaintiff collaterally estopped officer from asserting that her conduct was reasonable).[5]

This Court should follow the majority rule and prohibit the invocation of nonmutual offensive collateral estoppel against state and local governments, thereby treating the District government as it would treat the federal government, as a matter of comity and fairness. *See Freeman v. Dep't of the Interior*, 37 F. Supp. 3d 313, 346 (D.D.C. 2014) ("The Supreme Court has made clear that a private party may not invoke nonmutual collateral estoppel against the government with respect to an issue on which a different private party prevailed in prior litigation with the government.") (citing *Mendoza*, 464 U.S. at 160); *Disability Rights Council of Greater Wash. v. WMATA*, 239 F.R.D. 9, 24 (D.D.C. 2006) (suggesting collateral estoppel would not be available against WMATA).

Like the United States Attorney General, the Attorney General for the District of Columbia has discretion to balance a variety of factors when deciding whether to appeal a

---

[5] The issue is currently before the D.C. Court of Appeals in *D.C. Office of Tax & Revenue v. Exxon Mobil Oil Corp*, Nos. 14-AA-1401, 14-AA-1403, 14-AA-1404 (argued Feb. 9, 2016), but that does not prevent this Court from considering the issue here.

decision, including the predicted importance of the issue, limits on available litigation resources, and the Court's crowded dockets. If nonmutual collateral estoppel is held applicable against the District, the Attorney General will be faced "with a Hobson's choice: either abandon a discretionary posture toward appeals and appeal every adverse decision or suffer preclusive consequences in innumerable subsequent cases." *Petchem, Inc.*, *supra*, at *3. Imposing such a choice will necessarily require the District to appeal as far as possible the first adverse decision on an issue, which would stretch unreasonably its limited resources, burden the courts, and hamper the quality of decision-making by requiring the resolution of difficult issues on their first exploration.[6] Accordingly, it would thwart the development of important questions of law by freezing the first final adverse decision rendered on a particular issue. *Mendoza*, 464 U.S. at 160.

The regulation of firearms is an issue of paramount importance, and there is no binding precedent on how the carrying of firearms in public may be regulated. Application of nonmutual offensive collateral estoppel to the District here, in the manner plaintiffs advocate, would inappropriately freeze matters by requiring the District to become a firearm "shall issue" jurisdiction, and prevent further development of this still-evolving area of law.

## CONCLUSION

There is no basis for applying collateral estoppel in this case.

---

[6] The *Palmer* litigation provides a classic example of why nonmutual offensive collateral estoppel should not be applied against the District. There, while an appeal of the judgment was pending before the D.C. Circuit, the Council for the District of Columbia exercised its legislative judgment to enact the current public-carrying laws under challenge here, resulting in the Attorney General's dismissing the appeal because the prior legislation was no longer in effect. Allowing nonmutual collateral estoppel against the District would mean that the Attorney General would be forced to continue litigating the old law despite the Council's decision to enact a new one, purely to avoid the potential future application of collateral estoppel against it.

DATE: March 2, 2016.                    Respectfully submitted,

                                        KARL A. RACINE
                                        Attorney General for the District of Columbia

                                        ELIZABETH SARAH GERE
                                        Deputy Attorney General
                                        Public Interest Division

                                        /s/ Toni Michelle Jackson
                                        TONI MICHELLE JACKSON (#453765)
                                        Chief, Equity Section

                                        /s/ Andrew J. Saindon
                                        ANDREW J.SAINDON (#456987)
                                        Senior Assistant Attorney General
                                        441 Fourth Street, N.W., Sixth Floor South
                                        Washington, D.C. 20001
                                        Telephone: (202) 724-6643
                                        Facsimile: (202) 730-1470
                                        Email: andy.saindon@dc.gov

                                        /s/ Chad A. Naso
                                        CHAD A. NASO (#1001694)
                                        Assistant Attorney General
                                        441 Fourth Street, N.W., Sixth Floor South
                                        Washington, D.C. 20001
                                        Telephone: (202) 724-7854
                                        Facsimile: (202) 741-8951
                                        chad.naso@dc.gov

                                        *Counsel for the District of Columbia*